IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. x:26-cv-xxx

| | | |
|---|---|---|
| STEPHANIE R. HOBSON, | ) | |
| | ) | |
| Hobson, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTH CAROLINA | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| BENJAMIN O. ZELLINGER, in his | ) | **COMPLAINT** |
| individual capacity; LESLIE | ) | |
| COOLEY DISMUKES, in her | ) | **JURY TRIAL DEMANDED** |
| individual capacity; DANIELLE | ) | |
| MARQUIS ELDER, in her | ) | |
| individual capacity; ELIAS | ) | |
| ADMASSU, in his individual | ) | |
| capacity, KRISTIN BIERLINE, in | ) | |
| her individual capacity, FRANCES | ) | |
| BECKMAN, in her individual | ) | |
| capacity, MAGALLY RODRIGUEZ, | ) | |
| in her individual capacity | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## I.  **INTRODUCTION**

1.    This is a civil action by Stephanie Hobson (Plaintiff or Hobson) for retaliation

in violation of the First Amendment to the United States Constitution and for

1

retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.

2. Hobson was subjected to escalating retaliation after raising concerns about the failure of the attorneys in the Office of the Attorney General to prosecute claims involving minority victims, a matter of public concern. After she raised these matters of public concern and was subjected to retaliation, she thereafter requested and took protected FMLA leave, for which she was also retaliated.

3. As a result of Defendants' retaliatory conduct, Hobson was forced to resign her employment effective February 10, 2023. Hobson's termination of employment constituted a constructive discharge.

4. Hobson engaged in protected activity under the First Amendment and the FMLA and seeks a jury trial, declaratory and injunctive relief, costs, and any other relief the Court deems proper.

II. **JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 over Hobson's First Amendment claims pursuant to 42 U.S.C. § 1983, as applicable, and over Hobson's FMLA claims pursuant to 29 U.S.C. § 2617(a)(2).

6. Venue is proper in the Eastern District of North Carolina under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in this District.

III. **PARTIES**

7. Hobson is a resident of North Carolina and was employed by the North Carolina Department of Justice (NCDOJ) during the relevant period.

2

8. Defendant NCDOJ is a government entity and employer within the meaning of the FMLA.

9. Defendants Leslie Cooley Dismukes (Dismukes), Benjamin Zellinger (Zellinger), and Danielle Marquis Elder (Elder) were supervisors and/or decision-makers acting under color of law and within the scope of their employment at all relevant times.

10. Defendants Kristen Bierline (Bierline), Frances Beckman (Beckman), and Magally Rodriguez (Rodriguez) were Human Resources employees acting under color of law and within the scope of their employment at all relevant times.

11. Defendants Elias Admassu (Admassu) was legal counsel for the Attorney General's Office and acting under color of law and within the scope of his employment at all relevant times.

## IV. FACTUAL ALLEGATIONS

### Background

12. In July 2018, Hobson laterally transferred from Mecklenburg County (where she had been a Victim/Witness Legal Assistant (VWLA) for five years) to a position with the Attorney General's Special Prosecutions Unit (SP).

13. Hobson was informed that her position with NCDOJ was a vacated Administrative Secretary II position. Dismukes explained to Hobson that she would be fulfilling all the duties of a VWLA, as the unit had never had one and it was now going to become mandatory to ensure compliance with Marsy's Law after it passed.

14. Marsy's Law passed on November 6, 2018, and became part of the NC

3

Constitution, Art. I, Section 37.

15. Marsy's Law was enacted to guarantee violent crime victims and victim-survivors had certain rights in the judicial system. The law provides victims' with rights regarding notice of court proceedings, the right to be in attendance and heard at certain stages in the court process, and rights to receive timely information regarding the defendant(s) and their sentence, as well as any changes to their Marsy custody status.

16. Hobson's job required her to be familiar with judicial system procedures governing complex administrative, civil, and criminal matters at the State level, specifically with regard to the rights of victims and victim-survivors.

17. Dismukes had recently been appointed the Criminal Bureau Chief by Josh Stein, who was elected Attorney General in 2016 and took office in 2017.

18. After she was hired in 2017, she was vocal about the underutilization of the Special Prosecutions (SP) unit. Dismukes intended to encourage District Attorneys to send SP their "conflict" cases, grow the SP inventory and bring on more staff.

19. Dismukes also assigned herself incoming cases.

20. Hobson functioned as her VWLA. Dismukes's office was across the hall from the small annex where SP attorneys worked.

21. There was no section head position until January of 2020; thus, the small team reported directly to Dismukes.

22. After beginning in her position, Hobson begun to travel almost continuously in the preparation, coordination, and attendance of criminal trials in multiple counties

4

across the state. In addition to her work on pending trials, Hobson also traveled to bond hearings, administrative hearings, interviews, victim meetings, and any other court-related matters that involved the prosecution of charges identified under the Victim's Crime Act.

23.     When Hobson was hired in 2018, there were only four SP section attorneys, Adren Harris (Harris), Zellinger, Jason Caccamo (Caccamo) and Ryan Haigh (Haigh). Their section also included paralegal Angie Byrd (Byrd), the Governor's Extradition Secretary.    They all reported directly to Dismukes, who also had her own Administrative Assistant, Karen Joyner.

24.     Harris was the only African American / Black attorney in 2018.  At that time, and until late 2019/early 2020, there were no other attorneys or staff of color in the SP section.

25.     Caccamo was rarely in the office as he handled matters at the State Crime Lab. Haigh primarily prosecuted cases brought forth by the Department of Revenue. Haigh rarely needed Hobson for the types of cases he handled and when he did seek assistance, he sought out his longtime coworker, Byrd. Harris, known to be aloof, preferred autonomy, and expressed to Hobson his amusement about her  enthusiasm for contacting victims and understanding the dynamics of their cases. Hobson worked primarily for Zellinger.

26.     Zellinger had been hired by Dismukes in early 2017 after  she came to work for the NCDOJ.

**2018-2019**

5

27. Hobson and Zellinger initially got along well and she interacted with him more frequently than any of the other SP attorneys for the first year of her employment. Her desk was immediately in front of his office and Zellinger could see and speak to her from where he was seated. Both had just recently worked in District Attorney's offices, him in Wake County and her in Mecklenburg County, and both were accustomed to working with a high volume of cases and in offices staffed by dozens of employees. Both were learning to navigate the handling of cases in state court but without the same software programs and procedures utilized by local District Attorney's (DA) offices.

28. It quickly became apparent to Hobson that the SP section was lacking in many resources readily available to a local DA office. Those offices not only had better software programs, but they also had the benefit of an on-site investigator and they worked in conjunction with their local law enforcement agencies to build cases.

29. The NCDOJ SP section, however, accepted cases that were investigated and which involved defendants charged by local DA offices across the state. A great majority of cases referred to SP were conflict matters that had risen after a defense attorney became a county's DA and their office could no longer prosecute that defendant.

30. Many of these cases had several years of age on them and Hobson became tasked with locating information for victims, victim survivors, and witnesses.

31. As the inventory of the SP section grew, trials were scheduled with increasing frequency.

6

32. Hobson and Dismukes consulted frequently regarding the need for SP to have access to the programs run by the Administrative Office of the Courts (AOC) which were available to local district attorney offices.

33. Dismukes told Hobson she would get whatever Hobson told her the SP section needed.

34. Hobson felt uncomfortable burdening local law enforcement to obtain information from the programs to which they had access, so she told Dismukes that the section needed access to the law enforcement information sharing program she knew she could use to identify witnesses and their most current contact information.

35. Hobson learned about the FBI's N-DEX program from an agent with whom she collaborated on a serial rapist case. This case had potential victims dating back decades.

36. Dismukes immediately secured permission for Hobson to become the only authorized user in the Attorney General's office, despite Hobson not being law enforcement or under the supervision of a sworn law enforcement officer, because she trusted Hobson and knew how important the resource was to the efficient prosecution of these cases.

37. Dismukes also obtained ACIS, the AOC's case management system, and it was installed on the SP staff's computers, although with limited user functions.

38. The team also acquired the use of a program called CJLeads. CJLeads was a program that enabled users to add themselves to the watchlist of their defendants. The program would also generate a notification if a defendant was served or had been

7

issued certain criminal and civil processes.

**Selection of Jeff Welty for SP Section Head Position in December 2019**

39. In the fall of 2019 Dismukes hired Brittany Pinkham (Pinkham) to join the SP section. During this time, Hobson also began to interact more with Adren Harris (Harris) and became friendly with Pinkham. The three handled a time-intensive trial in a Surry County child sexual assault case that was the first trial Hobson worked on that was not assigned to Zellinger.

40. Working for Zellinger was unlike working for Harris and Pinkham in that Zellinger was unorganized and demanding. Furthermore, he would contact Hobson at all hours of the day with questions, wanting immediate attention and responses. Pinkham and Harris commented to Hobson about Zellinger's constant requests and his demand that Hobson respond to them even while she was attending court and working on trials assigned to other attorneys.

41. Pinkham encouraged Hobson to go to Human Resources (HR) and speak to them about Zellinger's behavior. Hobson did not believe that HR would take any action and she believed that Zellinger was vindictive based on her observations and his conversations with her, so she declined Pinkham's offer to help and she declined to engage with HR. Hobson was aware that Dismukes and Zellinger were good friends and that Dismukes was aware of Zellinger's actions.

42. It was known that Zellinger, Harris, and Haigh all applied for the Section Head position of Special Prosecutions which was posted in the latter half of 2019. Harris was the only Black internal applicant to Hobson's knowledge.

8

43. Zellinger asked Hobson to "ask around" and find out what people thought of Harris's chances. Zellinger did not consider Haigh a contender and stated he knew Haigh had only made the cut so Dismukes did not appear to be choosing between Harris and Zellinger. Hobson told Zellinger that she did not know anyone besides those in their section and was the last person anyone should ask for intel on the hiring decision.

44. Neither Zellinger, Harris, nor Haigh were selected for the SP section head position. Instead, Jeff Welty, who was a professor at the UNC School of Government and thus from outside the Attorney General's office, was hired as SP section heard just after the start of 2020. The decision was shared with the team in December 2019.

45. Zellinger was incensed. He called Hobson into his office, asked her to shut the door, and began to vent. Zellinger shared he was actively looking for another job and already had interviews lined up. He told Hobson that Dismukes had betrayed him and their friendship was over.

46. When Hobson did not react to Zellinger's rants, he asked her if she thought he was wrong to be so upset. Hobson stated honestly she was relieved Zellinger was not going to be her supervisor because he was already mean enough to her as it was.

47. Zellinger thought she was joking and Hobson stated, "No, I think you'd make a terrible boss." He asked if she thought someone like Harris would have better and Hobson said, "Harris? I was rooting for Haigh."

48. Zellinger told her to leave his office and Hobson said, "Thank God." As she was leaving Zellinger yelled, "And you can shut my door too."

49. In the spring of 2020, the inventory of cases assigned to the SP section had exploded since Dismukes started as Criminal Bureau Chief, and it continued to grow disproportionately to the number of attorneys in the section available to handle the caseload.

50. Due to internal office politics, the SP section also merged with the Law Enforcement Liaison (LEL) Section and began moving to a new suite of offices on the same floor at the end of 2019. LEL had one support staff member, Paralegal II Angela Towns, and typically one or two attorneys that handled the LEL section inventory.

51. In April of 2020 Virginia Murray was hired as a Paralegal I, a higher pay grade position than Hobson's position, but she and Hobson performed virtually the same job.

**2021**

52. At a team meeting in Spring of 2021 Welty announced he was going to delegate some of Hobson's trial caseload to Murray and Byrd. Byrd agreed to assist Harris on State v. Lamberth, scheduled to begin May 3, 2021, in Durham County. Hobson was assigned to assist Pinkham, on *State v. Minton*, a double homicide trial in Catawba County, scheduled to begin May 10, 2021.

53. Minton had originally been assigned to Zellinger in 2019. Zellinger told Hobson that he felt Minton was not worth looking at based on the facts he had been given from Dismukes. The evidence supporting prosecution was weak when the SP section took the case.

10

54. The case had been assigned to the SP section, along with many others from Catawba County, when a new District Attorney was elected for reasons described as a conflict with the new DA.

55. Zellinger told Hobson he did not want to take the heat for dismissing the case that involved a white defendant who was accused of having murdered two African American victims.

56. Zellinger had previously told Hobson he was going to sit on the case, not bring it to trial and wait until a new attorney was hired and then ask Dismukes to reassign it to that attorney. Zellinger kept his word and that is how *State v. Minton* was reassigned to Pinkham.

57. After Pinkham and Hobson met with witnesses in Catawba County, they determined that the case did have merit and interviewed over 100 potential witnesses. The case was extremely complicated.

58. Harris, Pinkham, and Dismukes had previously been given evidence.com access from the Catawba County DA's Office prior to the *Minton* trial. The DA's office had available users accounts left under their license and set Harris, Pinkham, and Dismukes with one since each was handling cases through Catawba.

59. *evidence.com* is a cloud-based digital evidence management platform used primarily by law enforcement and public safety agencies to store, organize, manage, and share digital evidence such as video footage, audio recordings, photos, and other electronic files. Law enforcement agencies upload digital evidence (e.g., body-worn camera footage, dashcam video, photos) to a secure cloud platform rather than local

11

hard drives or physical storage. The system helps agencies catalogue evidence with metadata, manage cases, and control who can access what and facilitates sharing and collaboration by investigators, prosecutors, and authorized users. *evidence.com* also ensure secure access to and sharing of evidence for investigations and court proceedings, and provides for the tracking of evidence handling, including audit trails (for chain-of-custody)

60.     During early 2021, prior to the Minton trial, Hobson had facilitated the DOJ obtaining their own *evidence.com* account after learning the State Bureau of Investigation (SBI) was migrating all of their cases out of the system they then used, and would be phasing out the "portal," the server through which the SP section had always received reports from local law enforcement. Hobson wanted the SP section to have *evidence.com* in place before the SBI portal was eradicated.

61.     Hobson and Welty were the only employees to participate in an informal training session given by the SBI on how Evidence.com worked and how to use it, specifically with regard to the functions prosecutors would be utilizing most frequently. By default, Hobson and Welty became the administrators for *evidence.com*.

62.     Hobson had created individual user accounts for each member of SP and sent out account invites, but not everyone had activated their individual account. Not every attorney had a matter assigned to them that originated from a law enforcement agency using evidence.com.

63.     Dismukes and Harris chose not to activate their NCDOJ user accounts and

12

continued using their accounts through the Catawba DA. Pinkham activated hers and maintained both her account from the Catawba DA and her account from the NCDOJ in the few short months prior to her leaving the SP section in July of 2021.

64. After three weeks of evidence the jury in *State v. Minton* began deliberating. Deliberations lasted over a week. Until the day of the verdict no one from their section had checked on Pinkham and Hobson or expressed interest in the case other than Harris. In fact, Zellinger had openly stated that he thought the SP section had wasted taxpayer time and money by not taking a dismissal in the case.

65. As the jury was deliberating on the last day Dismukes contacted Hobson and asked for an update. She stated the NAACP had been in contact with Josh (Stein) and there were threats of protesting. Dismukes stated, "Tell Brittany (Pinkham) they need to come back guilty."

66. On June 3, 2021, the jury convicted the White defendant Minton of murdering two African-American victims. Pinkham and Hobson received letters of recognition from the police department. Pinkham resigned less than two months later and accepted a position with the North Carolina Judicial Standards Commission.

67. During Dismukes' tenure as head of the SP section, a large number of homicide cases from Catawba County in 2018 were assigned to the section after a new district attorney took office and had to conflict certain defendants and their pending cases out. Harris had been assigned the majority of the cases from Catawba County.

68. Before leaving for trials in Durham and Catawba County in May of 2021, Hobson received a law enforcement notification from CJLEADS that one of Harris's

13

Catawba County homicide defendants, Jamar Robinson, had been charged and arrested on new felonies. Hobson informed Harris and he filed a motion to revoke Robinson's bond. Harris had calendared the hearing to be heard after his Durham County trial had finished. The hearing took place in the Catawba County courtroom of Pinkham's trial while the Minton jury was deliberating. Hobson joined Harris for the hearing, which ended in Robinson's bond being revoked. While discussing the case Harris told Hobson that Murray had handled discovery production in Robinson's case.

69.     In September of 2021, Harris and Hobson began defendant Jamar Robinson's homicide trial in Catawba County. The evening after the first day of jury selection, Harris became very ill and contacted Investigator Kim Craig to take him to the hospital.

70.     Hobson addressed the court in his absence and asked for time to assess Harris's condition, consult with the head of SP, and see if Harris would be able to return. It was ultimately determined he would need to return home and undergo surgery.

71.     Court was temporarily recessed so Welty could come to Catawba County the following day for entry of the mistrial. Robinson was re-calendared for the following Monday, with Welty and Zellinger now scheduled to prosecute.

72.     Murray, not Hobson, had been involved in the production of discovery for Robinson. Harris had received discovery on discs from Investigator Kim Craig (Investigator Craig) in a hand-to-hand transfer at the office in Raleigh earlier in 2021, while Hobson and Pinkham had been in Catawba County meeting witnesses for the trial beginning there on May 9, 2021. Harris asked Murray to handle the discovery

14

production. The discovery on the discs Murray had copied were shared to defense counsel through a program called Citrix.

73. Hobson had reviewed the Robinson case flat file sent from the DA's office. Hobson issued subpoenas for Robinson witnesses using information she located from both the case file and the NDEX database, but she did not have in-depth knowledge of the contents pertaining to the discovery production or its history. In July of 2021 she asked Investigator Craig if she could also share whatever Harris had in his Catawba County Evidence.com user account to Hobson in case she needed it, as she did not have his log-in credentials. Investigator Craig did and Hobson accepted the file share in the DOJ Evidence.com account.

74. The following week, on the second day of jury selection, Hobson was in a staff waiting area behind the courtroom watching bodycam videos on the DOJ Evidence.com account, trying to identify a courtroom observer that she believed was avoiding service of a subpoena as a witness to the crime.

75. During afternoon recess, Welty entered the room and stood behind Hobson. Hobson stated to Welty that this was her first time watching the bodycam videos and she was finding them to be extremely upsetting.

76. Welty asked, "Do I have these?" Hobson was caught by surprise and stated she would certainly hope so. Welty then asked where he would find them in the discovery. Hobson explained that she was watching them through the Evidence.com website but offered to find their location in the discovery for Welty.

77. Court was then called back into session and Hobson began trying to locate the

15

bodycams in the case file on the criminal division's shared drive where the attorneys housed their files, the J-Drive, and in the discovery shared through Citrix. They were not there.

78.     Hobson then called Harris, who was very medicated and had just had surgery, and tried to describe the situation at hand. Hobson emailed Harris the bodycams as they were on the phone and asked him if could open the files immediately. Harris did. Moments later Harris stated quietly, "No. No. I've never seen these." When Hobson asked what she should do, Harris said, "Just tell them the truth. Just be honest. I don't know what else to say." Hobson wrote a note and took it to Welty, who addressed it before the court. The judge recessed court until Thursday to give the defense counsel time to evaluate the bodycams.

79.     Hobson spoke with Harris again and updated him. Harris obtained an audit trail on his Citrix account as well as one from the administrator on his Catawba DA Evidence.com account. Hobson, as an administrator, performed an audit on the NCDOJ's Evidence.com account. Neither showed the bodycams ever being received other than when Hobson received the files from Investigator Craig two months before in July. On Thursday, State v. Robinson ended in mistrial a second time due to the late disclosure of the bodycams.

80.     After court adjourned on Thursday Hobson, Welty, Zellinger, and Investigator Craig spoke in the staff room. Hobson and Investigator Craig were both upset, not just over the allegations that Harris had not turned over exculpatory discovery but over the second mistrial. Hobson, Harris, and Investigator Craig had devoted a lot of

16

time earning the trust of the witnesses by going to their homes and meeting them where they felt comfortable, even eventually being given direct access by the homeowner to the scene itself, the basement of her residential home.

81.    Zellinger told Hobson there would be a discovery violation hearing and she would have to testify "against" Harris. Hobson responded that she was willing to testify and that she believed the failure to turn over the bodycam footage was because it had never been received and that no one was at fault. Investigator Craig stated she wanted to testify as well.

82.    Zellinger then stated to Hobson that the audit trail on the DOJ account, which she had shown to booth he and Welty, showed Hobson had accessed the videos back in nearly two months before trial and suggested she might have been responsible. Hobson responded that every file shared to the account showed she had access it, as she the one who had to click on files to see if they belonged to a case in their inventory or were new. Zellinger laughed and commented that made her look even more responsible, since Hobson just acknowledged opening them. Hobson was offended and stated the whole reason she had them was because she had asked Investigator Craig if she minded sharing everything she had shared to Harris's Catawba DA Evidence.com account to Hobson. Hobson stated Zellinger was perfectly aware of this as it had been discussed at length earlier that week and not to make comments like that once they got back to Raleigh as it could be taken seriously by others. Welty stated he thought everything would turn out fine.

83.    After leaving the courthouse Craig called Hobson. Craig was concerned she

17

was somehow responsible. Craig was adamant that she had shared the bodycams on evidence.com earlier that year to either Harris or Murray, or possibly both, since Murray was handling discovery on Robinson.

84. She stated it was around the same time she copied the rest of the discovery onto discs and drove three hours to Raleigh to personally give them to Harris. However, an audit of Murray's user account on evidence.com showed later she too had never received the bodycam footage files.

85. Welty reached out to Hobson the following day and asked her to write an explanation of what she believed happened. Hobson asked what her statement would be for and Welty said it would only be used for him to further understand how the bodycam videos had not been turned over in discovery.

86. It was no secret among Hobson's coworkers that Dismukes and Zellinger were not fans of Harris, and vice versa, and Hobson suspected that there might be an attempt to throw Harris "under the bus."

87. Hobson stated she was uncomfortable documenting anything that might negatively affect Harris but was willing to testify at any hearing. Welty stated Harris had agreed to write a statement and it would be in her best interest to do so as well, but Hobson still declined. Welty requested Hobson send him the audit trails she had procured and she complied.

88. The following week Hobson contacted Welty to see what time she needed to be present at the discovery hearing. Welty stated she did not need to come.

89. The hearing was held on September 28, 2021, and Craig attended any way,

18

despite Welty assuring her it was unnecessary, as Craig explained to Hobson. Craig contacted Hobson after and told her it went well and no misconduct was found on behalf of the State. Hobson never asked or learned what Welty's explanation was to the court.

90.     After returning from Catawba County Welty sent the SP team an email announcing that *State v. Robinson* had been calendared for trial on December 6, 2021. Harris already had another homicide trial, *State v. Brittain*, scheduled since the summer to begin on the same date. Welty stated that Zellinger would handle *Robinson*, with Murray assigned now to assist, while Welty joined Harris, with Hobson in their courtroom.

91.     Hobson had the difficult job of trying to schedule interviews with witnesses for the first trial setting of *State v. Brittain* while communicating with both Welty and Harris. Hobson found herself deferring to Welty, who was her supervisor, and communication between she and Harris, which had always been easy, became strained.

92.     Hobson was also being pulled back into Robinson by repeated requests from Zellinger and Investigator Craig, who was not finding Murray to be as communicative or nearly as invested as Hobson had been. Zellinger asked Hobson to issue new subpoenas after Investigator Craig notified him Murray had not issued them. He then began to contact her on a regular basis regarding *Robinson* and asked her to schedule meetings. Hobson voiced her concerns to Zellinger but he ignored them as he had for years.

19

93. Zellinger had also vocalized clear dislike for the *Robinson* case. After Robinson had mistried the first time, Zellinger made it clear he would not be going to anyone's home, visiting the crime scene, or speaking with any witness that was in jail.

94. On November 23, 2021, Welty sent out an email stating Zellinger's father was having health issues so he was being excused from prosecuting Robinson going forward. Welty stated, "I'll jump back on that one, with Virginia (Murray)."

95. All the civilian witnesses in Robinson were African-American. Investigator Craig and Hobson had desperately hoped Zellinger would sustain the fragile rapport that Hobson, Investigator Craig, and Harris had developed with witnesses who were ready and cooperative when Harris was prosecuting. After two mistrials, two months, and two more changes in the prosecutor, Hobson and Investigator Craig knew additional effort needed to be extended to the witnesses to maintain confidence in their prosecution of the case.

96. Near the end of November 2021, Hobson contacted Criminal Bureau Chief Dismukes and asked to speak with her. Hobson stated she intended to leave the Attorney General's Office the following year due to the high stress and non-stop travel. Hobson wanted to give Dismukes advance notice as Dismukes was prosecuting five co-defendants in separate trials over the course of 2022 and 2023, and the family of the victim lived in California and required a Hmong interpreter. Hobson felt Dismukes should ensure she had other support staff availability as Dismukes had confirmed Hobson's ability to assist, and these cases were the most complex matter being handled by their section.

20

97. Dismukes stated they were making changes in the section and wished Hobson had come to her sooner. Dismukes asked what else was going on and inquired about Harris's trial. Hobson stated Harris seemed angry with her for catering to Welty's schedule and helping Zellinger earlier with Robinson. Hobson was unsure if Harris seemed short with her for that, or if maybe he thought Hobson had not done enough to show Welty that the discovery issue had not been Harri's fault.

98. Dismukes stated, "No one believes that." Hobson stated she disagreed. Zellinger had made comments around Hobson and in front of others that Hobson got Harris in trouble, then claimed to be joking when Hobson took offense.

99. Hobson felt Zellinger's remarks were facilitating speculation that she was biased against Harris and responsible for what happened. Hobson asked if the issue could be openly addressed at a team meeting. Dismukes dismissed Hobson's concern, claiming everyone knew Hobson had "saved the day," despite Hobson knowing that was not the consensus among her coworkers. Hobson stated that as the administrator of the evidence.com account she now felt vulnerable, especially as no one was trained in using it. She felt it could easily happen again.

100. Dismukes then informed Hobson that Harris had blamed Hobson entirely for the discovery issue,. She stated, "Steph, he put everything on you to cover his ass. He took it to the top, Josh (Stein) even has it on his radar. You need to put your side in writing and if you have proof you should give that too." Dismukes assured Hobson that she knew Hobson had discovered the missing discovery and brought it to the court's attention, but that Hobson needed to document what had happened to protect

21

her job.

101. Dismukes said, "I know you like Adren (Harris) and you think he is your friend but he is not. Adren is loyal to Adren." Hobson expressed disbelief and stated, "From the bottom of my heart it was no one's fault." Dismukes said, "But has he been treating you differently? You have to give us something so I can protect your job."

102. Hobson held Dismukes in extremely high regard. Had it been anyone else Hobson would not have believed what she had been told about Harris blaming her for the fact that the discovery was not produced earlier. Hobson wrote an email and described how she came to receive the bodycams and her knowledge of Harris's and Murray's handling of the discovery, provided the content of their texts and her communication with Craig and sent the email to Welty and Dismukes. Nothing in her description of the events was indicative that there had been misconduct.

103. Once Zellinger was excused from the Robinson trial, Welty took over and Harris was again the only prosecutor on his upcoming trial in Catawba, *State v. Brittain*. Hobson and Harris traveled to Catawba County, met with witnesses, reviewed the evidence, and visited the crime scene.

104. Both trials, Welty's and Harris's, were scheduled to begin on December 6th but on that morning the defendant in Harris's trial (Brittain) chose to accept a guilty plea.

105. In November 2021, Hobson had just entered into a contract to sell her home in Cumberland County and was hoping to have repairs completed before the due diligence period was up. Due to her being overextended for work she had not been able to return to the property. Over Thanksgiving, Hobson's friend of over 20 years

22

had been placed on life support and ECMO due to Covid in Orlando, Florida, and was not expected to live. Her friend's daughter had only just turned 18 and wanted Hobson to come to Florida and take over as healthcare POA, as her mother had no other relative to do so.

106. After the Brittain ended unexpectedly early on December 6, 2021, Hobson spoke to Zellinger about his Neal trial coming up in less than a month. Zellinger told Hobson he was trying to have the Neal trial continued. Hobson told Zellinger that she was relieved he was asking for a continuance because that would allow Hobson to be able to attend to the sale of her home in Cumberland County and also proceed to Florida, without negatively affecting the work of the SP section.

107. On December 9, 2021, Harris and Hobson attended a bond modification hearing in Robeson County for Daniel Cummings, one of five individuals charged with a 2016 homicide. The defendant's motion was denied, and the matter was set for trial. Hobson had no other hearings scheduled for the remainder of the month.

108. Zellinger then contacted Hobson and stated he had been unable to continue the January trial and was panicking due to not having begun trial preparation. Zellinger had not read the discovery, chosen exhibits, or identified the State's witnesses he planned to call. He also had still not met the sexual assault victim. No meetings had been set. Roanoke Rapids Police Department had assigned a new investigator on the plagued 2008 case, and she was pregnant and due to deliver during trial.

109. On December 16, 2021, the jury returned a verdict of "Not Guilty" in Robinson. Craig called Hobson to let her know and they both cried. Craig stated Welty did a

great job, but witnesses were no longer cooperative and the trial strategy had been changed.

110. Welty contacted Hobson and asked her to assist him with locating paperwork on Robinson that he believed might have gone to the judges' office in Catawba County. Welty stated he would have asked Murray, but she was at Disney World, and he was in the process of leaving the SP section in a matter of days.

111. Due to Zellinger's procrastination on the Neal case and the denial of the continuance, Hobson could not take the leave she had planned to take. Instead, she had to drive to Orlando on December 24, 2021, and return to NC in the very early hours of December 27, 2021, to meet Zellinger for meetings and interviews in Roanoke Rapids.

112. State v. Neal began on January 2, 2022, and jury selection went all week. That following weekend Hobson arranged for a young woman from Virginia to come and attend court the next morning. In 2021, Hobson discovered an additional victim of sexual abuse by the defendant.

113. The DSS paperwork had been destroyed, and it was never charged. Hobson had convinced a Virginia Beach police detective to take an interest and he tirelessly looked through paperwork to find three pieces of paper confirming there had been an allegation against the Defendant by the young woman. Hobson and Pinkham had traveled to Virginia Beach to meet her in early 2021, prior to Pinkham's departure from the NCDOJ. Upon seeing her in the courtroom Defendant decided to enter a guilty plea. During this trial Zellinger sent Hobson a message stating, "You are

24

awesome at your job."

114. After the first of the year (2022) the Special Prosecutions Section Head position was posted and Zellinger and Harris applied again

115. Zellinger began to disparage Harris again during a mid-January phone call he made to Hobson. He stated he felt Harris was a liability and should not be practicing law, at least not with the SP section. Zellinger asked Hobson to complain about Harris, claiming "the higher-ups needed to know" that Harris was not fulfilling his obligation to victims and their families.

116. Hobson disagreed with Zellinger and told him that his accusations were untrue. Zellinger told Hobson that Harris had told everyone she was the reason he almost got in trouble and she should be furious at him. Hobson stated she didn't know what exactly had been said. Zellinger asked, "Why won't you do it? I thought you were mad at him too for the way he had been treating you." Hobson said she was but no matter how mad she was she believed Harris would be a better supervisor than Zellinger.

117. Zellinger continued to push and Hobson asked why Zellinger felt he needed any edge over Harris, as Zellinger was openly favored by Dismukes and Zellinger always announced when Stein called him or put him on a project. Zellinger made a few vague comments and Hobson asked, "Are you worried he has an advantage because he's black?" Zellinger said yes, but not just because Harris was black.

118. Hobson asked if it was because Harris was a "snazzy dresser" and Zellinger was not amused. He stated Harris was highly involved in the mentoring program for

25

other attorneys in the NCDOJ and that "people in charge love because that stuff is more important right now than being a great attorney," and that if Harris did get it over him it would only be for optics.

119. Hobson made it clear to Zellinger that she had no interest in helping Zellinger and did not agree with his assessment of Harris.

120. While handling coordination of the trial preparation and attending the Neal trial in Halifax County earlier that month, Hobson had also sent out subpoenas for the Frank trial, which was set for January 24, 2022, and which was assigned to Zellinger. State v. Frank had been set for trial on August 16, 2021, but an issue with an indictment caused it to be continued.

121. Zellinger and Hobson had already interviewed everyone the year before. Hobson contacted Zellinger on January 12th and asked the status on Frank as she had the witnesses still on standby. She had checked the court database and saw that a motion to continue had been granted on January 5th until February 7, 2022. Zellinger confirmed in a text it was but that a new trial date would be scheduled when they went back for a status conference on February 7th. Hobson then released all the witnesses on standby.

122. Hobson had previously informed Zellinger that if the Frank case did not go to trial on January 24th, Hobson was going to take the leave she had not been able to take in December.

123. In early January of 2022, Dismukes asked the section attorneys, along with Hobson, and Byrd to review the SP section's inventory and ensure all the information

26

in the NCDOJ tracking program, Infoshare, was up-to-date.

124. The SP section's ability to maintain procedures in place for accepting, tracking, and handling cases throughout the entire state of North Carolina had been negatively affected by COVID and also by staff turnover. Welty had come and gone, Pinkham had quit, Haigh had quit, and attorney Brenda Rivera had quickly come and gone. Several matters had not been entered for record-keeping. Hobson also had been contacted on several occasions by staff in other counties letting her know that attorneys from the SP section had failed to appear for a hearing.

125. Near the end of January 2022, Dismukes asked just Hobson to collaborate with her on the inventory spreadsheet Dismukes kept internally, Tracker, to make sure all matters accepted were entered, attorney assignments were current and that each matter had a support staff assigned to it, either Hobson or Murray.

126. During one of their phone calls in January 2022, Dismukes asked Hobson if she felt she would stay at the AG's office now that things had settled down, and Hobson stated yes.

127. On January 25, 2022, Dismukes texted Hobson, "FYI - you have A LOT OF cases. I need to give some to Virginia (Murray). We are thinking the Amy David case and Asheville School since they're newer." Hobson agreed and the reassignments were made.

128. Dismukes then texted, "PS - you have 88 hours of leave you need to take before May. Vacation? (winking emoji)." Hobson had accrued more vacation than the statutory limit State employees could have at the end of the fiscal year, June 30, 2022.

27

Hobson stated she planned to take the leave later in February because she wanted to visit her friend that was still in the hospital in Florida.

129. On January 27th Dismukes sent Hobson her username and password for her Catawba County DA evidence.com account and asked her to check behind her and make sure she had everything.

130. Dismukes stated that she believed that "anything that came to me from the SBI would have been on the portal for the whole section." Dismukes mistakenly believed the SBI portal was still being used and was synonymous with evidence.com. Hobson sent Dismukes a series of messages explaining the SBI's database migration from the "portal" to evidence.com, the difference between the two and how access had changed, and how Dismukes having an evidence.com account through the Catawba DA only gave her the ability to view files shared with her there.

131. Dismukes seemed uninterested in the nuances and stated she was primarily concerned about her matter New Hanover Schools being sent to "some account I don't have access to." Hobson reassured her that although the SBI had shared New Hanover Schools to the NCDOJ account, not Dismukes's Catawba County account, and that because Zellinger was assigned to it, he would receive notifications via his evidence.com account.

132. Hobson logged into Dismukes's Catawba County DA evidence.com account and checked the files shared and saved to Dismukes's account. Dismukes's user account appeared to have the same permissions as all the employees in the DA's office. Hobson had never seen an evidence.com inventory for any other agency other than the one

28

she handled at the NCDOJ, which only contained 22 cases at the time.

133. Upon further inspection into the massive inventory of the Catawba's County DAs office, easily over 3000 matters, Hobson noticed how many shares were still under incident numbers and not saved to a specific case. Hobson then understood how the discovery in the Robinson case had been missed: it had likely been shared to an "incident" number and not saved to the *Robinson* files shared by Investigator Craig with Murray.

134. Although the issue with Robinson was past, Hobson felt this was easily something that could happen again. The SP section accepted cases that were often very old or multi-jurisdictional.

135. In late February 2022, Hobson started to become involved in trial preparation for the cases with a California victim, and started making travel arrangements for the first trial of Dismukes's five homicide co-defendants, set for April 4, 2022 in Durham County (Tyson). Dismukes had hired a new attorney, Jocelyn Wright, and assigned her to help Dismukes handle the cases.

136. On February 22, 2022, Dismukes emailed the team and stated that Harris had resigned from SP.

137. In March 2022, Hobson traveled with Dismukes, Wright, and two Federal agents to California to meet with the victim's family in State v. Tyson. While in Sacramento, Dismukes pulled Hobson aside and told her that Zellinger had been selected to fill the position of Section Head. It had not yet been announced to the whole section.

138. Dismukes said she knew Hobson had "history" with Zellinger and wanted to know how Hobson felt about Zellinger now being her Supervisor. Hobson said she knew it was coming and was prepared. Dismukes asked her to shoot it straight.

139. Hobson said something along the lines of since Covid people were different now and it would be okay. Dismukes said, "Come on Steph (Hobson)." Hobson said she thought now that Zellinger was a supervisor he would realize he could not speak to her the way he had in the past. Dismukes nodded and waited.

140. Hobson then told Dismukes that they needed "to address the cases in Robeson County" in which she knew Zellinger had no interest. Dismukes asked what she meant and Hobson said that she knew Zellinger hated going to Robeson County and but those cases had languished and the lack of prosecution of those cases weighed heavily on Hobson.

141. Hobson said there was no reason for those cases to keep getting continued and now that Zellinger was Supervisor he should either try them or reassign them. Hobson said, "Robeson needs to start getting the Catawba County treatment" referring to the resources that the SP section had devoted to prosecuting cases in that county. Dismukes nodded and said "Okay."

142. Later that day after their meetings were finished. Hobson walked Dismukes up to her room and asked Dismukes if she could talk to her about Harris. Hobson expressed deep regret for not addressing the misunderstanding between she and Harris. Dismukes stated that Harris had blamed Hobson and she should have no remorse.

143. Hobson teared up and stated she was having a hard time believing that because she did not believe that Harris was the type to blame others. Dismukes said Hobson needed to let it go and that the section was better with Harris gone. Dismukes told Hobson it made her upset to see how much it was bothering Hobson and to please let it go. She said, "You know it had to happen the way it did don't you?" Hobson said yes and Dismukes said, "No, I'm asking if you understand why I had to handle it the way I did, with Jeff (Welty)?"

144. The implication was that Dismukes had hired Welty in order to avoid hiring Harris over Zellinger. Hobson said yes but was not positive if she correctly understood the implication from Dismukes's question. Hobson was uncomfortable and changed the subject.

145. Hobson was aware there were rumors that Dismukes had brought Welty in for a two-year term from the School of Government because she had "heat" on her to promote Harris instead of Zellinger. Hobson had never wanted to know the details. Hobson was not interested in nor ever attempted to ever understand anything that motivated decisions made by those in the highest levels of the Attorney General's office.

146. Upon returning from California, Hobson also went to Zellinger and asked him to file a motion revoking bond on Nolan Smith, a co-defendant in State v. Henderson. Henderson was charged with murder and Smith was charged with Accessory after the Fact. He had been charged with additional felonies while Harris was assigned to the case but had only recently been served by local law enforcement, and local law

31

enforcement had reached out to Hobson again to express concerns about Smith.

147. Hobson stated to Zellinger, "(Smith) is dangerous. He's going to kill somebody." Zellinger, now officially Section Head, stated it was Wright's case and to let her deal with it. Hobson explained that if Wright filed the motion she might have trouble getting it calendared quickly due to her limited availability resulting from the intense Tyson trial preparation schedule under which Wright, Dismukes, and Hobson were operating.

148. Zellinger told Hobson that if Smith's case was in Asheville he would attend court there, but he didn't want to go to the mountains otherwise, as there was nothing he knew of to do in Catawba.

149. During one of many texts from Zellinger during the Tyson trial, Hobson indicated she needed to take time off. Zellinger commented, "Maybe I'll get Virginia (Murray) to handle Frank then," to which Hobson responded, "That would be great." Zellinger told Hobson to send the days she was taking leave in an email, which she did. The dates were April 20-22, April 25-28, and May 2-3. Hobson did not take Friday, April 29th off, Groundhog Day, to ensure she would be available one day during that week should Zellinger need her despite the fact she was moving the following weekend.

150. On April 18th, 2022, State v. Tyson ended, after it entered its third week in a "Not Guilty" verdict. After the verdict Hobson, Dismukes and Wright went to a nearby restaurant. Dismukes told Hobson and Wright to take the following day off, but Hobson told her Zellinger would have a heart attack / stroke if she did. Dismukes

responded that Zellinger would be fine; Hobson disagreed.

151. As Hobson predicted, Zellinger called Hobson the evening of April 18, 2022, at 6:30pm to tell her to start setting witnesses up for the following week during which Hobson had already scheduled leave and made plans.

152. Hobson and Zellinger spoke several times on the 20th and discussed how the witness interviews were going. She told him where all the witness information was housed in the team's shared J-Drive, as well as in hard copy form in a folder on her desk. In 2018, Hobson had established a practice of keeping copies of all the Victim Impact Statements in folders marked for each case, just in case she was not there and someone needed to locate a victim's information quickly. She also listed witnesses and their numbers inside a log she kept in both paper and digital copies.

153. The following morning, during Hobson's second day of leave, Zellinger sent Hobson an email at 9:40 am. Hobson was not home. Zellinger sent Hobson a text at 9:45 am stating "Sent you an email – I really need that witness information." Confused, Hobson replied that she had already spoken with or was waiting to hear back from everyone. Hobson texted, "My bad, I thought that's what we discussed yesterday since I'd already been more or less in contact with them."

154. Hobson sent Zellinger a detailed text, "Whitt has the LEOs coming Wednesday at 10, Cassiday Pope is at 11, Carly is at 11:30, I asked Ozier, Elisabeth Chay, and Renee to give me availability for zoom, and waiting to hear back from Amy Osborne, Dana McIntosh, Copeland, and Samantha Weary. Levern is served but I haven't set a meeting BC Whitt needs to be there right? And he's a maybe anyway. That leaves

33

Nikki McLaurin unless I'm missing someone. I'm at the site so I don't have my computer, just going off the list that you sent me."

155. Zellinger texted, "We discussed Virginia setting them up and you were going to send us the contact info because you're out through 5/2." Zellinger responded that "the only days you'll be available pre trial is 4/29 and 5/4-5/6, which is totally fine but I don't want you to do this while you are out."

156. Hobson stated she would go back home and would email him. Once home, Hobson opened the email that Zellinger had sent her earlier that morning that stated, "we have now waited a full day since you notified me that you would not be able to work on the case until after 5/2. Yesterday you told me you would be able to send the information last night, but I'm sure you got tied up with your house construction. I don't mind granting approval for you to take these eight days off, but I really need this information as soon as possible."

157. Hobson immediately called Zellinger at 12:28 pm and they had a heated discussion. Hobson confronted Zellinger about sending an email containing untrue statements about when she had asked for leave and whether she had previously provided him information about the case.

158. Hobson then expressed to Zellinger that he treated cases differently based on the location of the trial and the socioeconomic status and race of the witnesses and victims.

159. She referred to Zellinger's determination to continue his Robeson County homicide cases until a new attorney was hired and he could reassign them had put

34

her under tremendous anxiety, as she was the one who had to keep the families apprised and had "run out of reasons" to make it look like the State was not dragging its feet. Zellinger had previously been very vocal about his distaste for Robeson County and had been adamant he would never do a trial there.

160. Hobson brought up instances of Zellinger asking Hobson to contact high profile case victims after hours on her personal time to "check in on them, see how they are doing." Hobson also confronted Zellinger about his insistence she be present at all meetings, yet he had met with white female victims alone in several cases with heightened media interest. In each of these meetings, he had accommodated the victims' preferences on time and location, whether it was after hours or on Sunday, and have the meetings outside their work, in parks, or at their home. Zellinger expressly told Hobson she did not need to attend each of these meetings with white, female witnesses.

161. Hobson then compared Zellinger's treatment of cases like Frank, a case with white victims and witnesses that had media coverage and documentary interest, to his assigned cases in Robeson and Durham Counties, where the victims were almost always minorities. In one notable exception from Durham, where the victim was a white female from a privileged family, Zellinger had asked Hobson to continuously check on the parents and see how they were doing. This simply did not happen on the other cases he was assigned from these counties, and many others with minority victims. Over time, the pattern became for Hobson to miss, or ignore.

162. During the call Zellinger asked, "Are you calling me a racist?" Hobson

responded "Essentially, yes." At this point Zellinger asked, "Are you saying I don't care about victims?" Hobson responded, "No, you do – if they're white. Or affluent. Or if there's press." Hobson told Zellinger that she knew that he made accommodations for white victims and their families, that she knew how he kept cases off published dockets, and how he waited until last minute to have minority victims and their families contacted to be in court while catering to the schedules of his high-profile cases.

163. Zellinger told her Virginia would take over the Frank trial from that point on and Hobson should take her leave time and should not work on anything work-related without recording her time. Their phone call at 12:28 pm lasted 23 minutes.

164. At 1:15 pm, Hobson sent Murray and Zellinger a detailed email listing witnesses, those meetings that had been scheduled, witness conflicts and contact information. Hobson then called her closest friend and told her she had told Zellinger about how she felt about how cases in the SP section were managed when they involved individuals who were located in rural NC and involved witnesses or victims of color who were not affluent and unlikely to garner any media attention and that she thought he was likely to have her fired. Hobson also confided in another friend and texted with Pinkham, her former co-worker.

165. For the next few hours, while on vacation, Hobson received and answered emails and texts from Murray and Zellinger within minutes upon receipt and forwarded the contact she was receiving.

166. The following day Nolan Smith, the defendant that Hobson had pleaded with

36

Zellinger earlier that year to file a motion revoking Smith's bond, murdered a man in Burke County. He evaded law enforcement and the US Marshalls until he was apprehended on April 28, 2022.

167. By the following afternoon, Friday, Hobson texted Zellinger at 3:19 pm with names of witnesses that had reached out to Hobson to respond. She stated, "Thought yesterday was a 911. I could have handled all this in a lot less time than it's taken me to respond and send contacts, with less interruptions. Also how should I record the time I spent doing it since I'm expressly forbidden from doing work?" Zellinger texted, "Send to Virginia." He told Hobson to now record less leave time.

168. Within the next two hours, three more witnesses contacted Hobson. Hobson provided them with Murray's contact information and forwarded their texts and emails to Zellinger and Murray in a group text. Murray responded that she made contact with two of them and had not heard back from the third. The third individual tried calling Hobson again that afternoon and again the following day, Saturday. Hobson forwarded the info to Murray and Zellinger in the group text. Zellinger responded, "Is she texting or calling? Did she contact you today?? I just texted her." Later Murray replied, "I had left her a voicemail with my name and number but never heard from her so I guess she didn't get it."

169. Hobson was contacted the following Monday and Tuesday while on leave by individuals involved with the Frank trial. Each time she forwarded the information to Zellinger and Murray, to which Zellinger would then respond asking Murray to make contact and what to say.

170. On Tuesday morning a witness contacted Hobson and asked if Hobson would be present at her meeting. Hobson contacted Zellinger and learned that he had not asked Murray to attend the in-person meetings. Hobson expressed concern for this witness and stated she would keep communicating with her. Zellinger responded, "Thanks. Virginia can try to hand hold as well – maybe next time you can talk with her and have Virginia join the call?"

171. On April 26th, Zellinger texted thanking Hobson for all her help.

172. Zellinger asked Hobson if she would like to be back on the Frank trial when it started on May 9th. Hobson replied that would be unfair to Murray who was now invested and had planned for the required travel. Hobson also did not want to add confusion again for the witnesses.

173. Although Hobson remained working in Raleigh, she was still contacted during the trial by the primary witness, as well as two witnesses who had finished testifying and were waiting in the courthouse unsure of what they were supposed to do. Hobson reached out to Zellinger for permission to release them from their subpoenas.

174. The Frank trial ended in a guilty verdict on the seventh day. Hobson saw the verdict on breaking news and sent Zellinger a text congratulating him. He responded, "Thanks and thanks for all your hard work." Soon several witnesses reached out to Hobson stating they heard a verdict had been returned. Hobson sent Murray and Zellinger a text stating, "I've tried to update some witnesses so you guys don't get inundated, congrats congrats." Only Zellinger responded with "Thanks thanks."

175. Hobson was thanked privately by the lead victim, multiple witnesses and law

enforcement for her efforts on the Frank matter, a case in which she had been involved with for three years.

176. In Hobson's Pre-Disciplinary Conference paperwork five weeks later Zellinger wrote that Hobson had deliberately withheld information and tried to sabotage the Frank trial.

177. On June 21, 2022, the Buncombe County District Attorney's Administrative Assistance, Susanne Middleton, reached out to Hobson regarding a conflict case name?? that had been accepted by Dismukes. She stated that the DA's office was still receiving information uploaded to their evidence.com account and needed to know if she should do anything further. Hobson had communicated with Middleton previously when matters had been accepted. Middleton knew it was not typical for Hobson to not make contact.

178. One of the first procedural steps after SP accepted responsibility for a case was for the SP support staff assigned to the case to notify the matter's investigative law enforcement agency, in this case Middleton in Buncombe County, so they could add the SP section, and the assigned SP attorney if known. The county would then be removed as an authorized recipient of information about the case. These steps were outlined in writing by Dismukes as well as Zellinger after he became Section Head.

179. Hobson was unaware of the matter and checked Infoshare. There was no record. She then searched the folders on the J-Drive and located documents on the matter saved by Jocelyn Wright.

180. Hobson then reached out to Wright, who texted that it was not yet charged.

39

She shared with Hobson that it was a conflict case because "the wife of the defendant works in the DAs office." Wright said Murray was the Victim/Witness Legal Assistant assigned. Hobson emailed Middleton and copied Murray on the following message, "Timothy Foster is assigned to another legal assistant in our section, Virginia Murray. I have copied her on this email so she can advise as to what documents have been received."

181. Wright called Hobson to see what had prompted her to reach out about the Foster matter. Hobson stated that the matter had no record of acceptance and that the Middleton had called to tell her that the Buncombe DAs office was still receiving documents on the case.

182. Wright then shared that employees in the office had been caught accessing information on the case. Hobson tried to impress upon Wright that this was a reason for the matter to be removed and Buncombe County access terminated. Hobson then brought up her concern about discovery possibly being missed when shared through evidence.com and told Wright about what happened with Harris in Catawba County.

183. Wright seemed to take great offense to this and informed Hobson that she had heard all about what kind of attorney Harris had been and Hobson could be assured Wright was not careless or incompetent. Wright said she did not need to have someone in Hobson's position concerned about how she handled her responsibilities. She stated she had a law license and Hobson did not. Hobson was taken aback as she and Wright had gotten along extremely well up in the four months Wright had been with the SP section. They had worked long hours together during the Tyson trial in

40

Durham and had been traveling to Catawba County to prepare for a homicide trial Wright had inherited from Harris's remaining inventory that was scheduled for August.

184. Hobson immediately agreed it was Wright's case and that she was just doing her duty. Hobson said since the matter was assigned to Murray and Hobson had now said her piece it was out of sight, out of mind. Hobson stated, "You're the boss of you," and Wright laughed.

185. The day after the conversations with Buncombe County and Wright, on the morning of June 22nd, Zellinger texted Hobson, "Two projects: 1) Can you check if there has been anything uploaded on Asheville school case at all asap? 2) Can you get the caseload printout done and emailed to me by end of day or tomorrow?"

186. Asheville School was an investigation that Dismukes had assigned Murray in January, but Hobson knew saying that pointing out Murray was assigned to the cae would make Zellinger mad so she stated she would check. Hobson was currently uploading other files from another matter.

187. That afternoon Zellinger told Hobson he did not have the discovery on another matter, New Hanover Schools, and needed her to download it from evidence.com. Hobson felt sure she had done so already and moved it to files that were accessible to Zellinger but stated she would do so.

188. After checking behind herself, Hobson texted Zellinger, "Hey - I did download the evidence.com stuff in January. I remember now, you said hold off after (Neal). It's all in there so if you've seen that then it's still all that is in evidence.com. I just went

41

through and compared to be sure. You have everything." Zellinger asked, "For New Hanover?" Hobson replied, "Yes, sorry should have been more specific." Zellinger replied, "Yeah, step 2 was to bates stamp and do a log."

189. Hobson had already Bates stamped the discovery earlier that year months before and uploaded it to Zellinger's Sharefile account. Zellinger had already accessed the 2000 pages of discovery and downloaded. Hobson knew this because his activity had triggered Sharefile to send Hobson a notification. Hobson searched her emails and texts and there was no request for a log in the four months since she had worked on the discovery, but she chose not to say anything.

190. On the next day, June 23, 2022, Zellinger texted "I think you said this but we don't have anything for Asheville school from sbi right." Hobson said she would check. Hobson told Zellinger she could get back into Axon (evidence.com). She stated, "It's been down off and on. I can keep trying to sign on or see if (Murray or Byrd) can check." This was not uncommon and usually resolved quickly. Zellinger did not respond.

191. Shortly after this exchange Hobson received a notification from the *evidence.com* account that a case had been shared from the SBI. The subject was identified as "Mark Meadows." Hobson still could not log in to the portal. She then searched the attorneys' folders in the J-Drive and located a folder for "Mark Meadows" under Dismukes. Like the case assigned to Wright, this case too was unfamiliar to Hobson.

192. Dismukes still primarily used her account that the Catawba DA had created

42

for her but had activated her NCDOJ *evidence.com* account at Hobson's request. On a couple of prior occasions, discovery on various matters had been shared to Dismukes through the DOJ account. Each time Hobson had reviewed Dismukes's case files to ensure it was discovery she already received from the SBI by way of an external email or hard copy. Hobson would then email Dismukes and document what had been received and whether it was discovery already in her possession.

193. Hobson had tried on many occasions to streamline the attorneys' use of *evidence.com*, especially for Zellinger, who had also acquiesced to activating his account the year before after Hobson caught gaps in the numbers of the case reports on *Spruill v. Jones*, caused by Zellinger asking the SBI Agents to send him download links rather than sharing through the database.

194. Although active, Zellinger steadily refused to access his *evidence.com* account when a notification came in and would instead forward the notification to Hobson and instruct her to log in and "see what this is and download it for me," regardless if Hobson or Murray was assigned to the matter. Hobson had repeatedly explained via email to Zellinger and Murray that having Hobson do this had caused confusion on at least five cases since April.

195. Dismukes was, however, the Criminal Bureau Chief, and those guidelines did not apply to her. Hobson accessed Dismukes's folder of cases in the section shared drive, the J-drive, and located one labeled with investigation subject, "Mark Meadows." Upon clicking on it, Hobson received a notification denying

43

access. This was the first time Hobson had seen a folder with restricted access. Hobson called and emailed Dismukes's Administrative Assistant, Marvin Boone-Pittman. She received an out-of-office response that Boone-Pittman was away for the rest of the week.

196. Hobson emailed Dismukes at 12:18 pm. Dismukes called Hobson minutes later, expressing confusion as to why the SBI shared the documents to the NCDOJ account rather than her Catawba DA account. Hobson explained what she had learned about *evidence.com*.

197. This was not the first time Hobson had this conversation with Dismukes, but it was the first time it seemed to resonate with Dismukes that WHAT? NOT USING ncdoj account?? could be a major problem.

198. Hobson told Dismukes she was beyond relieved Dismukes felt the same. Hobson shared she knew everyone thought she was paranoid about *evidence.com* but she felt there was just cause to be so, which Dismukes adamantly agreed.

199. Hobson said she had just had a similar conversation with Wright and that she had offended Wright without meaning to. Dismukes asked her to explain about Wright. Hobson summarized *Foster* and that it seemed Wright had interpreted what Hobson said as criticism so Hobson dropped it. Dismukes stated Wright would be just fine and *Foster* needed to be removed from the Buncombe County DA's as of yesterday.

200. Dismukes said, "Tell me what I need to make happen." Hobson said the team

44

needed to have formal training on the program.

201. Dismukes told Hobson to schedule a meeting with Hobson, Dismukes and Zellinger for the following week. Dismukes then told Hobson to contact Wright and tell her what they had discussed. Hobson hesitated. Dismukes asked, "Steph do you want me to call her?" Hobson laughed and said no.

202. Dismukes called Hobson at 12:30 pm and their call lasted 27 minutes.

203. At 1:11 pm Hobson texted Zellinger and asked if he had asked anyone else to try and log into *evidence.com*. He replied only, "No." At 1:17 pm Hobson texted, "(Dismukes) had an *evidence.com* account question too. We talked and she wants to have a meeting with us next week."

204. Hobson tried to call Wright and got her voicemail. Hobson then received a call from an officer in Hickory regarding Wright's upcoming trial, *State v. Seabrooks.*

205. At 1:41 pm Hobson texted Wright, "Leslie and I just had a talk about a case she has on *evidence.com*. I know the other day when I asked you about *Foster* you said you guys had everything and I bringing it up (sp?), but stuff like this is a huge discovery violation waiting to happen. If not on *Foster* than on the next case. Also, the DAs office should not still have access to it, that's a huge problem. Their whole office has access to it, meanwhile we won't know if anything gets added to it."

206. Twenty minutes later Wright responded, "We're going to address it next week." Then, "My file isn't a discovery violation bc there is not charge. I'm just

45

reviewing things to decide if a case exists. If something is charged then I will have to turn over whatever I have to that defense attorney."

207. At the same time Zellinger texted Hobson, "Are you in the office? Can you meet on teams at 2:30?" Hobson was texting with Wright and did not see Zellinger's messages right away.

208. Hobson replied to Wright, "We are talking about two different things though, it doesn't have anything to do with that. It's when a case comes in we're supposed to contact the officer and have the case reassigned in *evidence,com* (if they use it) to us, as well as the crime lab if it applies. It should happen every single time. Susanne [Midleton] from the [Buncombe] DAs office sent the email about getting notifications bc she knows every time we've gotten a case from them I've called to request the physical file, a download from the DAs, and the contact from the investigator or officer so I can have them reassign the case to us in evidence.com. She was basically saying we're getting notifications about the case fyi, which means that agency uses *evidence.com* and hasn't been contacted. In this circumstance it also means the entire DAs office has access to anything on a case that is a conflict because of an employee."

209. Wright replied back, "There will be a system in place that will be discussed next week" to which Hobson responded, "I know I'm the one who talked to Leslie about it and she asked me to have the meeting."

210. Wright texted, "Boz is having the meeting. I talked to Leslie too." Hobson did not respond further, not wanting to get into the middle of anything involving

Wright, Zellinger, and Dismukes.

211. Wright called Hobson at 2:21pm and they spoke for 21 minutes. Hobson felt the call went well and at the end they were commiserating about a Buncombe County matter that had given them both a lot of aggravation. Both were laughing.

212. Hobson saw a text come in at 2:39 pm from Zellinger "Call when you can? You at the office?" Hobson thought that was odd as Zellinger knew she was working remotely.

213. After receiving that text Hobson ended the call with Wright and called Zellinger but got voicemail. He responded, "Can I call you back in 10. On call." Hobson replied, "I was on the phone with (Wright) and an officer before that."

214. At 2:57 pm, Zellinger called Hobson. Zellinger said Hobson was trying to put off mistakes she made on other people and cover her actions. Zellinger stated that both Murray and Wright had complained to Zellinger about Hobson interfering in cases she had no business being involved in and they were tired of it. Zellinger states, "This is why people hate you." Hobson was stunned and said, "They hate me? Okay they hate me". This upset Hobson and she briefly cried but gathered herself. Zellinger said, "Well maybe not hate but they don't like it and it needs to stop and it's going to stop."

215. Hobson asked which cases she was accused of interfering in. Zellinger stated *Foster*, to which Hobson responded that she had been contacted on that matter by the DAs office and did nothing other than find out what the case was, who

47

it was assigned to, and responded to Buncombe that Murray was the point of contact – and copied Murray.

216. Hobson repeatedly asked for Zellinger to provide her more details regarding the alleged interference about which Murray and Wright had complained. Zellinger stated it did not matter what it was, it only mattered that they had come to talk to him about it. He stated repeatedly, "You called (Dismukes) about it, you don't think that's interfering?" Hobson reiterated that Dismukes had called her regarding her own case.

217. Zellinger stated that Hobson had then blamed Murray which Hobson adamantly denied. Hobson stated that she was aware Murray had repeatedly told others that Hobson was responsible for things Murray had not done. Zellinger wanted to know examples and told her to send them in writing, to which Hobson responded she would not. Zellinger seemed happy with her response and stated, "Exactly, because there isn't any proof." Hobson stated she did not know that Murray had actually come to Zellinger and until she knew differently Murray was an innocent bystander. Hobson also stated that Zellinger himself had caused a lot of miscommunication during the brief time he was responsible for prosecuting Robinson with Murray assigned, by asking Hobson to handle things Murray had not done. Zellinger stated, "Now that's a lie." Hobson stated she knew he had emailed asking her to do Murray's subpoenas in *Robinson* and Zellinger said, "Now you're just making shit up."

218. Hobson also stated it would not make sense that Murray complained about

48

Hobson interfering in *Foster*. Hobson told Zellinger she did not believe Murray had come to him and he stated both Wright and Murray had, not just about *Foster* but about *Burns*.

219. Hobson was floored and asked, "*Burns?* Are you kidding me*? Burns*? I want to hear what the interference is. I have done everything not to be involved in that case." Hobson was well aware of the case *State v. Blackwell, Burns. Morgan, and Fields.* It had been Welty and Haigh's and was from Robeson County.

220. Defendant Blackwell was calendared for trial and Hobson was already in trial on another matter, so Welty had reassigned the case to Murray during a team meeting, mentioning that it would be the first trial Murray would be handling from beginning to end. It ended up being continued and Hobson had been kept apprised of it since.

221. Hobson was also aware that twice no one from SP had shown up to answer up for the case during administrative court. The last time had been in February, and Hobson had been contacted by the assistant DA on Facebook messenger after trying to reach Welty and Haigh at the office and learning both no longer worked there.

222. When Zellinger stated Murray and Wright had come to him to complain that Hobson interfered in Burns, the one case Hobson had intentionally avoided, Hobson knew Zellinger was building something against her. Hobson said, "I knew when you asked me that day if I thought you were racist and I said yes that I did it to myself. I knew this was going to happen but I didn't know when."

49

223. Zellinger pretended he did not know what she was talking about and asked, "When was that?" Hobson told him to stop, gave him the date and approximate time of the call and even started to describe where she had been at when they had the exchange.

224. Zellinger interrupted and said, "Oh you mean when you refused to give us the information on the witnesses (for Frank)?" Hobson, again, was incensed. Zellinger stated that Hobson had been unavailable and kept taking days off intentionally. He said, "You can't take days off before a trial." Hobson's voice rose and she said, "I'm always before a trial! I'm the only person on our team that is always before a trial!"

225. Hobson repeated that she had known that day Zellinger was going to punish her for being truthful about his attention to cases involving non-affluent, non-White victims. Hobson asked Zellinger if he knew how much effort it took for Hobson to tell him yes when he asked if she thought he was racist. He replied, "Well it's not true so it doesn't matter."

226. Hobson then reminded Zellinger that in 2019 during State v. Lassiter trial, Zellinger had complained to her that there was no media coverage on the case he was trying and how he had better cases to spend his time on. Hobson was writing on a whiteboard with her back to him and said she bet there would be media once a verdict was close. Zellinger made a sound and said, "Nobody cares about dead black kids in Durham," to which Hobson turned around quickly and said, "I care about dead black kids in Durham Boz."

50

227. Hobson then said to Zellinger, "You knew you were wrong when you said it because you got all nervous and apologized and then started to ask me about my son and pretend you cared so I would forget you didn't say that, but I never forgot."

228. Hobson then stated that she had told a coworker about it that evening driving home from Durham because Zellinger knew he crossed a line. She stated that her coworker said, "How many more reasons do you need to go to HR?"

229. Hobson felt it was just her word against Zellinger's and he would just deny the statement. Zellinger said, "Who? Who did you talk to? Brittany (Pinkham)?" Hobson did not answer.

230. Both Plantiff and Zellinger were very angry and had been speaking loudly. Hobson said Zellinger always had it out for Harris. She asked Zellinger why he had told her she would have to testify against Harris in the discovery violation hearing when that wasn't true. Zellinger replied that he didn't remember saying that. Hobson said, "Investigator Craig was there too." Hobson stated that as soon as she said she would advocate for Harris, Zellinger changed track.

231. Zellinger said "And then he blamed you. He said it was your fault. See? So aren't you glad you didn't have to testify?" Hobson told Zellinger she didn't know what Harris said to this day. Zellinger said, "Everyone knows it wasn't your fault." Hobson said that was funny because recently another coworker had been discussing it with an attorney outside of the DOJ and stated, "You

51

can't trust (Hobson) with discovery. She almost cost (Harris) his law license." Zellinger stated he could not control what people said outside of their office, but Hobson felt he could address it internally.

232. Hobson said she should have gone to HR when Zellinger asked her to complain about Harris after the Section Head position had been posted, but that she did not think it would make any difference because Zellinger had told her that he had been promised the SP section head position by Dismukes years before.

233. Zellinger asked Hobson what she knew about that situation and Hobson told Zellinger that she knew what he had told Hobson. Hobson reminded Zellinger that he had called her into his office in December of 2019, upset after learning Welty was being hired as Section Head. Zellinger said he did not remember doing that. Hobson recited the things Zellinger had confided in her.

234. On June 23, 2022, when Hobson reminded Zellinger of the 2019 conversation, Hobson was unaware that Dismukes and others were currently being sued in Federal Court by a former employee, David Adinolfi, for discrimination involving the creation and handling of hiring for the Section Head of SP position. Hobson did not learn of the filed lawsuit until August of 2021.

235. Hobson told Zellinger just talking about the December 2019 conversation reminded her how she had privately gone to him during trial in January 2020 and told him that he was affecting her mental health. She reminded Zellinger that he had apologized and seemed honestly remorseful at that time - until weeks later when she had her Interim Performance Evaluation with Dismukes

52

and Welty and Zellinger. The feedback Zellinger provided about the Slade trial was completely false. Hobson told Zellinger, "This is what you do."

236. Hobson asked Zellinger what the process was for speaking with HR. He asked why she wanted HR and she replied, "Because I know how you are and I thought you were going to do something after (the April call) and I thought when you didn't that maybe you took what I said about the cases to heart." Hobson stated she knew she had neglected her own health and that she was scared to ask for leave after what happened in April.

237. Zellinger commented that she was already talking about taking leave and they had just discussed how she could not take time off before a trial. Hobson stated, "The trial isn't until August!" Zellinger said, "Still, aren't you doing meetings now?" Hobson responded they had started early because Wright had vacation scheduled in July and again before trial. Zellinger said, "Put in a request and I'll consider it."

238. Zellinger told her they should talk about everything in-person. Hobson asked if Dismukes would be there and he commented that Hobson needed to stop going to Dismukes. Hobson repeated that Dismukes had contacted her, that she didn't go to her about anyone and that it was Dismukes who had her reach out to Wright. Zellinger said Wright was very upset with Hobson and Hobson asked for what and then asked him if Wright was worried that what happened to Harris would happen to her, essentially acknowledging that people in the section believed Hobson was responsible for accusing Harris of discovery

53

violations.

239. Zellinger explained that Wright was insulted that Hobson, who was not a lawyer, would think she was the type of attorney to make careless mistakes. Hobson again said she and Wright had just talked it out and understood it was just miscommunication. Zellinger responded, "Well you'll see that's not true."

240. Hobson said she wanted everyone involved to meet together. Zellinger said they would but he and Hobson should talk first.

241. Later Hobson sent Zellinger a text, "Is there a way to get HR involved and address it." She stated, "I'd like to see what HR can offer here." Forty minutes later Zellinger responded, "Hey we can absolutely have HR there (prob virtually). I'm not sure they'll be available at 9:30 tomorrow but we're trying to get them there. I sent you the meeting invite for 9:30 tomorrow to discuss. Please accept and attend."

242. Hobson responded "I honestly don't think that's in my best interests. I just need to speak with someone first. I'm not being difficult but I really want to discuss options with someone first. I got blindsided today."

**Involvement of Frances Beckman, Magally Rodriguez and Danielle Marquis Elder**

243. Zellinger canceled the meeting invite he had sent to Hobson, which included Danielle Marquis Elder (Elder). Hobson was unsure why Zellinger included Elder, who was the section head for the appellate section. Hobson had not known Zellinger to defer to anyone besides Dismukes. Hobson emailed both and stated, "I'd really like an opportunity to talk with someone from HR first

54

but I'm not sure how to facilitate that." Hobson also asked if whenever a meeting was held Wright could be present.

244. The next morning, Friday, June 24, 2022, Elder responded, "Fran Beckman is the new employee relations manager in HR. You can reach out directly to discuss any questions you have, and we will plan to include her in the meeting next week." Hobson called HR but could not reach Beckman. After six hours without hearing from Beckman, Hobson emailed Elder to let her know she'd left a message but had not yet heard back. She wrote, "It is very important to me to talk to someone independently first. I also feel it is unfair to have a meeting without everyone involved."

245. Earlier that same morning before receiving Elder's email Hobson had emailed Zellinger some documents that refuted specific things he had accused her of being wrong or lying about during their call the day before.

246. Zellinger had accused Hobson of being responsible for the Asheville School investigation, which Hobson insisted was assigned to Murray. When Hobson had insisted this a second time Zellinger had yelled, "Stop lying!" Zellinger had told her that it did not matter what Hobson believed or what Hobson thought because the "spreadsheet was the only thing that mattered." The case inventory spreadsheet was housed in the Infoshare program and accessible to everyone on the team. Hobson had been surprised when he yelled and felt he would not have referred to the spreadsheet if he was wrong, so she then accepted responsibility for being wrong and sincerely apologized. A couple of

hours after the call Hobson had checked the spreadsheet in Infoshare and saw it did, in fact, have her name assigned to Asheville School. It still continued to bother her, as she was one of only a few who updated the case information in Infoshare and was familiar with not only her cases but the team's inventory as a whole.

247. Later Hobson then remembered Zellinger, just earlier that very week, had asked her to download the spreadsheet and send it to him which she did. That download from June 22, 2022, showed the case was assigned to Murray. Hobson located another saved version of the spreadsheet from January that showed Murray assigned as well. Hobson had not been wrong or lying. Worse, Zellinger had clearly changed it after their call.

248. Hobson had searched emails between she and Zellinger from 2021 and located ones where Zellinger was asking her to handle subpoenas and schedule meetings that Murray had neglected on Robinson after Hobson had expressed to him her concerns about being pulled into it. Hobson also located the email she had sent Zellinger on April 13, 2022, per his request after they discussed it over the phone, with the dates of the leave she was taking. It proved she had asked for leave a week in advance.

249. Hobson emailed the spreadsheet and emails to Zellinger without an accompanying message. She felt they were self explanatory and believed Zellinger would not continue to accuse her of lying on those specific subjects. She chose not to send any of the emails between she and other coworkers,

despite his claim that no proof existed in her defense, because she knew Zellinger would find a way to use it against her. Hobson did not want to produce them unless she knew for sure Wright and Murray had complained to Zellinger as he claimed.

250. Two hours after she sent the documents Zellinger replied, "Thanks for providing this information. We will discuss this next week." At 1:37 pm Hobson responded that they had been discussed and were some of the things he had said she was lying about or was wrong. During their call the day before Zellinger had specifically accused her of not giving advance notice in April that she wanted to take leave before the Frank trial, that she had always been assigned the Asheville School investigation, and that she had tried to

251. Hobson also wrote, "I am not aware of a meeting next week. I am still waiting to hear from HR." Zellinger did not reply.

252. Elder emailed at 2:06 pm that she had asked Beckman to reach out to Hobson and "Hopefully you two can connect today. She will also be at the meeting next Tuesday. Everyone who is necessary for the meeting will be in attendance on Tuesday....I hope you can connect with someone in HR today or Monday. Regardless, the meeting scheduled for Tuesday is not optional; it is required that you be there."

253. Elder and Zellinger's emails made it clear that while Hobson had been trying unsuccessfully to reach Beckman, Elder had been able to speak with Beckman and they had already planned a meeting. Hobson did not know if this was

57

procedure.

254. At 2:51 pm Beckman emailed Hobson and introduced herself as the new Employee Relations/Equal Employment Opportunity Officer and stated, "I understand you were attempting to reach someone in HR." Beckman told Hobson to reach her at her email. Fifteen minutes later, Wright called Hobson wanting to share something she thought Hobson would find funny. Hobson did not mention anything regarding Zellinger or the situation that was transpiring.

255. At 5:21 pm Hobson emailed Beckman a long email, stating:

> (Zellinger) and I got into a very heated discussion during the first day of my leave in which I expressed to him very candidly my feelings on his treatment of cases involving minority victims. I have no doubt he has harbored serious resentment since then and I firmly believe after yesterday's events I cannot work in the environment he has fostered. Since last evening I have been physically ill and consumed with worry. I have a long, documented history of Mr. Zellinger's treatment toward me. I've spoken to my therapist at length, friends, family, all of who are concerned about the effect on my mental health. I began writing things down at the suggestion of a former co-worker of his who reached out to me in 2019 – someone I have never met. I did reach out to a previous supervisor for help, but he didn't assign me to work with someone else as I requested because Mr. Zellinger wanted me to work on his cases. I asked for HR to mediate and also allow me an opportunity to address the claims he made against me. He also made statements that he said came from two coworkers, so I requested they join the meeting too since he said he was speaking for them. That request has been quietly ignored and finally denied. He has different requests of me than my peers and I am also required to travel for criminal trials regardless of my own schedule. I am burned out from continuous exposure to murder, rapes, violent crime, and in DAs offices across the STate those doing my job are offered resources and encouraged to take away time to recoup. Other legal assistants are not required to go to victim meetings, interviews, or even asked – but I am required

to go even if there is no purpose for me there. The one time I asked to be excused from a trial for leave in four years I have been paying for it ever since. I want to take leave time but am scared of retaliation if I do. He has told me there are new rules in place for me based on allegations brought to him by my coworkers that I was never given the opportunity to address. If a request for leave is denied (and he threatened to deny my last request) I need to ask for FMLA. Please let me know what options might be available for me.

256. Hobson also emailed Elder back that evening and wrote, "I asked Boz to get HR involved because I did not feel he and I could communicate after our discussion on Thursday. Some very upsetting accusations were made about me. . . ." Hobson stated she need to talk to someone in HR and "ask some questions for my own protection." She went on to say she'd like everyone involved as "Those people are necessary for a fair, honest, and open resolution." Hobson told Elder that the things that Zellinger told her that her co-workers, Murray and Wright, accused her of made her feel "truly distraught," "bullied and sad," and "concerned that ?? [the] I process I personally requested already feels one-sided and adversarial."

257. Hobson also stated before Tuesday's meeting on she needed to speak with HR and her medical provider, and that she had tried to be seen by her provider after the call with Zellinger on Thursday. Hobson told Elder that, "The effect this has had on me is overwhelming." Elder responded, "If you have medical appointments to attend you have sick leave for this purpose. But getting up with your doctor is not a reason to not attend a scheduled meeting. You are not being bullied. You are being required to attend a meeting with your supervisor

59

and your Division Head, with an HR representative present. As stated previously, it is not optional, it is required. I hope that you had a restful weekend."

258. Beckman emailed Hobson on Sunday, June 26, 2022, around noon and said, "Thank you for sharing this information. Are you available for a telephone call or teams meeting to further discuss your concerns?" and stated they could meet by Zoom on Monday afternoon.

259. On Monday morning, June 27, 2022, Hobson replied to Elder that she and Beckman had a meeting planned and added that, "For clarification I never said, to anyone, I was refusing to attend a meeting...the meeting was set after I was assured I could speak with (HR), yet hadn't...In the same vein I expressed I was attempting to speak with my doctor since that was going to be a part of my discussion with HR. I did no, however, say that my attending a meeting would be contingent on that happening." Hobson also stated she had not said she was trying to schedule any doctor's appointments during work hours.

260. Hobson added, "Clarifying things that are being taken out of context makes me sound argumentative, which I am not trying to be. I do want to protect myself....In addition to HR, I will have someone attending the meeting by phone."

261. Elder responded "DOJ meetings discussing personnel meetings are not open to third parties. So your request to have someone else attend via phone is denied. DOJ also has a policy against recording meetings so any request to record this

60

meeting (or allowing another to do so virtually) is also denied. Per the policy, any violation of this subjects you to disciplinary proceedings."

262. Hobson had never stated she wanted to record the meeting or have anyone else do so, but simply indicated that she wanted an unbiased witness present.

263. Elder informed Hobson the meeting was to meet with her supervisor and discuss issues, emails, texts, and communications to improve Hobson's communications. "Per your request we will have an HR representative present. I am also going to be present as your indirect supervisor. If you have further questions you can discuss with the HR manager at your meeting later today."

264. On DATEJune 27? 2022, Hobson met with Beckman over Zoom. Hobson told Beckman everything that had occurred and sobbed off and on.

265. Hobson talked about the cases that the section had and that Zellinger was selectively prosecuting them. Hobson had caught on to ways Zellinger kept cases from making the printed docket so any watchdogs such as the AOC would not know when hearings were being held.

266. Hobson shared that Zellinger would not meet with anyone who was African-American outside of a police station or a DA's office. Hobson had not thought anything of this for some time because while she was employed at the DA's office in Mecklenburg County they usually scheduled victim and/or family meetings at those places or the courthouse.

267. Hobson described the incident in 2019 involving the young attractive affluent White woman who was a victim in a case involving a candidate for Sheriff, and

61

that Zellinger had asked Hobson to set a meeting with her, which she did. Hobson expected to attend but Zellinger said he might change the meeting time. Hobson asked for confirmation within a day or two and Zellinger stated she did not need to go. Zellinger stated he was going to meet the victim during her lunch hour and when Hobson asked where he stated they would probably sit on a bench somewhere outside the woman's work.

268. Zellinger typically insisted she attend all victim meetings, and witness meetings, especially when he was not joined by a law enforcement officer.

269. Hobson stated Zellinger as early as 2018 would have her call certain people involved in certain cases out of the blue, even after-hours, and that he insisted she call the charging victim in a case involving a State Representative during the evening to the point it became weekly.

270. The defendant was charged with misdemeanors and since he and the victim were separated, there were custodial issues that became intertwined in the criminal matter. The victim would call Hobson wanting to know what to do regarding insurance, doctor appointments, travel, and Hobson expressed to Zellinger that he had encouraged the victim to think they were representing her on all matters involving her estranged husband, which was unfair to Hobson but also to the victim.

271. In fact, Hobson was out to dinner with friends one night and Zellinger texted her asking when was the last time she had "checked" on the victim. Hobson responded the victim had called earlier but Hobson was in a restaurant and

62

did not answer the phone. Zellinger began calling Plaintiff even though he knew that she was at dinner. Hobson went outside to take Zellinger's call. He told her she needed to call the victim back right then and said, "What if it was an emergency?" Hobson responded, "If it was an emergency I'd hope she'd call 911 and not me." Zellinger told Hobson if anything bad happened it was her fault. He said, "I don't want you to come to work tomorrow and hear you didn't call (victim)." The victim continued to call after the case was disposed and when Hobson asked Zellinger if she could tell her to direct all questions to her civil lawyer, Zellinger made comments like, "Just be nice to her," and "I thought you really cared about domestic violence victims."

272. Hobson acknowledged she always did whatever Zellinger told her to do and it annoyed her more than upset her. Beckman was assertive that Hobson should not feel responsible.

273. Hobson told Beckman that the SP section had received an influx of cases during her tenure working at NCDOJH. Hobson could not ignore clear racial patterns among the cases and how Zellinger handled them. Hobson stated that in 2019 they had received a case from Mecklenburg County where a young African-American woman, Kendall Crank, had been caught in a shoot-out between gang members.

274. SP usually accepted cases that were further along in the court process, but this had been referred to them soon after being charged due to a DA's office employee being a potential witness. Hobson and Zellinger went to the bond

hearing and while sitting in the courtroom during the docket call Zellinger said, "I guess I better look at this case and pretend I give a fuck about it." Hobson was offended by this but provided Zellinger with things she knew about the case and the victim for him to say before the court, which he did.

275. Zellinger then told Hobson to schedule a family meeting at the police department or the DAs office. They met the family at the DAs office and Zellinger said he was surprised by well-spoken and presentable everyone was. Not long after Kendall's mother reached out to Hobson asking if there was any way she could have her daughter's possessions from the impounded vehicle. Hobson spoke to Zellinger who said everything would be considered evidence and had to be kept until after the case was disposed. When Hobson relayed the news the mother stated emotionally it was really her daughter's Bible that she had hoped to have. Hobson told her she would see what she could do. When she spoke to Zellinger in his office he became aggravated and said, "I have way more important things to do than worry about someone's fucking Bible." Hobson was taken aback but told him this was one thing she would keep bothering him about until he authorized its release, which he eventually did.

276. Hobson had also felt Zellinger ignored her communications regarding a misdemeanor charge in this same case with which one of the three co-defendants had been charged that had not gone before the Grand Jury. After the Grand Jury indictment, the misdemeanor remained pending in District Court.

277. Hobson was contacted by DA's office staff more than once after Zellinger promised to address it. Hobson tried to impress upon Zellinger that the DAs office was having to keep track of the misdemeanor and make sure it was continued in District Court, which was not only no longer their responsibility, but also inappropriate considering the circumstances of it being a conflict case.

278. Zellinger told Hobson to respond to the DA's office. He also made comments like, "I thought you used to work with these people, don't you want to talk to them?" Hobson would remind him that if the charge was called and failed it would result in an Order for Arrest, to which Zellinger would shrug off with, "Who cares? They're already in jail."

279. It bothered Hobson, who had been a courtroom clerk at the beginning of her state employment, that she felt obligated to explain the unnecessary inconvenience that was beubg put on the clerk and others by Zellinger delaying in  filing a simple long form dismissal. Hobson voiced concerns the charge would result in the defendant being arrested at some unforeseen date in the future, regardless of the pendancy of his felony matters.

280. Zellinger had been an assistant district attorney for years. Over five months the charge was continued in District Court by the DA's office with Hobson's apologies. Hobson was embarrassed by Zellinger's refusal to file the dismissal because  these were her former coworkers.  Moreover, she knew enough about Zellinger by this point to suspect he would find a way to blame Hobson.

281. Hobson felt Zellinger would not have been so flippant if the defendants and

65

victim had been white. Before his promotion to Section Head Zellinger expressed to Hobson multiple times his irritation the defendants would not take pleas or cooperate, as he had believed would have happened by that point. Zellinger commented that if it went to trial he was "going to be pissed if I get stuck wasting my time." Zellinger felt it was a run-of-the-mill homicide that another SP section attorney should handle and stated he should be kept available for more complex cases.

282. Hobson told Beckman during State v. Slade, the trial that Zellinger and Haigh had tried, Hobson had asked him if he wanted her to try and locate an African-American's victim's mother. The victim was an adult but had been arrested on outstanding warrants. She was being held in the Detention Center and had received death threats and was under pressure from the State to testify against the man who tried to murder her, a validated gang member.

283. Zellinger stated, "Hell no she's a piece of shit." During jury selection the mother showed up at court and Zellinger received a note with her name and number. The defendant later that week spiked a fever and court was recessed for a couple of days.

284. Hobson was in the office helping someone else with a matter involving the crime lab. Zellinger walked up and said he wanted Hobson to call victim's mother now, and Hobson stated she was doing something for someone else but could call her in about thirty minutes. Zellinger said he wanted to make sure it was done.

66

285. This offended Hobson who was known for, and even teased about, her willingness to communicate with case participants. Hobson held firm she was in the middle of something. Zellinger stood for a moment, clearly annoyed, and asked, "Do I need to stand here until you do it?" She stated, "I wanted to call her last week but you said she was a piece of shit, remember?"

286. Zellinger became angry and their voices were raised to the point it begin to catch attention. Zellinger wanted to know what she was working on and asked, "Is that for a trial? Because if it's not then you need to stop that shit right now." Hobson said actually it was for a trial, to which Zellinger expressed disbelief and stated she was lying. He said, "Nobody has anything coming up that is so important it has to be done now."

287. Hobson disagreed so Zellinger insisted she tell him what trial and identify the attorney. Hobson responded the case was Haigh's but she was helping Jason Caccamo, the SP attorney at the crime lab, because they had just learned an analyst under subpoena was unavailable for the dates of Haigh's upcoming trial. Zellinger walked away and returned. Zellinger asked why Byrd wasn't doing it and Hobson replied that Byrd was off. Zellinger stated Haigh needed to have Byrd help him and stated, "When I'm in trial you don't do anything for anybody else," and walked away.

288. Zellinger later came to Hobson's desk, almost as though nothing had happened, to let her know he had contacted victim's mother and even gave her a detailed update. Later that day Pinkham told Hobson she could hear the

Case 5:26-cv-00072-FL    Document 1    Filed 02/11/26    Page 67 of 170

argument from her office down the hallway and was proud of Hobson for finally standing up to Zellinger. Hobson stated that although it felt good to stand up for herself she knew Zellinger would pay her back, and Pinkham acknowledged that was true.

289. Hobson brought up to Beckham that she had asked Zellinger to file a motion to revoke bond on Nolan Smith in February. The matter had been Harris's but Harris was leaving the office at the time. Zellinger asked, "What county is that in?" When Hobson said Catawba Zellinger said "Fuck no, I don't go to the mountains unless its Asheville." She stated she had told him Smith was dangerous and law enforcement felt he would kill someone, and that he did in April.

290. Hobson told Beckman that Hobson believed Zellinger was concerned it might come out that the AG's office had prosecutorial responsibility for the defendant and based on defendant being charged with felonies, they should have tried to revoke his bond, did not do it, and now someone had been murdered. Nor could Zellinger blame it on law enforcement or someone in the District Attorney's not informing them.

291. Hobson told Beckman after the Nolan Smith murder she became worried one of the defendants on the Burns case might commit a serious crime. She stated Burns was assigned to Murray, and Murray had admitted to Hobson that she had forgotten about it.

292. Hobson stated the case had been pending for eight years and there was no

identifiable reason why the case had not been prosecuted and that Hobson did not want to be involved in the case because of the delay in prosecuting it and the likely difficulties that would be present due to the delay in prosecution. Hobson had simply kept the SP section team aware of what defendants were on the calendar in Robeson but had made it a point not to be involved in the cae.

293. She told Beckman that later in 2020 Zellinger had dragged on scheduling trial for a co-defendant in the Slade case and had pleased when the other defendant made bond and that Hobson had stated to Zellinger after the bond hearing that she felt the court had just signed the other defendant's death warrant.

294. Hobson told Beckman that the defendant's defense counsel sent notice after notice by certified postal mail over mostly consecutive days to get Zellinger to schedule a trial in the case and Hobson who was responsible for processing this mail.

295. After Hobson had made several trips to the office for the duplicative notices she asked Zellinger to talk to the defense attorney. Zellinger stated the attorney did not like him and that Zellinger was highly amused by the letters. Zellinger stated that he was ignoring her as long as he could and wanted to see how mad she would get. Hobson asked if he could get in trouble and he laughed and said no and that he was going to "wait her out a little more."

296. Hobson told Beckman that months later the letters were brought up in conversation between Hobson and Zellinger. Hobson said told Zellinger that

even though picking up the repeated letters was annoying, she appreciated defense counsel's efforts on behalf of her client. Zellinger stated he would not give the counsel any credit and that she had wasted her own time and his. He stated, "Besides, if you wait long enough sometimes these things have a way of working themselves out." The defendant, Donovan Bright, was murdered in July 2021.

297. Hobson contacted the homicide victim's mother to let her know Bright had been killed. The woman was shocked and after a period of silence said, "I didn't want this. I wanted justice but not like this." Hobson shared it had impacted her and that she felt guilty for being annoyed by the notices, which she now viewed as having a sad sense of urgency.

298. Hobson admitted to Beckman she knew the exposure to constant murders and sexual assaults of children and adults alike had not been good for her mental health and things weighed heavily on her.

299. Beckman asked her about the death of her son and his pending wrongful death case, about which Hobson was extremely private about at work. Hobson wanted Beckman to know that she had left the DAs office in Mecklenburg both because of and despite the incredible support system there that had sustained her after her son's death. Hobson did not want to always be seen as the woman whose child had died, and on the best days she still saw sadness in people's eyes when they spoke to her.

300. Hobson explained to Beckman that she had applied for the job at the Attorney

70

General's office on an impulse but did not expect to be hired because at the time she had almost no remaining vacation or sick leave (due to her son's death), which would understandably not look good for a state employee of over ten years.

301. Hobson had decided she would not offer to explain that she had accumulated a great deal of leave prior to her son's death but used it after her son had died.

302. About two months after being hired Byrd had come to her and kindly stated, "You know it's okay to talk about your son." Hobson had been caught off-guard and stated she had not disclosed it during her interview or since to anyone. Byrd told her everyone knew before she began, not only about the circumstances of his death but that Hobson had a wrongful death case pending, as Dismukes also used to work in Mecklenburg and had inquired about Hobson after her interview.

303. Byrd said Dismukes had informed the team about Hobson's situation before her scheduled first day. Byrd reiterated she wanted Hobson to know she could talk about it. Hobson explained that she was not uncomfortable talking about her son at work and in fact often wanted to, but that she had not wanted anyone to feel sorry for her and did not want to be viewed as a "broken wing." Byrd stated that Dismukes had been vocal that Hobson's experience was going to be beneficial to how their office worked with victims.

304. Hobson told Beckman she had never taken off work during her time at the AG's office for mental health reasons and explained to Beckman that she was open

71

that she was in therapy not only because she was an advocate of it but because she had to leave work exactly by five on those days or she would be late due to traffic, and also to explain why she did not walk out with her coworkers as was their routine. Hobson stated it was common knowledge she was diagnosed with PTSD and anxiety as she had chastised Zellinger on several occasions for "popping up" around the blind corner of her desk.

305. Beckman indicated to Hobson that she felt Hobson was not being fair to herself by not taking time off for her mental health needs, but Hobson said it had not been an issue until recently. Hobson shared that she stopped attending grief counseling because she had to keep canceling because of travel and the unpredictability of trials and her therapist could not continue to hold a standing time. For the same reasons she had difficulty scheduling her medication check-ins every three months, which were required for her to continue receiving her prescriptions.

306. Hobson also explained to Beckman that she had been forced to cancel appointments before and had run out of her medication while out-of-town for trial which despite making her extremely sick had not prevented her from working. She stated that she was simply expected to repeatedly travel and had never refused, which she acknowledged had been due to her own commitment to the victims and their families that she got to know over time, as well as her conviction to the word she felt they did. Hobson did not feel as though she would have been denied relief from travel had she gone to Welty or Dismukes,

72

as both had brought to her their acknowledgment that she had responsibility for too many cases.

307. However, Hobson explained that Zellinger was now Section Head and after Zellinger had reacted negatively in April 2022 when she took leave, Hobson expressed that she was hesitant to do so again. Hobson told Beckman that the mediation on her son's wrongful death case was supposed to take place sometime between July 5-8 but due to the number of attorneys involved they had not settled on a final date and if it would be remote. She did not want to request the entire week of as mediation was only one day but she could, as she had hundreds and hundreds of hours of vacation and sick leave, as well as comp time and bonus leave from years ago that she still had been able to use. Hobson stated if Zellinger ignored it like last time, or denied it, she would not know what to do.

308. Hobson told Beckman about an experience earlier that month that reaffirmed her concerns about requesting leave. After the June Robeson County Administrative calendar had come out, Hobson asked Zellinger to please confirm if she would be needed on the following Monday afternoon, a week away, for his case. Zellinger stated, "You never miss going down to Robeson County and seeing your friends." He was vague.

309. Hobson stated that if the case was not set for hearing and no victim family was planning to come than she needed to take the day off. By midweek Zellinger still had not confirmed who would be attending from their office or what day.

73

By the end of the week Zellinger told her she did not need to come but to ask Wright what she thought. He then stated, "If she says she needs you there you have to be there." Wright told Hobson she did not need to be there.

310. Hobson confided in Beckman that she had long ago caught on that Zellinger did not want the Robeson Clerk's office to put his name in the system as the prosecutor assigned to his pending cases. They still reflected the assistant district attorneys that had been assigned before the case had been accepted by the SP section.

311. Hobson had made a point to bring it to Zellinger's attention when he was scheduled to cover calendar call in Robeson County for the team on December 6, 2021, as Welty, Harris, and Hobson were in trial in Catawba. The VWLA there had inadvertently told a victim's family member to be in court on Monday morning for a bond hearing that was actually going to be held on December 9, 2021, which was a Thursday.

312. The change had not made the printed docket but Hobson had made several attempts to reach the victim's mother. Hobson asked Zellinger to address it with the VWLA while in Robeson and to also make sure to have his name entered as the prosecutor by the Clerk, as it was the only way to indicate in the statewide system that the matter was assigned outside of the DA's office. Zellinger said he would but did not.

313. Zellinger had printed the calendar in February of that year and brought it to Hobson with questions, as he was coordinating coverage and explaining the SP

74

section's procedures to Wright, who had just started. Zellinger stated he emailed the court coordinator to get their cases continued and wanted to make sure he had accounted for all the defendants of theirs on the calendar. He had missed one and expressed annoyance. Hobson stated it would help everyone if the calendar had his initials on it with the charges instead of the Robeson ADA.

314. Hobson picked up her desk phone and Zellinger asked who she was calling. When she responded the Clerk's office Zellinger exclaimed, "Put the phone down hang up the phone," and Hobson did and told Zellinger, he almost gave her a heart attack. Zellinger stated, "I don't want you doing that. I mean it, I don't want you doing that." Hobson said she had figured for some time Zellinger was keeping his name off the case intentionally but even if she had not, his reaction was so weird she knew something was off.

315. Around 9 am of the day Hobson was off Zellinger reached out. He asked a question about another matter and then asked if she was going to court in Robeson that afternoon. She reminded him she was taking leave. Zellinger asked Hobson if she had checked with Wright about being needed in court. Hobson stated yes and Wright said no. Zellinger than told her she should call and ask her again just in case. Hobson called Wright and this time Wright said she needed Hobson "to be there and show me the lay of the land" and laughed.

316. Hobson had asked to be off a week in advance because she had a hearing in Mecklenburg County court to terminate the rights of her son's non-participating nd non-supportive father posthumously. The hearing was by

75

Zoom at 12 pm and Hobson was unsure how long it would last. She also expected it would be upsetting. Hobson did not want to share that information with Zellinger. Hobson drove to Robeson County, attended the Zoom hearing from her vehicle and then composed herself to walk into Robeson County Court for the afternoon session, where her attendance was unnecessary. No families had been expected or in fact attended and the only thing Hobson showed Wright was the location of the ladies' restroom. She did not share anything personal with either Zellinger or Wright.

317. Beckman was effusively sympathetic to Hobson during the meeting. Beckman expressed dismay at the way Hobson felt she could not utilize her earned leave and told her that in a situation like that she should have just called in sick. Hobson said that would have been worse.

318. Hobson trusted Beckman and told her some of her suspicions about how Harris had been treated. Hobson deeply regrated writing anything about what happened regarding the discovery and sending it to Welty and Dismukes because she knew it gave Harris the impression that she had sided against him. Hobson stated that while in Catawba together in December she and Harris interacted as they always had, but sometime after there was a definite shift and she figured he had been told she had changed her mind about writing something up about the discovery.

319. Hobson admitted she had been angry at Harris for not giving her the benefit of the doubt as her statement was exactly what she told Welty and Zellinger in

Case 5:26-cv-00072-FL    Document 1    Filed 02/11/26    Page 76 of 170

September, but now realized there was a bigger picture at play that she did not fully understand. Beckman was interested in why Hobson felt that way and told her Zellinger had acknowledged that although he felt he was better qualified, he was concerned Harris might get the Section Head position because he was black. Beckman asked how that related to Dismukes and Hobson carefully said it was well-known Dismukes disliked Harris intensely. Hobson said Harris was not warm and fuzzy, in fact standoffish, and was very picky about with whom he fraternized. Hobson said Harris had told her he appreciated the fact she had no filter, and he could tell the way she spoke in front of his face was the same way she would speak behind his back.

320. Beckman seemed to be extremely supportive and understanding. Hobson asked Beckman if she could write something to put in Harris's personnel file describing how the mechanics of how the discovery violation happened, not because it mattered anymore or that anyone would see it, but because she did not know what had been said about Harris in his file. Beckman said, "Absolutely, absolutely you can." Hobson felt encouraged enough by Beckman's support to ask Beckman if she could find out whether Harris had blamed her for the discovery issue as Dismukes had claimed, and Beckman said she had a right to know and Beckman would find out.

321. Hobson told Beckman that she had lost a lot of weight in the past two years from stress, at one point over forty pounds, and had developed insomnia. People she interacted with through her job would often comment on her weight

77

loss and a few, including Dismukes, had asked, "Are you starving yourself?"

322. Beckman asked how Hobson would respond and she said she would respond honestly no, but people would still express concern, so she would offer she had been prescribed Adderall and it affected her appetite. In reality she had been on Adderall for years and was now only taking a third of her dose to help try and sleep. Her doctor had stated if she lost any more weight she would take Hobson off of it completely, which made Hobson nervous because she needed it to stay focused. Hobson shared when anxious she would stay awake for two days, and her doctor had prescribed sleeping pills but they made Hobson feel very foggy and disoriented.

323. At the end of the Teams meeting Beckman told Hobson it was clear she was in no shape to attend the meeting the next day and that she should stay home. Beckman said there would not be a meeting regardless because she needed to do quite a bit of investigation into everything Hobson had told her. She stated that despite Hobson's deference to Dismukes "these problems start at the top."

324. Hobson said she could not stay home from work the next day because it would look bad. Beckman said, "Call in sick," and Hobson said she would be fine.

325. After the lengthy Teams meeting with Beckman ended, Hobson contacted Pinkham, whom she had promised to keep apprised. Hobson told her everything Beckman had said, the plan that Beckman told Hobson that she had moving forward. Hobson told Pinkham that Beckham had immediately understood that Hobson was not doing well due to the demands of Elder and

Zellinger that she attend a meeting with them and the inherent threat to remaining employed. Hobson surmise that if Beckman she could tell that having only spoken to her for a few minutes that it was obvious that Hobson's supervisors could tell. Hobson said she was nervous about some of the things she had told Beckman, but because everything she said was true, Hobson's conscience was clear.

326. Hobson stated she had not planned to disclose some of the things that she did to Beckman but she had "spilled her guts.".She stated Beckman emphatically agreed that Hobson was correct and that Wright and Murray should be a part of the meeting. Pinkham asked if Beckman had indicated when the meeting would be rescheduled for and Hobson said she only said it definitely would not be that week. Pinkham asked, "Did she say what kind of meeting it was called?" Hobson admitted she had forgotten to ask but would.

327. Hobson sent Beckman an email at 1:00 am knowing she would not hear back until the following work day but unable to stop worrying. She began by thanking her for all the time she had spent with her but stated she was still confused and bothered by something.

328. Hobson explained that after she told Zellinger she wanted to speak to HR, he asked her to meet with him. Then she sent him the screenshots of the texts she had sent Wright, in which she apologized when he responded and said that she had meant to send them to Dismukes. He asked to meet again and asked her to accept a meeting invite for the next day, and she replied she needed to speak

with HR first Elder became involved and set a meeting that she said was mandatory, would discuss Hobson's performance issues, and they would have HR there.

329. Hobson wrote to Beckman: "My question comes from reading HR policies and trying to understand if this [our meeting] is considered a mediation, an informal grievance, a disciplinary hearing...etc....the question is – was this to be an informal meeting with HR presence," "a mediation," "a grievance or attempt to reach a resolution pre-grievance? I'm trying to see which policies apply...I know you are addressing things currently and the questions may be moot – at least with regard to tomorrow's meeting...." Hobson ended the message apologizing for taking more of Beckman's time and thanking her for her kindness.

330. An hour and a half later at 2:37 am Beckham responded back in a markedly different tone and ignored everything Hobson had asked. She instructed Hobson that she needed to apologize to Joslyn (sp?), which immediately struck Hobson as off given that Hobson and Wright had spoken that same day, texted acknowledging the prior miscommunication, and had talked several times since.

331. Beckham then wrote, "As far as Leslie (Dismukes) is concerned – it's not appropriate for you to contact Leslie in this manner. You do not report to or work directly for Leslie. You have two supervisors between you and Leslie. Your first attempt should be to have a conversation with your manager Ben

Zillinger (sp), then contact Danielle Marquis." Beckman proceeded to lecture Hobson and stated, "You work for them. It may be difficult to have that conversation given the history and it may be more comfortable for you to go directly to Leslie but it is not appropriate to address this problem with someone at Leslie's level."

332. She then told Hobson to "Place yourself in the position of a supervisor for a moment" and asked her how Hobson would handle a "direct report" that had "went around and over you to a senior member". After asking Hobson what actions Hobson would take against such a person she signed off simply "Fran."

333. Hobson did not see the email until she was in the office the following morning. She did not respond. Hobson interacted throughout with Byrd and Wright, who indicated nothing amiss. A few minutes after one Zellinger came to her desk for the first time that day and asked if she was going to the meeting. Hobson had been picking up mail and for a moment was dumbfounded and asked, "What meeting?" She glanced at her computer to see the time and stated Beckman said the meeting was not going to take place because it was premature, to which Zellinger nodded and then walked away in the opposite direction.

334. Not long after Zellinger returned with a woman came around the corner smiling and introduced herself as Frances Beckman. Hobson asked what was happening and Beckman looked directly at Zellinger, who then walked away again.

81

335. Hobson's desk was actually a cubicle enclosed on three sides with one side being waist-height and an entrance. Beckman entered the cubicle, which was not designed for occupancy by more than one person, and began whispering she was there to escort Hobson to the meeting. Hobson was completely taken off-guard and repeated that Beckman said there was not going to be a meeting. Beckman told Hobson that after talking to Zellinger and Elder she felt Hobson would find that things were better, and it would be better to get it over with now than rescheduling it to a later date.

336. Beckman said there was no reason for Hobson to be worried about the change and she would be surprised by the informality. Hobson asked if she could have a few minutes to print out the documentation she would like to bring. Beckman said it was not necessary but Hobson said it was very important to her to be able to bring her proof. Beckman said she did not need any proof and that Beckman would be right there, by her side, advocating for her. Hobson asked if she could bring Wright but Beckman said no one was allowed to attend.

337. Hobson then realized she had a 1:30 pm phone call with her attorneys regarding mediation that she had just confirmed by email earlier that day and told Beckman she had done so because the meeting was canceled. She stated this was making her very anxious and she wanted to follow the plan that Beckman had told her about the day before. Beckman stated if Hobson did not hurry Elder may try and take disciplinary action against Hobson and then took Hobson's elbow to guide her out of her cubicle.

338. Stunned, Hobson began to walk down the hallway but stopped and turned around, stating she wanted to print her stuff and to let them know she only needed three minutes.

339. Beckman then stated there was no time but not to be concerned because if Hobson did not like the way the meeting went, which Beckman confident she would, then Hobson had a right to request a follow-up meeting. She laughed and said, "Sometimes these things require two or three follow-up meetings, it's all a process." Hobson picked up her notepad, pencil and phone, but Beckman told her she could not bring her phone so Hobson put it back down on her desk. Hobson walked with Beckman past one cubicle and stated she needed to take her anxiety medication. Beckman went into the cubicle again with Hobson and leaned over her as Hobson went into her purse to get the pill bottle, to the point they were physically touching. Beckman said again for Hobson not to take her phone and took Hobson to the conference room just a few yards down the main hallway. Elder and Zellinger were inside and told her to sit.

340. Hobson looked down and saw a paper packet in front of each seat and glanced at it, where she saw, "Documented Counseling Session." Without sitting she scanned down and saw, "Ms. Hobson has continuously involved herself in cases that are not assigned to her, or in cases in which she does not have a responsibility to support." Hobson, still standing, said, "I am going to go ahead and offer to resign. Boz, if you are going to do this, I am going to have to say things that I do not want to say. I don't want to be mean or hear you be mean

83

to me." Zellinger looked down and Elder said, "We are here and we are going to have this meeting." Beckman began chatting and Zellinger interrupted her and asked Hobson, "Please stop looking down and reading the worksheet, please sit down and let's talk." Elder stated this was now considered Hobson refusing to attend the meeting, which Hobson stated Beckman had told her not to worry about the meeting. All three ignored Hobson's statement.

341. Hobson said she would sign whatever they wanted but wanted to know when she had ever interfered with a case or involved herself in anything without being asked. Zellinger brought up Hobson speaking to Wright about evidence.com, to which Hobson responded that she did exactly what Dismukes said and Dismukes was the boss of everyone there.

342. Elder then said Dismukes was not going to be involved and from that point forward Hobson was strictly prohibited from any communication with Dismukes again. Hobson asked how they would work as Hobson was her assistant on most of the cases Dismukes was prosecuting. She repeated that it was Dismukes who contacted her, which everyone knew. Elder stated that from now on Hobson would send any communication by email for Dismukes first to Zellinger or Elder, and that if she did not do so, she would be subject to disciplinary action.

343. They went through the document and Hobson asked to see documentation. She stated she had documentation and would like to get it, and Elder said if she left the room it would constitute a refusal to cooperate and she would, again,

be subject to disciplinary action.

344. The document stated that Hobson was doing work after hours, to which Hobson stated to Zellinger, "You're the one who created that monster. You've had me doing things for you all times of the day, all days of the week for years, even when I said I wasn't comfortable. Zellinger stated that he had not done so since he became supervisor, and Hobson reminded him Easter weekend he had her making calls and working on his travel reimbursement.

345. Elder stated, "I heard you talked to a victim's family for two hours, that's just simply ridiculous," and laughed. Hobson responded, "Danielle, that person is the mother of the decedent in the homicide trial Jocelyn (Wright) and I are preparing to try. She has severe mental health issues and was very distrssed." Elder laughed and said the woman needed to be distressed Monday through Friday during business hours.

346. The woman Elder was mocking attempted suicide the following week and was hospitalized.

347. Hobson was denied all requests to provide documentation, statements, inquiries, or even a written explanation of her actual interference. She stated over and over to Zellinger, "Fine, just tell me what I supposedly did on State v. Burns, Blackwell, Morgan and Fields." Zellinger could not give an answer. Hobson reminded Zellinger that he himself had asked her to do research on that case and after he learned Wright had come to her for help had said, "Jocelyn needs to start doing shit on her cases herself."

348. Hobson was told she was now to "not so much as touch a case" if she was not assigned to it. She said that sounded ideal and asked it be put in writing for her own protection, since everyone came to her for help and might take it wrong if she refused them. Zellinger said he would but never did.

349. Last, Zellinger stated Hobson had to give a minimum five days notice to take leave and that still did not guarantee he would approve it. He now required Plantiff to meet with him weekly to discuss all of the concerns in the counseling worksheet.

350. After the meeting Hobson walked out with Beckman who behaved as though the meeting had gone beautifully. Hobson said she was submitting her request for the follow-up meeting and asked if she needed to do it in writing as well. Beckman said letting her know was fine but not to send it in writing.

351. Beckman stated she knew she had promised to send Hobson an application for FMLA but kept forgetting and would send it once she returned to her office. Hobson asked if those documents could be found online and Beckman said no, they were all internal.

352. At her desk Hobson sent Beckman a courteous email requesting her follow-up meeting. The request was ignored but Beckman did send a response at the end of the business day that said, "It was great meeting you in person today! I owe you the packet on FMLA. I cannot access the file the (sp) documents are located in on our drive. As soon as IT gives me access I will send you the paperwork. Thanks for your patience."

86

353. Upon returning to her desk Hobson was contacted by her attorneys, who had been trying to reach her and provide her with the date of mediation and ensure there was no conflict.

354. Hobson finished out the day and then met briefly with Pinkham who worked nearby to ask what to do. Pinkham begged Hobson to quit for her own sake, but Hobson said she had made a promise to the family in the upcoming trial. Harris, the original prosecutor, had left the office and the victim's mother had said many times, "Don't you leave me too."

355. At 5:40 pm, Hobson asked Beckman if she could get the forms from the DOJ network. She also stated she wanted to reply to the portions of the counseling worksheet in writing with documentation she had ready to have them removed or addressed in the follow-up meeting.

356. Three minutes later Beckman responded, "These documents are internal to HR. Mrs. (Magally) Rodriguez has access to the files and will be sending you the documents tomorrow. Be sure to inform (Zellinger and Elder) on the upcoming trail (sp) and days you will need to be present in court. They need that information to allow you to take regular paid leave until the FMLA is completed." She did not acknowledge Hobson's request for the follow-up meeting, which she had volunteered to Hobson and said it was "her right."

357. Hobson asked Hobson if what Beckman was telling her sounded right to her, and Pinkham said it did not, but she was unfamiliar with FMLA law. She stated she would check and minutes later Pinkham sent Hobson an FMLA

application she located online.

358. Hobson responded to Beckman at 6:22 pm and stated she had been hoping to take the forms by her doctor's office on the way home. Hobson informed that the trial did not begin until August 8th. She believed the trial that Beckman had referenced was the State v. Seabrooks trial, which was over five weeks away, as her son's case had no set trial date was not even tentatively scheduled until summer of 2023.

359. The mediation in her son's case had been confirmed just hours ago to take place over one day, Friday, July 8. Not only was Hobson over a week and a half away from the date, it was a holiday week, and their small team had nothing scheduled. Wright would be on vacation for the week, which was in part why she and Hobson had begun trial prep ahead of schedule. Hobson was worried Zellinger would deny her the day off out of spite, which would force her to call in sick. At the end of the email she asked, "How do I officially request a follow-up meeting to address the counseling worksheet that are unfounded? I have the documentation I would have had ready today."

360. The next day, on June 29, 2022 , Zellinger emailed Hobson at 7:22 am and told her he was adding things to things to the counseling worksheet. Hobson responded, 'I'm sorry, I don't understand exactly. You mean for the follow-up meeting I requested?" and "I've requested it in writing."

361. The same day at 11:31 am Beckman emailed Hobson a lengthy email which began, "In regards to your personal court case involving your son...." and

instructed Hobson she needed to give the team any and all upcoming dates related to her son's case. Beckman also wrote:

> I would suggest making a list of the dates you are aware of now...for example, when do you need to be in Charlotte for mediation? The trial begins August 8th. If you plan to be in attendance August 8th then you need to let Box (sp) know that now and request leave. It is not appropriate to request leave the date before you need to be in Charlotte, NC for a personal appearance. It is more responsible to plan leave dates ahead of time and allow your section to cover down on your workload in your absence. You are correct, your manager can disapprove your leave request if it is not submitted with enough time for them to plan for your absense or of there are mandatory meetings that everyone must attend. In regards to FMLA. You can submit for regular accrued leave to attend appointments related to your son's case. FML (sp) must be approved by HR once you submit the packet. Box (sp) and Danielle were informed yesterday of your intent to submit an FMLA packet. This process is transparent meaning HR will inform them once we have your completed packet. You will need to take regularly accrued leave for these appointment until the FMLA packet is reviewed by HR and approved.

362. Beckman now informed Hobson she could submit her documents to Zellinger and he would attach them to the worksheet. "The need for further meetings will be decided by your supervisor" and instructed Hobson that "You must respect Boy's (sp) authority to decide the topic of discussion for those meetings. You should receive the FMLA packet information from Ms. Rodriguez today."

363. The email once printed had been clearly cut and pasted. The fonts were different styles and sizes, not only between paragraphs but also within sentences.

364. Six minutes after Beckman sent Hobson this message Zellinger responded to

89

her and stated, "Hey, we're not having a follow-up meeting about the DCS worksheet." He stated Hobson could send her "addendum" and he would attach it to the Documented Counseling Worksheet and upload it to NCVIP, where employees' performance documentation and evaluations were housed. He then set weekly meetings with Hobson beginning July 12th, beginning Hobson was approved for leave the following week.

365. Hobson had not requested leave for the entire week.

366. Hobson had received an email from another HR employee, Magaly Rodriguez, with attachments and thought that Rodriguez had sent the FMLA application. Beckman also immediately notified Elder and Zellinger that Hobson had received the FMLA packet and made additional commentary about her efforts to coordinate with Hobson and her refusal to comply.

367. Hobson responded to Beckman's chain email that Hobson had received the FMLA paperwork, "I didn't get the paperwork – instead she sent me some questions that I don't believe are needed just to send me an application. I just want the paperwork I requested last week please."

368. At some point Beckman was addressing, responding, or copying Hobson on five simultaneous email streams, with different information and responses in each. Hobson did her best to document the timeline within each response. On one where Beckman appeared to addressing Zellinger individually, Hobson stated, "I realize it is pointless because I am just a legal assistant but I've been placed in a position where any request for leave is short notice to you...I did my best

90

to start the process with HR last week because I felt threatened to do anything without going through HR."

369. Instead of acknowledging Hobson's message that she had not received the packer, Beckman replied to the group, "In regards (sp) to FMLA: Ms. Rodriguez has provided you the documents. Please direct your questions regarding how to complete the forms and submit to Ms. Rodriquez. If she is unavailable I will be glad to assist you. FML must be processed and approved through HR before you can use it."

370. Hobson replied to Zellinger's group email regarding her request for a follow-up meeting at 4:19 pm, "(Beckman) told me it was my right to have one . . . . I believed her, but I also believed her when she said not to worry about attending the meeting." She tried, again, to refute what had been written in the DCS worksheet, "I have an abundance of emails, texts, and more where I can refute the things I'm upset about and shed light on how much I'm asked to assist...No employee should be at the mercy of things their coworkers may or may not have said about them, whatever their intention may be. That is a precedent that should not happen in any place of employment." Resigned, she closed, "I am obviously out of my league here and it is pointless for me to share anything. I recognize that you can say or write anything you want, and I could bring forth all the proof in the world but clearly honesty, transparency, and truth are not a party to this process." She stated she would not address it further.

371. Beckman responded to the group and stated, "Your concerns have been heard

and are noted." She reminded Hobson the documental counseling sessions was not a "disciplinary process," even though Hobson had been told multiple times during the meeting by Elder that she could not file a grievance and any request to do so would simply be ignored or denied. Beckman ended with, "Please take the time you need for self care. We are here to assist you as needed."

372. To Hobson directly, Beckman sent, "I was unaware you were provided the DCS worksheet ahead of time because you continue to state you needed time to prepare, but if you had no knowledge of the context of the meeting, what were you preparing for? That is why I stated there was no need to bring anything in addition to a note pad and pen." Beckman also stated that Hobson was going to have a meeting – the meeting Zellinger was going to make her have every week to discuss her performance concerns and to evaluate her compliance with all the things she had been falsely accused of. Beckman stated, "You have what you asked for: a meeting, time to prepare a response and a method to respond. These are the same options afforded to all employees. It is now up to you to decide how to handle yourself in this situation."

373. Resigned, Hobson replied the meeting was not what Beckman told her she was entitled to and that "I appears it wouldn't have mattered anyway." She told Beckman that now she would subjected to more retaliation from Zellinger and that all this was because "Boz was upset over some things I said to him in April – that were painfully accurate. If they weren't, we wouldn't be here. I do make an easy target, I admit."

374. Hobson responded to Beckman's chain email that Hobson had received the FMLA paperwork, "I didn't get the paperwork – instead she sent me some questions that I don't believe are needed just to send me an application. I just want the paperwork I requested last week please."

375. Hobson felt confused by the multiple email streams. After responding to the earlier group email that she had just received the packet, Hobson went to print the application only to realize it was information from the Federal website on how to fill it out. Rodriquez had sent an email that stated Hobson needed to answer questions before she could send her the right application to fill out.

376. Hobson's physician offered to intervene on her behalf and told her to bring whatever she had, but Hobson had no forms to bring. Hobson had also told HR her doctor would help her get the forms but was informed by Beckman she could not use the online form or any other, and that the DOJ used their own documents for FMLA.

377. All of the emails occurred on June 29th. Hobson had informed her supervisors she intended to seek FMLA on June 23rd, and to speak with HR on the 24th. In the four years she had been with SP she had never requested time off citing any reason on her son's case.

378. She had not needed to, as the complaint had been filed in 2018 and since then she had only attended one deposition in 2021, for which she requested a day of leave from Welty, who said of course, without asking or needing a reason.

379. That one deposition had been all Hobson could handle, and she did not want

93

to be present at others. Her own deposition had been many years ago. She had asked for the afternoon off earlier that month for a separate hearing a week in advance without giving a reason and ended up not even being able to take it after it was approved because Zellinger told her she had to be in Robeson County court.

380. That evening at 7:45 pm Hobson still had not received the FMLA packet. Earlier she had informed her doctor's office, which had extended hours, she would be bringing it in and also needed to be seen as soon as possible. She wrote Beckman an angry email that began, "Fran, I told you in writing on Friday I wanted to apply for FMLA. This isn't about my son's case, or mediation it's about my mental health and the fear of retaliation, the physical sickness I've had since Thursday. I don' need FMLA appointments for appointments or anything with my son's case...I have hundreds, literally hundreds of hours of saved leave I can't take – vacation, sick, overtime, comp. I need time away from work so I can be okay. Get treament I need, be hospitalized if I need, rest. Not be harassed by my boss and called so he can tell me my coworkers hate me."

381. Hobson reiterated, "Over and over you promise to send me the paperwork and I'm so scared I'll get fired if I call in sick, and a person where I'm at shouldn't be scared to call in sick. Please stop referencing my son's case. Stop asking me for dates. It has no bearing other than I would have addressed possible day off when I had the mediation date but you had me believe I'd already be in the application process for FMLA...you suggested I schedule my FMLA around my

94

job responsibilities. I need FMLA BECAUSE of my job and my supervisor and you've delayed the process even getting started at the risk of my health." Hobson reminded Beckman, "You saw me Monday, you commented on my condition, you acknowledged how bad off I seemed. You said as soon as we got off the phone you'd send it and you didn't."

382. Hobson stated, "All I want is the application to give my doctor so I can get the application in" and commented, "I don't understand why you can't access it or why you need IT to give you access, or why I have to answer questions from your coworker to get it. Stop referencing my son's death and wanting me to supply dates and where I'm going to be, wanting info – it doesn't feel right. The person you asked to send it didn't, as you know, even though you told everyone they did." Hobson closed by stating, "Please send me the paperwork or a reason why you are refusing to let me apply."

383. By the next morning Hobson had contacted her physician's office three times. She was given an early morning appointment but staff called her before to check on her and she was told to go to Wakebrook, a psychiatric facility with an emergency room. Her medical records, later obtained by NCDOJ, include notes where staff expressed concern for her state and documented she was "in crisis mode."

384. Hobson emailed Zellinger and Elder that she was being seen and would be using sick leave.

385. At 2:35 pm Rodriguez emailed Hobson, "Hope tis email finds you well. Attached

95

please find a sample packet of FML for your review. I have also included a quick guide for informational purposes. Upon completion of your review, if you have any additional questions or require clarification, please feel free to let us know." Attached was an application for FML with "SAMPLE" marked across every page. Hobson responded, "So that I'm clear, this is what I'm sending my doctor? This "sample packet" with portions filled out and XXXXXXXs where my name would be?" She pleaded, "My doctor is planning on seeing me when this form is provided, so I cannot chance any more delays." She begged, "Just a blank application please, without XXXXXXXs and incorrect dates. I cannot risk having to resubmit it. Tomrrow is a week straight of requesting simply the right to get the forms to apply."

386. Hobson received outpatient treatment that day and a physician's note excusing her from work with no date to return.

387. Beckman responded to Hobson's email, only copying Rodriguez, but did not answer any of her questions about the "sample" form. Beckman stated that Hobson had "refused" to tell Rodriguez information needed to choose the right application. She wrote, "HR has the FMLA packet separated into two types of documents based on if FMLA is being used to support the employee or the employee family member. Your email response indicated that you refused to answer her questions. If the answers to these questions had been provided, HR could have better assisted you. We are here to assist you and ask that you consider cooperating with the process to ensure timely and accurate responses.

96

Based on your email: I have informed Ms. Rodriguez that the FMLA is for use by the employee and that the anticipated start date is 24 July 2022. The start date can be changed as needed."

388. This was untrue. Rodriguez had only emailed Hobson the following, "Can you tell me when you are going out on leave and what type of leave it is? (Maternity, surgery, family illness, etc?) This was I can better prepare the pack (sp) for you."

389. Beckman also added, "Just as a reminder, I am new to the HR department. I do not have access to all the areas because permissions based on training requirements must be completed prior to. Permissions are granted by the IT office. This ensures privacy and protection of employee information. Ms. Rodriguez is new as well and had worked for the HR department for little over 5 months. We all have separate responsibilities. Ms. Rodriguez is responsible for the FMLA packets but we work together to ensure the process is facilitate properly for the employee."

390. The clinicians Hobson saw that day said they had never seen anything like what Hobson was experiencing. One told Hobson she had seen similar treatment to other state government employees and that her only advice to Hobson was, "Quit. Today. Please."

391. On Friday morning, July 1, 2022, Beckman created yet another new group email, this time adding Dismukes and Kristen Bierline, beginning , "Good morning, HR is in the process of completing an FMLA request for Ms. Hobson."

She stated "Ms. Hobson has indicated that she intended to take FMLA beginning 24 July 2022" (which was completely fabricated)"and "The employee has been informed she must confirm the start date with Ms. Rodriguez our FMLA manager. MS. Hobson has not indicated if the leave will be block leave or intermittent. This information must be indicated as part of the FMLA process."

392. Hobson did not respond to that email but did respond to the one Beckman had sent to only Hobson and Rodriguez previously, and copied Zellinger and Elder. She did not include Dismukes as she had been told by Elder and Zellinger she was strictly prohibited from sending Dismukes any communication.

393. Hobson's email stated, "I did not refuse. I asked for an application and said any information needed you would have. You were going to send the info Sunday, Monday, Tuesday, then after the meeting Tuesday....Be clear – you have intentionally hindered me in the process of applying for FMLA. There is no doubt and my doctor, as well as the people treating me yesterday, were appalled. I am copying my supervisors. I just don't want any further interaction from your department. I contacted the Eastern office for the Department of Labor for help."

394. Beckman responded "Accept my apologies for the delay. The HR office will make the necessary adjustments to its FML process to ensure these delays do not happen in the future. Thank you for allowing Ms. Rodriguez the time she needed to complete the official packet and provide it to you. The information

98

you shared in your recent email was most helpful and what was needed to complete her process." Beckman closed by informing Hobson to return the application to Ms. Rodriguez and that "The timeliness of the follow-up actions are determined by the return of the packet, by you, to HR. It will be processed accordingly."

395. Rodriguez then sent Hobson an email that said, "Please find the attached Family and Medical Leave information and forms for your reference and to retain on file. The Medical Certification and VSL Request forms will need to be completed and returned to me for processing." Rodriguez wrote, "NOTE: We must have a return –to-work form completed in order to allow you to resume your poaition. Even if you choose not to complete the FML packet or qualify for leave this is still a requirement." Rodriguez attached an application, now without the "SAMPLE" watermarks, but where she had pre-filled information in areas only Hobson and her doctor were supposed to complete.

396. Hobson responded asking what she was supposed to do with the form and if her doctor could make the corrections to the information filled in if it was incorrection and initial the corrections and inquired if it would affect the processing of the application.

397. Hobson did not receive a response. Hobson's doctor was going to be out of the office the following week but stated to bring whatever Hobson had been provided and she would make it work.

398. During the day Hobson was also contacted by Wright requesting help getting

99

ahold of the medical examiner, despite Wright knowing from Zellinger and Hobson that Hobson was out on leave. Hobson assisted her because the Medical Examiner's schedule is one of the most demanding and her availability as a trial witness was critical.

399. Hobson later learned that the forms given to Hobson were the same as those on the Federal DOL website and that they could be picked up in person by walking into HR and requesting them or downloading them from the intrnet. They are not customized or only internal to the DOJ as Hobson had been told multiple times.

400. Hobson was already approved for leave the week of July 5th and did not engage with the office further. She had already provided a doctor's note and information regarding her appointment for her doctor to fill out the paperwork. Rodriguez, copying Beckman, Zellinger, and Elder, emailed her on July 8th despite knowing that Hobson was in in mediation on her son's wrongful death case on that date. The email asked if there was anything HR needed to change or adjust on Hobson's FML packet.

401. On July 14, 2022, Hobson emailed HR, Zellinger and Elder that she had the completed packet from her doctor and explained that her provider "made and initialed corrections to the dates that were already populated; hopefully this should not be an issue."

402. Hobson asked if she could scan and email the originals, how often she needed to update Zellinger and at what point she would need to give a return date.

100

Rodriguez responded on the 18th and stated email was fine and the original could be mailed later. Rodriguez stated she would follow up with answers to Hobson's questions after receiving the forms. Nothing was said, again, about Hobson's question about the corrections her doctor had made on the form to the incorrect information HR included on the form.

403. Not trusting HR, Hobson scanned and emailed the paperwork but also told HR she would take the originals to the mailroom at the Attorney General's office and send them by inter-office mail, which she did, along with a note again identifying the areas her provider had marked through and initialed. On the 19th Rodriguez responded in receipt of the application, "Prefect! Thanks Stephanie. I'll process these for you."

404. Two days later, on July xx, Rodriguez sent Hobson an email with the following questions:

1.On the first page of Form WH-381, at the top, the typed-in dates were marked out and have "error" and new dates handwritten in.

**Question:** Did you make those changes or did your healthcare provider change them? Please let me know.

2. On the first page of Form WH-380-E, Section I-Employer, (2), the date was marked out and has a new date, "error," and initials written in.

**Questions:** Did you make those changes or did your healthcare provider? Whose initials are they?

3. In the Medical Information, Part A (1), another of the typed-in dates was marked out and a new date handwritten in.

**Question:** Did you make that change or did your healthcare provider?

101

Hobson was told to respond within 72 hours.

405. Hobson immediately responded, "My provider made those changes. In some earlier emails I noted the dates were incorrect but on the last packet they were still typed in, so she changed them as we went through the forms together. Her name is Stephenie Brinson, initials SB."

406. Rodriguez thanked Hobson for the quick response and asked for nothing additional.

407. On Hobson's application, HR had checked the box indicating, "We have not determined that restoring you to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us." It was also pre-populated that Hobson would be required to furnish her employer with periodic reports of her status and intent to return to work at "reasonable intervals based on most recent medical facts provided." Hobson was never told what that obligation was despite asking both HR and supervisors Zellinger and Elder.

408. Hobson's job responsibilities were summarized by HR as "Contact with public and other agencies, document preparation, incoming/outcoming phone calls, assist with legal exhibits for trials, clerical and other duties." Not only was this a wholly inadequate list, required travel was noticeably absent.

409. Hobson's provider Stephenie Brinson (Brinson) completed the application on July 12, 2022. Brinson indicated Hobson was and would be incapacitated from "6/30/22 to12/31/22," indicating the planned medical treatments Hobson would

102

be having and that the treatments would a least three times a week. This was optional to provide, not required by Federal law. Brinson gave more information on the form than required, and next to options for a reduced schedules she put simply, "NO WORK." The only required medical certification was complete.

410. After requesting a status update on the application at the end of July, Hobson was told she needed to sign an authorization allowing HR to communicate with doctor and get "clarification" or else her application would not be approved. HR sent her a "HIPAA Release Form" that authorized her doctor "to provide my medical information and medical-related information to Frances Beckman, Employee Relations Manager at the N.C. Department of Justice, regarding the matters listed in Section II of this document."

411. Section 2 was a paragraph that read, "I (Hobson) give the above healthcare organization and/or provider permission to communicate and release my medical information and medical-related information to the persons listed in Section I in order to clarify and authenticate any and all information in my FMLA application."

412. There was a Section 3 – Reason for Disclosure and Right to Revoke – but no Section 4. Section 5 was for Hobson's name, date, and signature.

413. The release form was not on letterhead, nor did it have many of the required elements to satisfy a valid consent for medical information, but Hobson did not know this.

103

414. She was told HR only wanted to verify that the initials and corrections on her FMLA application were in fact those of her provider. Hobson hesitated to sign the form and HR reached out again to insist her application was in jeopardy of being denied. Hobson signed the form on August 5, 2022, and returned it on August 7, 2022.

415. Hobson reached out to HR in late August about the status of her application and was told that Beckman had not been able to get anyone at Hobson's doctor's office to return her messages. Hobson went to her Doctor's office and they verified that no one from HR had attempted to contact the office. They told Hobson as soon as they did they would let her know.

416. On August 26, 2022, Beckman emailed Hobson and stated, "In an attempt to answer your question on the status of your FML application. We have been working to clarify the information provided on the FML packet with the medical provider. I have spoken to the staff at Advanced (sp) Care and have been waiting on the clarifying questions to be answered by the medical provided and returned. I spoke to the medical team at Advanced (sp) Care today as part of my regular Friday follow up calls and they assured me the information would be sent shortly."

417. Beckman also instructed Hobson to enter her leave time (which Hobson later learned was against policy when an employee is on FML) and that she "would receive and official FML notification from Mrs. Rodriguez early next week." Hobson contacted her doctor again and they stated they had not heard from

Beckman or anyone in HR.

418. On Saturday, August 27, 2022, Hobson received an email that Zellinger had completed her Performance Evaluation for the 2021-2022 year and it had been submitted for her review. The deadline given to her to complete her review was September 2, 2022. She emailed Zellinger to ask what she needed to do and he told her not to worry about it, that they would make up her evaluation after she returned. She received another email notifying her that her evaluation needed her signature on August 20, 2022. Hobson had been strictly prohibited from logging on into any work servers including those that maintained her time and her personnel evaluations.

419. On that same Saturday, August 27, 2022, Hobson's doctor's office called her and said Beckman had left a message on Friday afternoon and emailed a, authorization form. They stated that on Monday, August 29, 2022, their front desk staff would attend to it.

420. Hobson received notification that her FML had been approved on September 12, 2022, and was expiring September 22, 2022. Hobson still had well over 500 hours of available time she had accrued to use but could not determine the exact amount because she was not allowed to access her leave information.

421. The form Hobson received on September 12, 2022, included boxes to check if the information sent by the medical provider was incomplete or the employer needed more information. Hobson later learned this would have been the appropriate way for HR to have requested information from her provider. She

105

did not learn the scope of what had been done with the authorization that Beckman and Rodriguez authored on July 27, 2022. Both were on the emails and metadata shows Rodriguez's program was used to create the document on that date.

422. Hobson was subjected to more harassment after she indicated her intent to return to work in October. On October 7, 2022, she spoke with Rodriguez about the Return-to-Work (RTW) form they were requiring and stated she was just waiting for her doctor to email it back. Shortly after this call, Hobson's email access was inexplicably revoked.

423. Hobson contacted the help desk on the following Monday and learned it had been revoked at the request of HR. She attempted to contact HR but could not get anyone to return her call. She did receive an email from Rodriguez, explaining that Hobson was restricted from using her State email while on FML – the same email that Hobson had been communicating with HR and her supervisors to the entire three and a half months she had been on leave since June DATE?. Hobson explained that her doctor was returning the RTW form to her email, again, the same email that Hobson had used to receive and return her application and authorization form. Hobson was then chastised for conducting personal business through her work email.

424. Hobson then submitted her first complaint to the Equal Employment Opportunity Commission alleging ????.

425. Hobson returned to work on October 17, 2022. The morning of her return before

106

she had even gotten to the office, Zellinger sent her an email and told her he had some things lined up for her to work on. The first item was setting up a meeting with the victim's family in State v. Slade et al.

426. Slade was the defendant who had gone to trial in January 2020. It was also the case where the defense attorney of the other co-defendant had sent Zellinger multiple notices trying to schedule trial, and the co-defendant was murdered before the case was ever tried. Nearly three years after Zellinger tried the Slade case, he said that he was planning to plead one of the remaining four co-defendants in January 2023.

427. The second task Hobson was given was to locate charging documents for five unrelated defendants and bring copies to Zellinger. To Hobson's dismay four of the five defendants were defendants on cases assigned to Murray and thus Hobson knew that she was at risk for being accused of interfering in a matter not assigned to her if she carried out Zellinger's instructions.

428. The first case was State v. Burns, Blackwell, Morgan, and Fields, the case Zellinger told Hobson that Murray and Wright had made formal complaints to him about Hobson's interference.

429. The second was Austin Jackson, a matter Murray had been assigned the previous winter. Murray had previously shared with Hobson that Murray had given the wrong information to the victim's family regarding a bond hearing and the family had gone to the wrong courtroom and missed the hearing altogether.

430. The third was Timothy Foster, the matter about which Hobson had taken concerns to Wright about evidence.com to which Wright had taken offense. This case was also the matter Zellinger told Hobson that Murray and Wright had made formal complaints about Hobson's interference to Zellinger.

431. The fourth was a Robeson County trafficking case with multiple defendants Zellinger had been assigned in 2018 and which had been assigned to Murray as support staff in 2021.

432. The fifth was another Robeson County defendant, the only one assigned to Hobson.

433. Hobson had scanned all the physical files in herself other than Foster and Jackson, which had been assigned to Murray upon acceptance.

434. Hobson was concerned that she had been repeatedly warned not to "so much as touch" a case that was not assigned to her, and now she was being told she would have to do exactly that - before she had even returned to work.

435. Hobson arrived at the office and met briefly with Zellinger in his office. Zellinger gave Hobson new rules governing her responsibilities upon her return to the SP unit. Hobson was not allowed to access or view cases in Infoshare, the database containing the team's inventory, case status, and assignments that she had been maintaining since 2018. This was the same database that generated the spreadsheet of cases and assignments Hobson had sent Zellinger on June 24th to show she had not been lying or wrong about her assignments, and which Zellinger had changed, after their call.

436. Hobson was also reminded that she could not touch, inquire, or be involved in any capacity on a matter to which she was not assigned.

437. He asked if she had gotten his email and assignments and she nodded. Hobson asked Zellinger if he realized that he was having her do things on Murray's cases. Zellinger nodded and said that he was aware. Hobson said, "But Boz. You know what cases are on there." Zellinger asked, "So?" Plaintiff stated, "Burns is on there." Zellinger nodded and said he was aware.

438. Hobson found all in the physical files except Foster. Hobson was unaware if had been requested from the DA's office, and she was not about to ask. She used ACIS, the AOC court database, and learned Foster had been sent by Wright to the Grand Jury by way of superseding indictment two weeks before.

439. Hobson located copies of the indictment in Wright's folder in the J-Drive. Hobson gave Zellinger the requested copies, which she later saw shoved in a box of miscellaneous papers for shredding.

440. For Zellinger's second assignment, Hobson made contact with the victim's mother, Donna Fowler, in Slade et al. Ms. Fowler stated she had been upset that the case was taking so long to resolve and that three of the four co-defendants had been walking free all this time. Hobson said Zellinger wanted to meet with her, and she was eager to do so but expressed she had no vehicle and was employed as a caretaker. She asked if they could come to her home and Hobson stated she would try.

441. As soon as Hobson stated the victim's mother had asked if they could come to

Case 5:26-cv-00072-FL    Document 1    Filed 02/11/26    Page 109 of 170

her home Zellinger stated no, it needed to happen at the police station or the courthouse. Hobson stated the woman had no car and was a live-in caretaker. Zellinger said, "Well we can send someone to pick her up." Zellinger suggested a Teams meeting. Hobson contacted Ms. Fowler back and asked if she could do Teams, to which Ms. Fowler responded, "Is that something on a computer? I don't have a computer." Hobson went back to Zellinger and said she thought the victim's mother was not very tech savvy and might feel embarrassed if Hobson pursued a Teams meeting.

442. Zellinger said he didn't care what Hobson figured out but that he would not go to her home. Hobson and Zellinger stood and stared at each other silently. Hobson knew he was remembering what Hobson had said about Zellinger refusing to go to the homes of African-Americans. Zellinger then said, "Fine, fine, you know what? I'll meet her at her house or wherever but you won't be with me. As a matter of fact give me her number, I'll call her."

443. The following day she had her first mandated weekly meeting with Zellinger and Elder in attendance. They asked her about her health and Hobson told them about receiving ketamine treatments. Neither had heard of it so Hobson gave them a brief explanation. Hobson wanted to be transparent as she was receiving ongoing treatments and she had already made HR, Zellinger and Elder aware before returning that she would need to take accrued leave on the days she received the treatments. Hobson still had over 300 hundred hours of available leave time.

444. Hobson also stated she was in therapy and had a standing appointment. She asked if could switch one of her in-office days so she could attend both therapy and be in attendance at the team's newly established weekly meetings but Zellinger stated no. Hobson said if she kept her current standing appointment she was concerned she would not be able to make it from Raleigh to Knightdale on time so her therapist had offered to switch her with a patient being seen on Mondays. Both Zellinger and Elder said it was not up for consideration and gave no reason.

445. They then told Hobson they were going to discuss her Performance Evaluation right then. Zellinger gave Hobson a printed copy. It was the first time she understood that the Performance Evaluation that Zellinger had told her in September they would "make up later" was never going to be made up because it had already been completed and submitted by Zellinger on August 27th, almost two months after she had been on medical leave, during a time she had been strictly prohibited from accessing the internal website where such information was housed. Hobson had never been able to participate in the Employee portion of the process and submit it before it was final, let alone know what it said.

446. Before even reading the evaluation, Elder informed her she could not grieve the evaluation. Hobson was told it was final and could not be reopened or edited.

447. Hobson glanced through the Evaluation and saw the same false statements

111

she had contested at the meeting in June, which were the allegations that she had tried to sabotage the Frank trial and that coworkers had complained that she had interfered with State v. Burns, Blackwell, Morgan, and Fields. And of course, there was no explanation by Hobson explaining the lack of merit to those accusations.

448. The manufactured accusations bothered Hobson because she knew not only did she possess an abundance of documentation to the contrary, but their presence in her file would affect her potential employment elsewhere with the State judicial system. Hobson quietly stated she was renewing her requests for an inquiry as to the allegations in the Documented Counseling Session worksheet, and now the Performance Evaluation. Elder told Hobson she needed to let it go.

449. Hobson pointed out things in the Evaluation that she knew had never been brought up. She asked why there was no reference to any of the extensive travel she had done or pleas, hearings, and trials that she had been involved in. Zellinger said he could not put things in her evaluation before he was a Supervisor.

450. Hobson then pointed out a comment that referenced a trial she had worked on the previous year, when Welty was Section Head. Zellinger asked why she chose to point that comment out and said it was complimentary, which it was, and he thought Hobson was upset by the lack of positive feedback. Hobson later learned Zellinger had not written it – it had been in the exit evaluation that

112

Welty had given her when he left SP. In fact the few positive comments in the evaluation were Welty's – it was clear that Zellinger had just cut and pasted them.

451. Hobson then asked why there was nothing about the Tyson trial she had done with Dismukes and Wright after Zellinger became Section Head. That trial had been time-intensive, involved travel to California and six-day workweeks, and the coordination of French and Hmong interpreters. Hobson brought up that she had traveled more than anyone in SP, and possibly the Criminal Section in its entirety. Her last eight months of travel reimbursement had been over $7000. Elder and Zellinger had nothing to offer by way of response.

452. Zellinger then asked if after Hobson read the evaluation, knowing what it said and that it was never going to change, could put everything behind her and move forward. Hobson sat for a moment and said, "I have to process it." Zellinger nodded and said that was fair, and Elder agreed. The meeting was then over.

453. Hobson was very subdued during the meeting. She knew there was no point in being otherwise.

454. Hobson went to her desk but began to cry and went into the bathroom. When she returned Dismukes's assistant, Boone-Pittman was standing by her desk. He stated, "I saw you in the hallway and I had to come give you a hug, you just look so sad." Boone-Pittman hugged her and whispered, "Why would you come back?" Hobson whispered back that she didn't know what she was thinking.

113

She stated she had made a mistake. Boone-Pittman than asked Hobson why she didn't request a transfer.

455. Hobson did not know she could transfer. She believed that she would have to apply for a lateral transfer to a posted position and hope to be selected and go through the interview process, as she had done in her previous moves from Cumberland and Mecklenburg County. Hobson had no confidence that she would be hired with the information in her personnel file, especially now, even if Zellinger was not contacted. Boone-Pittman assured her she could and that it happened often. Hobson thanked him and said she would.

456. Hobson had only shared a few details of what had transpired regarding work with Byrd, who had contacted her several times while she was out on medical leave and stated Boone-Pittman had told her "what they did to that girl was terrible." Byrd stated Boone-Pittman had expressed concern for Hobson and knew more than anyone else there, but Hobson never asked what that meant.

457. The first week back Hobson learned that Zellinger had given Murray, and only Murray, a promotion and substantial pay raise of over $9,000 on July 2, 2022, days after Hobson had gone out on medical leave. Murray was now a Paralegal II, and being paid the same amount as Byrd and Towns.

458. Byrd, who held a bachelor's degree in paralegal studies, had over 17 years of State service at the time. She was the Governor's Extradition Secretary and tought classes for the Conference of District Attorneys. Each year since 2019 Byrd had asked to be promoted from Paralegal II to Paralegal III, as she far

exceeded the qualifications of her position. Each year she had been denied.

459. Angela Towns, who handled all the responsibilities for the LEL half of their section, was also certified and held a Paralegal II position with almost a decade of State service. She also had not been promoted during Hobson's time.

460. Murray had almost six years total with the State. She started with SP in April of 2020 and on July 2, 2022, received a promotion from Paralegal I to Paralegal II. Murray told Hobson she had no paralegal experience.

461. The DOJ documented Murray's promotion as "the result of a long-standing classification request based on her many years of working beyond her classification handling ALL of the sections' criminal cases . . . ."

462. Byrd stated Towns, who is African-American, had learned first Zellinger was going to promote Murray to equal standing as she and Byrd and expressed to him there would be backlash if it happened. Elder and Dismukes were being sued by a current DOJ employee for race discrimination, alleging they had established a pattern of not promoting African-Americans.

463. Hobson told Byrd she had been unaware of Murray's promotion. Byrd stated she would have had no reason to know, as it was intentionally kept out of the DOJ newsletter with the others State employees salaries are public record.

464. Hobson was subjected to small indignities after she returned to work after taking FMLA. Zellinger constantly walked by her desk and asked, "What are you working on?" During a team meeting Hobson asked a question about one of her assigned cases and Zellinger embarrassed her. She remained silent for

115

the rest of the meeting, after which Zellinger told her she needed to be more involved.

465. On one occasion Zellinger and Hobson came from opposite directions in the main hallway and Zellinger asked, "Where are you going? You're carrying your purse." Hobson said, "To the bathroom." Zellinger then asked, "And how long will that take?" Hobson just stared at him and Zellinger seemed to realize what he had asked and said, "Never mind," and walked into his office.

466. The first week Hobson was introduced to Meredith Britt (Britt), a new SP attorney, and Erika Jones (Jones), who had started with the LEL part of their section. Jones left not long after Plaintiff left; in 2023. Britt left in 2024.

467. Zellinger had reassigned Britt his only Robeson County homicide. He had also assigned her the last remaining Catawba County homicide, State v. Henderson, Smith, and Smith. Nolan Smith was in custody for the murder he had committed in April, which was being handled by the Burke County DA's office. In just eight months, State v. Henderson, Smith, and Smith had been assigned to Harris, Zellinger, Wright, and now Britt.

468. Britt asked for help locating a file for an investigation she had been assigned. She had received a stack of discs on the matter but could not find the original file and was not sure if there had ever been one. Hobson recognized it – it had been Harris's at one point, so she knew there was a file. She promised Britt she would locate it.

469. Hobson was in the filing room, which was next to Dismukes's office on the other

116

side of the floor where the SP offices had first been located. Dismukes walked during Hobson's first week, saw her and came into the room. She greeted Hobson warmly and stated she knew Hobson was coming back but did not realize she had already returned. Hobson asked how everything was going for Hobson.

470. Hobson stood and tried to think what she could say. She had been told she could not address Dismukes. Beckman had even stated during their June meeting that she was going to speak to Dismukes about Dismukes communicating with people beneath her level, to which Hobson had laughed and said, "That's going to go over great."

471. In the filing room Dismukes laughed and said, "Steph? What's happening here? Cat got your tongue?" Plaintiff replied, "You know that I'm not supposed to speak to you right?" Dismukes laughed again and said, "You can always speak to me. Maybe not about work stuff because that needs to go to Boz (Zellinger), but you can always speak to me. Who said you couldn't?" Plaintiff did not answer.

472. Dismukes stated again, "You can definitely talk to me. How have you been? Are you doing okay these days?" Plaintiff responded she was doing really well. Dismukes then asked if she was working on anything special. Plaintiff responded that she was looking for a file that she knew existed. Dismukes stated, "Well if it exists you'll find it. Who's the attorney on it?" Plaintiff said it had been Harris's.

473. Dismukes said she should have guessed it was Harris's. She said, "There's no telling what he did with it. He probably took it home and didn't feel like bringing it back and we'll never see it." Plaintiff said, "Actually, after Adren (Harris) had it the file went to Boz (Zellinger) in February, there's an email that refers to them meeting about it." Dismukes's demeanor changed and she said, "Well we are still cleaning up his messes." Plaintiff said, "Adren (Harris) gets blamed for a lot of stuff that wasn't his fault." Dismukes turned to leave and said "He needed to go. We're a better team without him and I, for one, am glad he's gone." She left. Plaintiff did not see Dismukes again before she left NCDOJ.

474. Over the next week Zellinger would, without fail, walk by the filing room near their old annex of offices on the opposite side of their floor and appear to be surprised when Plaintiff was inside. Plaintiff explained she had been filing cases and shifting all the files to make room.

475. One afternoon she told him she was searching for the file on the investigation for Britt and he ordered told her to stop. He said there were way more important things she needed to be working on. Zellinger wanted to know if Britt had asked her to look for it and she said no. She stated if she could not find the file she would reach out to the SBI. Zellinger stated, "Don't volunteer or suggest doing anything. You wait to be asked."

476. Plaintiff's second meeting with Zellinger was on October 25, 2022. Elder was not present. Plaintiff told him she wanted a transfer and had learned it was

118

pretty common at the DOJ. Zellinger stated he would speak to HR and Plaintiff stated she did not know it would be facilitated by HR. She stated she did not trust HR after what had happened with Beckman. Zellinger agreed that Beckman and done some things that he and Edler had discussed were handled badly. He asked if Plaintiff ever figured out why they revoked her email and she stated no.

477. Zellinger told Plaintiff she seemed "detached" at the team meeting the previous week and she said she felt very uncomfortable sitting with her team. Plaintiff stated that she knew herself and could not move past what had been done to her. She asked Zellinger how it had felt for him after he lost the race for Wake County District Attorney and had to continue working with people that had openly criticized him to his face and behind his back. Zellinger stated, "It sucked but I did it, and I did an amazing job." Plaintiff reminded him that when she started with SP he had talked often about his hatred for Wake County DA Lorrin Freeman and called her and other people in that office derogatory names.

478. Zellinger began only nodding or being silent. Plaintiff took her phone, showed him the screen, put it on his desk and told him she was not recording.

479. Zellinger asked if they could be fine moving forward and she stated she wanted to move to another position in the DOJ. She had prepared the following script before the meeting and said, "I'm in the best place I have been at in over six years. I want to take that somewhere new, where I can flourish, and do it in

119

the most non-confrontational way possible."

480. Zellinger stated he did not want her to leave and Plaintiff asked how he could say that with a straight face. He insisted he meant it. Plaintiff told him he had permanently ruined her reputation and hurt her chances of getting another job in the Judicial System. Plaintiff stated she knew he would hurt her chances of getting another job so she was coming to him in earnest to request a lateral move to another part of the DOJ.

481. Zellinger asked if she knew where she would like to transfer and Plaintiff stated she had no preference, she was realistic because of her evaluation and her worry Zellinger would sabotage her, which Zellinger then said was offensive.

482. Plaintiff asked Zellinger to understand she was over halfway to retirement, still had available leave and was receiving treatments covered by her State plan. She stated it was best for everyone if she went to another section and too much had happened, to which Zellinger nodded.

483. Zellinger then asked if there were things that he could maybe revisit and asked, "What if we get your evaluation reopened online?" He admitted he would change his ratings or comments.

484. Zellinger agreed to look into why Plaintiff had multiple different position titles and that in the payroll system, Beacon, her position code was a Grade 8, which was incorrect. Plaintiff had tried to fix this with the State Office of Human resources, who directed her to the DOJ's HR, where she told Beckman and

120

Rodriguez but nothing happened.

485. Plaintiff also spoke with Zellinger about the Statewide Personnel system, which receives its information from the State Controller, now showed her as "Reinstated." To be reinstated an employee has to go into leave without pay status, which Plaintiff never did. Plaintiff said her employee profile gave the appearance she had been fired or quit and then rehired on October 17, 2022, when her email and user access had been restored. Plaintiff was concerned about the accuracy of her months of service

486. Zellinger took notes and promised to address everything with HR. He asked if Plaintiff knew Kristen Bierline, the head, and she said no, so he stated he would communicate just with her from now on.

487. Zellinger stated he would reach out to Kristen Bierline (Bierline) and get back to Plaintiff in a day or too. As she was leaving his office Zellinger stated that a transfer might take some time and asked Plaintiff to handle his upcoming trial, Cherokee County DSS. Plaintiff stated it was Murray's, but Zellinger wanted her to handle it. He stated if she had not yet been transferred by the time it went to trial she would have to do it if he told her to anyway. Plaintiff said she was still receiving ketamine treatments in Durham every Thursday. Zellinger nodded and Plaintiff left.

488. The day after her mandatory performance review meeting with Zellinger Hobson attended a team meeting. After the meeting was over Zellinger dismissed everyone but Hobson, Murray and Byrd. He stated he wanted to

121

revisit the case assignments. Murray then pulled out a list she had prepared in advance which listed cases to which she wanted to be assigned, an opportunity never offered to Hobson.

489. Zellinger said he expected everything would pretty much stay the same as they had been before Hobson went out on leave, and asked Hobson if there were any cases on which she wanted to request that she stay assigned.

490. Hobson said Gregory Younger. Zellinger said, "Dismukes isn't doing that anymore. That case isn't going anywhere anytime soon." Plaintiff stated she knew no one was handling it. Zellinger stated might not even be tried by their section, if it ever was tried.

491. Younger was a convicted rapist held under a civil commitment as a sexual predator in South Carolina under the purview of the South Carolina Attorney General. The SBI had flown Dismukes and Hobson in their plane to New Jersey in 2018 to meet with a kidnapping and rape victim that had been identified in 2010, but had not wanted to cooperate.

492. Hobson had reached out to her and convinced her to meet with them. She was protective of the victim's identity. The SBI, Dismukes and Hobson had ended up meeting with the victim on 6 of the most viable cases, and Dismukes ended up indicting Younger in charges in two counties. Plaintiff maintained occasional contact when some of the over 20 alleged victims. Younger had never been served on his criminal cases in NC and the future of the case was unknown.

493. Zellinger went through all the defendants Murray had on her list and then addressed the ones remaining on the section's inventory. Zellinger then called out "Who is Burns? I have a Burns on here. Do I have a Burns on here twice?" (The section had a single defendant case with a defendant also named Burns). Murray and I both stayed silent. Zellinger looked at Hobson and said, "You know who it is, you always remember everybody's names," and Hobson just said yes. Zellinger then looked up and said, "Robeson," and Hobson nodded. Zellinger looked at Murray and asked, "That's yours, what, you don't want to keep it?" Murray shrugged and said, "I guess."

494. Zellinger asked her what the co-defendants names were and she responded she did not know and would have to look. Then he looked at Hobson and said, "Do you know so I can write it down?" Hobson responded with their names.

495. Hobson had just been reminded one week ago that Murray had made a formal complaint about her "interference" and "unwanted involvement" in the Burns case, yet neither she nor Zellinger recognized the name of one of the defendants.

496. Murray had previously forgotten she had the case. Among the emails Hobson had that she had wanted to use in her defense included one from February earlier that year, four months before Zellinger stating she was being accused of unwanted involvement. The Burns case had been addressed by Dismukes in a team email discussing cases previously assigned to Harris being re-assigned to Wright.

123

497. Murray reached out to Hobson in a private email to state she did not want the team to know but she had forgotten the case had been assigned to her in 2021 and she had dropped the ball. She admitted she had not done anything with it in a year and did not know where to find the contact info for the victims. Hobson helped her get the information, did not share what Murray had told her. and kept her distance from the case due to its history of neglect.

498. On Wednesday, October 26, 2022, Zellinger stated he was still waiting to hear back from HR Head Kristen Bierline.

499. On Friday, October 28, Zellinger asked Plaintiff to go into evidence.com and verify everything was current and downloaded. He said Byrd had been given administrator access since Plaintiff had been on leave, and Murray had been checking the database in Hobson's absence, so it should be caught up for now, but he wanted Hobson to "still check."

500. Plaintiff asked if that included cases she was not assigned to and he stated yes. Plaintiff then asked if Zellinger would document a written policy making it clear that she could access the site. He stated he would think about it and it would be addressed at next week's team meeting, but for now Plaintiff needed to have handled evidence.com by the end of the day.

501. Hobson looked on evidence.com and saw that Murray had looked at the cases since August 26, 2022 – two months before. Foster had never been shared to the account either, which meant it was still available to the Buncombe DAs office. Hobson knew there was nothing she should, or could, do about that fact.

124

502. Hobson decided that after accessing each case, assigning the new information to the assigned attorneys and closing those cases that were no longer open, she would audit trail each matter to protect herself, and she did.

503. Hobson also had not heard back from anyone about her transfer request. When she did her weekly email summarizing her work that week she included:

-Had my weekly meeting and discussed my personnel evaluation. I requested accommodation in the form of a move to another opening

-Accessed Evidence.com and documented the cases I'm assigned to

Under the section for things Hobson was planning to work on the next week she included:

-Go over case status in Evidence.com and policy regarding such.

504. The following Tuesday, November 1, 2022, Plaintiff met with Zellinger for their weekly meeting regarding her "performance issues." Zellinger asked how Hobson was doing and she stated great. He asked about her treatment, which Hobson raved about, and stated he was interested and planned to check it out further online. Hobson told him not to look up ketamine (as there was an IV administered form that was not covered by insurance or regulated by a psychiatrist) and to look up Spravato, which was FDA approved and only administered in-office. Zellinger asked how to spell it and Hobson complied. She told him the answer she gave people when they asked if Spravato worked: "I don't know what the magic is, but it works. You literally cannot have dark thoughts. Even if you try to reach for them you simply can't." Zellinger nodded

125

and said that was great.

505. Zellinger stated he still had not been able to get ahold of Bierline and rather than email her again, he was going to stop by her office in-person after their meeting because he was going to be out the remainder of the week.

506. Plaintiff realized that meant there would not be a team meeting the following day so she asked him if he could email everyone something in writing who was responsible for what on the site and he said no. He stated every time something came in on the site he wanted Hobson to email him.

507. Hobson knew, as did Zellinger, that the "owner" of any case assigned to them in Evidence.com received a notification when something was received. The only time Hobson would only get a notification would be if the case was new and was shared to the section, not to a specific attorney.

508. Hobson asked if anyone else was responsible to checking the account or even their own individual cases, and he said that didn't matter. Hobsons responded it did to her, because she was being asked to access cases not assigned to her and evidence.com had audit trails.

509. Hobson asked Zellinger, since it was just them, why he chose State v. Burns, Blackwell, Morgan and Fields of all cases to accuse her of unwanted interference. Zellinger shook his head and asked why Hobson could not let that go.

510. Hobson stated that she just could not understand how if Murray and Wright had felt they needed to go to Zellinger and document a complaint about Hobson

126

regarding the case, and Zellinger felt that whatever it was Hobson did was so egregious he needed to put it in her personnel file and yearly Performance Evaluation, then why did they not recognize the name of the case.

511. Zellinger said that didn't mean anything and Hobson said it did to her.

512. Hobson stated she had heard about Murray's promotion and hoped it had not been a reward of some sort from Zellinger, which he stated was ridiculous and asked if people were discussing what one another made, and if so, they should not be, which Hobson later learned was a violation of the National Labor Relations Act (NLRA). Hobson stated she had heard about the promotion and looked up the salaries of Bryd, Murray, and Towns herself.

513. Hobson stated Murray being promoted did not hurt her feelings but it sent a message to Towns, Byrd, and other staff that years and experience did not matter. She did not want that message to be because Zellinger was retaliating against Hobson.

514. Before walking into the meeting Hobson had spoken to Byrd and asked for her permission to discuss the pay inequity issue and how it looked. Hobson shared she had filed a complaint with the EEOC and would not discuss it with Zellinger that Murray's promotion had upset people if Byrd was uncomfortable, and Byrd responded that while she did not feel as angry about it as Towns, she trusted Hobson.

515. Zellinger wanted to know if there was anyone with NCDOJ Hobson told about what had happened recently. She said no. Zellinger asked if Hobson had

127

spoken to any attorneys and she said, "Well, Brit (Pinkham).... I've talked to her." Zellinger seemed bothered by this. He stated that was not quite what he meant. Zellinger stated he knew that Hobson and Pinkham "were cool and got along" but that he had not been aware that we "were friends like that."

516. Zellinger said he meant if Hobson had talked to any other attorneys and "not these attorneys" (NCDOJ). Hobson said no and that she had not talked to an attorney in the sense that she thought he was getting at. Zellinger questioned Hobson a little more and Hobson stated that she wanted to keep the issues that she had with HR and Beckman separate and not discuss them.

517. Hobson acknowledged she had made a complaint to "an outside agency." Zellinger nodded. He asked what would happen if Hobson stayed. Hobson asked what he meant and he said "just that." She responded, "I guess I'm worried I'll regress." Zellinger asked what that would look like and did not know how to really respond. She stated that her friends were worried that if she kept working in SP she could get as depressed as she had been in June. Zellinger nodded and said, "Right, right, but what does that mean?" Hobson stated she guessed they worried she would kill herself.

518. Zellinger immediately began writing on his legal pad and Hobson said, "I see you over there writing away, I know what you're doing." Zellinger put the pen down and said "No, no." He stated the meeting was going to be shorter than the one from last week because he would be out the rest of the week. Zellinger stated he was going to see if Bierline was in her office and Hobson went back

128

to her desk.

519. Hobson told Byrd a little about the meeting and said Zellinger was going to speak with Bierline. Byrd stated that she and Boone-Pittman had been keeping their eyes peeled for open positions and talked to Hobson about two that she had seen.

520. Hobson did not speak to Zellinger again until about six hours later. Hobson had been contacted by an attorney over in Elder's section, Nick Vlahos, and went to see if she could assist him. She did not know quite how to help answer his question so she went to ask Zellinger how she could better assist Vlahos. Zellinger was not in his office. Hobson assumed he had left at some point in the day. Hobson walked back to see Nick Vlahos and stated there was a chance the files he needed may not have been taken to archives and she would go look for them. He stated he did not want to bother her as it was just before five o'clock but she stated she did not mind.

521. Zellinger got off the elevator at 5:00 and seemed shocked to see Hobson. He asked, "What are you still doing here?" Hobson believed he was going to be angry because she had not yet left and she stated she had been looking for a file for Nick Vlahos. She stated Vlahos had told her not to stay after on his behalf but she wanted to help because he was so nice. Zellinger only said, "Well that was very nice of you."

522. She stated she would enter her time as leaving at five. Zellinger did not seem concerned and walked over to Nick Vlahos's desk with Hobson while they all

129

spoke for a few minutes about some major developments in caselaw that Hobson felt was really interesting. Hobson thanked Vlahos for taking the time to explain it to her. Zellinger told Hobson he had not seen Bierline in her office but would let me know when she reached out to him. Zellinger then left just before she did for what Hobson later learned was an after-hours meeting with Bierline and others to discuss placing Hobson on Investigatory Leave.

523. The next morning Hobson had her standing appointment with her therapist, Sharon McGee (McGee). She had told McGee about asking for a transfer the previous week, which McGee was very supportive of her doing. She told McGee that something weird had happened the previous day and the more she had thought about it, the more she felt uneasy. She described Zellinger had been asking her questions that evolved into questions about what would happen if Hobson stayed at her job, and looking back it seemed Zellinger had kept going until he was satisfied with her response.

524. McGee asked for clarification if Hobson was suicidal or having suicidal thoughts and she stated absolutely not.

525. Hobson expressed Zellinger had seemed unnerved by her mention that she had talked with Pinkham and McGee asked why. Hobson said probably her familiarity with their section and also perhaps Pinkham's position at the Judicial Standards Commission might make Zellinger nervous after everything that had happened. Hobson was not sure but knew something seemed weird.

526. After therapy Hobson drove to Raleigh and saw Pinkham walking on the sidewalk near the DOJ. Hobson told Pinkham that she should be flattered because just the sound her name had made Zellinger tremble with fear. Hobson shared yesterday's conversation with Zellinger and Pinkham said she felt Hobson needed to know Zellinger had contacted her while Hobson was on medical leave and said he wanted to talk to her about a "nightmare employee relations matter."

527. Pinkham said she had immediately stopped him and told Zellinger she might be in a position to know what he was talking about, and that she would not allow the conversation to go any further. Pinkham stated she had wanted to tell Hobson but it was when Hobson had not been doing well, and "It just seemed like one more thing to upset you." Hobson said she understood. Pinkham asked her to keep her posted and Hobson went into work.

528. Hobson got situated and then went to look for two files that Zellinger had reassigned to her the previous week that were "missing." She was in a filing room down the hall when West came to the door, with Beckman behind her. West said, There she is!" Beckman came into the room and West went back down the hallway. Hobson stated to Beckman, "You know I've asked not to deal with you right?" Beckman was smiling and stated, "yes, and I'm sorry, I promise it's nothing. There's some forms related to your FMLA that you still need to sign, so I came here to go grab you." Hobson stated that her understanding was Bierline was going to be reaching out to her and Beckman

responded that it was in fact Bierline that was waiting for Hobson. Beckman had only offered to get Hobson because she knew where she sat and what she looked like.

529. Resigned, Hobson stated she needed to stop by her desk and wash her hands. Beckman stated there was a bathroom on the first floor. Beckman followed behind Hobson back to the main area of SP. Hobson went into her cubicle and put the files she was carrying down. Byrd's office was almost directly in front of Hobson's cubicle and she was seated inside with her door open. Beckman walked and stood on the other side of the wall of Byrd's office and stood with her back turned, staring out the window at the parking deck. Byrd stage-whispered from her office, "Who is that? She refused to give me your name. She's been lurking around all day." Hobson did not answer.

530. Byrd whispered again, "Does she not know I can see her in the reflection of your glass?" Beckman then turned around and came over to the corner of Hobson's desk just out of Byrd's view. Beckman leaned a little over the waist-height wall and told Hobson quietly that she probably didn't need her phone because they were just coming right back. Hobson gathered her phone, pen and a legal pad and walked out without saying anything to Byrd. Beckman followed her to the restroom while Hobson washed her hands. On the elevator Beckman asked how Hobson was doing and she responded great. Beckman was very upbeat and talked about her summer while Hobson stood quietly. They walked by the HR suite and Beckman stated, "Oh that's her office but Kristen

(Bierline) is waiting for you down here." Beckman opened the door to a conference room where only Elder was inside.

531. Hobson said, "No not again, " and Elder told her to please have a seat. She sat. Beckman was to her left and seemed to be smiling. Hobson tried to focus on Elder who was seated directly in front of her. Elder stated "they" were very concerned about her and that Hobson had made some very concerning statements the day before. Hobson looked back over at Beckman who was smiling widely.

532. Hobson stated, "I need to say something before we begin." Elder waited. Hobson turned to Beckman and stated, "I want to say this in front of someone so you can't lie about this too. What you did to me, the things you pulled, the lies.....you traumatized me. And I was sick, and you knew. Can you understand what you did? You traumatized me and you had no reason. You should be ashamed." Beckman stopped smiling and just stared. Elder was quiet.

533. Hobson looked at Elder and said, "Okay. Tell me how this goes."

534. Elder stated Hobson had said some "concerning things." Hobson asked what it was she had allegedly said but Elder would not say, only that again, it was some "very concerning things."

535. Hobson texted Mcgee "911" and explained to Elder and Beckman that she had just seen her therapist that morning and that Hobson needed to call her. Elder said it wouldn't matter.

536. Elder slid a letter across the table with her signature and a form titled

133

"Notification of Fitness for Duty Evaluation." The reason for the referral stated only "Possible suicidal ideations – employee indicated she can no longer continue to work in the assigned section."

537. Hobson said, "Danielle, I take a medication that is proven to make it impossible to have suicidal thoughts let alone suicidal ideations." Hobson told Elder that she knew perfectly well Hobson wasn't suicidal.

538. McGee called. Elder told her she could not answer but Hobson did and put her on speakerphone. Elder immediately refused to make a sound. McGee asked what was going on and Hobson told her briefly. McGee asked for the names of who was there and Hobson stated Elder, who began shaking her head and mouthing the words, "I can't talk to her." McGee asked to speak to Elder and Elder shook her head, so Hobson said, "It's not possible." McGee said, "Tell me what they are doing to you." Hobson said, "It's Boz. Boz got me." McGee asked for the language used and Hobson said it didn't specify I'm sure "it was the comment about my friends being worried I'd off myself." Elder began to nod in agreement.

539. McGee offered to come to the office then but Elder shook her head no. McGee said she would write a letter with her clinical opinion and observations and Hobson said, "You know it's not going to matter to them. It is going to happen."

540. McGee asked if Hobson was good and Hobson laughed a little and said, "Yes, I really am," to which McGee said, "You sound great. I'm proud of you. Keep me posted." Hobson hung up and Elder began speaking again.

541. Elder stated that Beckman had reviewed Hobson's medical information from her FML application and there was information in there that was "very concerning." She stated Beckman could not tell management what exactly it was but it was just "very, very concerning." Beckman nodded and smiled.

542. Hobson was confused as to what they could possibly have been talking about, as she had personally been present with her doctor as she evaluated Hobson and completed the form. Hobson had then returned it to HR herself. There was nothing in those forms to indicate or suggest Hobson was suicidal or a risk to herself, or certainly anyone else. Elder stated she simply did not know what was in there, as it could not be shared with her either.

543. Elder told Plaintiff that Investigatory Leave was not a disciplinary action and was not subject to the grievance policy. However, she stated that if Hobson did not undergo the evaluation she would be subject to disciplinary action. Hobson asked what the evaluation entailed and Elder would not say, only that Hobson's doctors could not intervene in the process and Hobson stated they had a right to be involved, as this was essentially contradicting the opinions of three medical care experts she saw weekly, and she was their patient, not the AG's.

544. Hobson stated she wanted to consult an attorney. She stated she wasn't worried at all about being found fit but that she wanted to put a stop to Zellinger tormenting her. Hobson stated she wanted to know what her rights were. Elder said she understood and sent Beckman down to legal.

135

545. This meeting took place on Wednesday, November 2, 2022. Hobson was given until 5pm Monday to consult an attorney.

546. After Hobson received the deadline to talk to an attorney she told Elder she understood, and if Elder was truly concerned about Hobson than Hobson wanted to thank her. Elder asked if Hobson had gotten the forms Zellinger sent her that morning and Hobson stated that she knew he had sent her something that appeared to be related to FMLA but had not opened the attachment. She had been in therapy and came straight to the filing room. Elder stated Zellinger had sent her reasonable accommodation forms. Hobson asked what a reasonable accommodation was and Elder stated she would understand when Hobson looked at the forms.

547. Hobson then asked if she underwent the evaluation and was returned to work if she could start in another position. Elder looked at her and said, "Stephanie, I don't want you to worry about that. When you come back you will still be with your team. You will always be a member of Special Prosecutions." Hobson took that as a threat since she had requested to transfer out of the SP section.

548. Hobson asked if they would revoke her email and user access. Elder said yes but not until tomorrow. Elder sent Beckman to get a copy of the forms that Zellinger had sent, and Elder and Hobson got on the elevator. Elder told Hobson she was learning to use power tools and they talked about home improvement.

549. Upstairs Hobson asked Elder if she would still be able to finish the day. Elder

136

said yes. Hobson then spent the remaining hours until five putting status notes on files and sending emails.

550. At five Hobson tried to access her Performance Evaluations to print them for her records. Her email and log-in was still working. However, the Performance Evaluations were locked-they showed on the screen but could not be opened or printed. Byrd tried as well and said she had never seen that happen.

551. Byrd stayed with Hobson so she could let her into their parking garage, as Hobson had given Elder her badge. In the parking garage Hobson handed Byrd the letter than Elder had given her and stated she had not wanted to read it. Byrd said it stated that Hobson was not being placed on Investigatory Leave with Pay (ILWP) the following day and must remain available to respond to any requests or inquiries from management and would be required to report to the office when directed.

552. Hobson was also not permitted to contact anyone employed by the DOJ , not only coworkers, and if they contacted her, she was required to report them. All her accounts and email access were suspended. "Any violation of these directives may would result in disciplinary action, including dismissal".

553. It also stated it was not a disciplinary policy and not subject to the Grievance policy.

554. The letter written by Elder did not state any reason she was placed on ILWP.

555. The State Office of Human Resources provides a training and a form letter for managers to place employees on ILWP. It included a section for the manager

137

to specifically describe the reason or conduct that occured, on what date, if it was witnessed by other employees, and any other factors leading up to or in conjunction to the placement. The form letter directs managers to "Include specific behavoirs and/or performance issues, names and dates and relevant quotes, if available."

556. It then occurred to Plaintiff then that she had been invited to spend Thanksgiving with Byrd because she was scheduled for treatment the evening before and could not drive for 24 hours. She began to cry and told Byrd not to contact her. Byrd stated she was not worried about a stupid letter but Hobson said she would not answer her calls and to take care of herself until she saw her again.

557. The letter stated that the only available point of contact for Hobson, for all matters, was Frances Beckman.

558. That evening Hobson contacted her therapist and updated her on what had transpired. McGee was shocked. Hobson stated it was almost ridiculous to her that they were claiming she had threatened suicide in Zellinger's office before 11 am on Tuesday and yet had her continue to work the entire day, then come back the next day. Elder and Beckman had already planned to place her on Investigatory Leave just after lunch, yet expected her to finish out the day.

559. McGee expressed concerns about HR, Zellinger, and Elder being keenly aware Hobson may be upset by the action, yet despite Hobson having just returned from months of medical leave and still receiving a comprehensive treatment

plan she had openly disclosed upon her return, they made effort or suggestion of reaching out to her emergency contacts. Elder refused to even acknowledge she was present in the room when McGee called. To McGee, this was not just unethical or against policy, it reeked on intention.

560. Since Zellinger had lied and Elder had made very little effort to pretend otherwise, it did not dawn on Hobson until after speaking with McGee that if she had been threatening suicide as Zellinger claimed, he, Elder, and HR had not made any effort to seek medical help or reach out to any of her contacts or providers. In fact, they had sent her home both days where everyone knew she lived alone with no family nearby.

561. Even if Elder and HR did believe Zellinger and thought Hobson had made threats to kill herself in his office, the whole situation had been handled poorly, with zero regard for her physical and emotional safety, and against the State policy for administration of ILWP. Hobson should have been placed on ILWP immediately after the incident that established the need.

562. On November 4, 2022, Hobson's therapist sent a letter with her credentials to the Attorney General's office stating she had been seeing Hobson regularly and has recently as the day she was placed on ILWP, without presentation of any suicidal ideations. Her letter was never acknowledged or sent with the forms to the Employee Assistance Program representative.

563. In November Hobson also submitted a second complaint to the Equal Employment Opportunity Commission.

564. Hobson received the *Employee Assistance Program Policy*, which Beckman and Elder had forgotten to give her, along with the additional paperwork she needed to sign from HR legal Counsel, Elias Admassu, the afternoon of November 4th, with instructions to complete and sign. She was told to email Beckman and Elias Admassu no later than 5 pm, November 7th.

565. Magaly Rodriquez called Hobson twice, once to confirm Hobson's personal email address, and the second asking Hobson to email Admassu to confirm she received his email with the policy, which Hobson did. Hobson emailed Admassu back and stated she read the policy and it stated that even if she underwent the fitness for duty (FFD) and was deemed fit she could still face disciplinary action, up to and including termination. Hobson asked Admassu if he could clarify what disciplinary action she could face in that circumstance.

566. Admassu responded that he could not advise her by answering her questions and to address them with Beckman. He told her to sign the release if she was going to cooperate.

567. Hobson then received a scathing email from Beckman stating "the delay in this response" was due to Hobson sending the wrong person – Rodriquez – an email "at the close of business Friday. The HR team is here to assist you in any way we can. Understand that, much like the other departments in the DOJ, each HR team members have separate areas of responsibility. Maggie Rodriguez is NOT responsible in any way for the management of this function" Beckman

140

stated FFD responsibilities were within her scope of duties, that Hobson had been told only Beckman was the point-of-contact. She let Hobson know that the email Hobson had sent Rodriguez "precisely at 5 pm pm November 4th, 2022, was emailed to the wrong person at HR. Your timing is unfortunate as 5 PM is the close of business for that day, as well as for the week, as it was a Friday. I am sure that as a long-time state employee you are aware of this fact."

568. Beckman wrote "allow me to clarify":

-Maggie Rodriquez does not handle employee relations matter which the FFD and Referral falls under

-Mr. Elias Admassu is the HR attorney and as such cannot provide you with counsel or guidance and cannot answer your questions

-You were given until 5 pm Monday, November 7th, 2022 to return the forms indictaing your cooperation with the Fitness for Duty Evaluation

-Failure to return the forms by 5 pm, November 7, 2022, is an indication that you are refusing to cooperate with the Management Directed Fitness for Duty Evaluation.

569. Beckman told Hobson to read the information on the EAP which was attached to her in an email on Friday, November 4th, 2022 at 12:42 pm. She then told Hobson if she could not find the answers to her questions she could email Beckman with questions, or put Hobson's lawyer in contact with her and she "will assist to the best of my ability."

570. Beckman then wrote a paragraph reminding Hobson she could not speak to

141

Case 5:26-cv-00072-FL   Document 1   Filed 02/11/26   Page 141 of 170

any employees of the NCDOJ, including coworkers, "nor are you to have any contact with the client agency during the period of Investigatory Leave with Pay.

571. Beckman specified that the NCDOJ employees "include and are not limited to HR personnel that do NOT have oversight of this process. Any questions will need to be sent to me at this email address. Failure to do so will cause a delay in the response."

572. Hobson responded, "As clearly stated in your email any employee that contacts me must be reported, even if that person is HR." Hobson stated she was not aware than "Rodriquez contacting me constituted a violation." Hobson stated Rodriguez had been very nice and had reached out on behalf of legal. It had been Rodriquez that requested Hobson email (Admassu) and confirm with him that she had received the emails Rodriguez sent. Hobson confirmed she had read the EAP manual Rodriguez had voluntarily provided her that Beckman had failed to provide.

573. Hobson stated, "As before when I was attempting to apply for leave and you were deliberately delaying my application process I asked you to refrain from emailing me these long, condescending emails."

574. Hobson mentioned "I did notice where you stopped copying legal (Admassu) and Bierline in your responses." She then requested Beckman copy them on all communication.

575. Hobson consulted an attorney who requested additional time from HR's legal

142

counsel, Elias Admassu, to read the emails and policies. It was granted and the attorney recommended Hobson undergo the evaluation since it was clear she would pass. She signed the form consenting to the FFD and the attorney, who was not retained at the time, reached out to Admassu and provided it to him by the deadline, November 14, 2022.

576. Initially Hobson had only been provided the form provided by Elder stating she was consenting to the FFD.

577. Admassu sent an additional release to Hobson directly on the 15th and she was instructed to sign as soon as possible to move forward with the FFD. Hobson responded that she was a bit confused, as this form had different boxes checked. This consent authorized the EAP to release prepopulated information to Frances Beckman, including: "Other - Summary of Risk Assessment/Fitness for Duty Evaluation", "dates of service" and "treatment Summary". Hobson told Admassu it also required a witness signature and while she knew he could not answer her questions, she did not want him to think she was not responding while she waited to hear from EAP representative John Trombello (Trombello).

578. Trombello told her Admassu was supposed to have explained the releases to her before she signed, along with a witness. Hobson said it was fine and she wanted to get it over. Admassu responded after speaking with Trombello and reminded Hobson to direct all emails and communications to Beckman only. She signed and the new authorization was returned.

143

579. After a couple of weeks, Hobson had not been contacted by anyone from HR or the EAP to schedule the FFD evaluation. On November 28, 2022, she contacted Trombello. He stated he had never gotten any paperwork from the DOJ and had never heard of her. Hobson emailed Beckman, who did not reply.

580. On December 29, 2022, Hobson called Trombello again, who advised he had just received first contact from Beckman and had warned her the 30-day period of approved investigative leave was almost up. Beckman promised to send them that day, but they were never received.

581. On December 30, 2022, Hobson emailed Admassu, Bierline, and Beckman, and stated she had reached out to Trombello again and he still had not received any paperwork from Beckman or anyone at HR. Hobson wrote that she had been unable to make holiday plans due to being required to remain local and available, and she would like to know if she could schedule her volunteer shifts in December at the Cumberland County Salvation Army.

582. At the end of the 30-day period of paid leave given for the FFD evaluation Hobson reached out to Trombello again. He stated he had never gotten any paperwork from the DOJ. Trombello said at the end of the 30 days HR either had to request an extension or return Hobson to work.

583. Hobson and Trombello both reached out several times to HR in efforts to get Beckman to return the paperwork needed by the (EAP).

584. On the very last day of the Investigatory Leave, December 1, 2022, Beckman emailed Hobson at noon to say that the forms had been provided to Trombello.

144

585. Beckman stated that the NDOJ HR had requested an extension of the investigatory leave period to allow time to conduct the FFD and that "You will receive a formal notice of the extension via email upon approval."

586. Hobson later learned that this was a lie on two fronts. The paperwork to Trombello was not complete. HR waited over another full week and finally submitted a request to extend the period of ILWP on December 8, 2022. On that date, Bierline emailed Nancy Astrike at the State Office of Human Resources a request for extension with an explanation why it was needed.

587. It took over a month for Hobson to learn what the reason for the extension request said. State employee personnel policy states that the employee has to be sent the extension approval in writing once approved. The extension was approved the following day on December 9, 2022, but Hobson had to request the written approval multiple times over December and January. It was then she learned that Bierline, in her request for an extension, claimed Hobson "retained legal counsel who requested a delay of the FFD process" and Bierline was requesting a 30 day extension to the current investigatory leave "due to the length of time it took to move this process forward with the EAP."

588. The request also stated Hobson had been referred to the EAP for a FFD evaluation Hobson undergo an evaluation "based on serious threats of self harm/suicide."

589. Nancy Astrike approved the extension request citing "The agency started the FFD evaluation through the Employee Assistance Program but it has been

145

delayed as Ms. Hobbs (sp) retained legal counsel....this request is within bounds of the Administrative Code for extension of investigatory leave as information that is required for resolution of the matter is unavailable." The additional thirty days granted would expire on January 1, 2023, and "There can be no further extension after this date. Please advise the employee in writing of the extension, the length of the extension, and the reasons for the extension. Also, upon conclusion of the investigation, please advise OSHR of the outcomes of the investigation."

590. On December 6, 2022, two days before Bierline even sent the request for the extension, Beckman emailed Hobson and stated she needed to contact Trombello, Employee Assistance Program, to go over the details of her upcoming FFD evaluation scheduled for 14 December 2022.

591. Beckman was well aware that Hobson and Trombello had been in constant communication, even copying one another on emails with HR, and that while Trombello had told her there was availability on the 14th for the FFD it could not be confirmed until the extension of the ILWP was granted. The FFD had actually been previously scheduled for December 7, 2022, but Trombello had to cancel it since Beckman never finished sending in all the required forms.

592. Once the extension was approved Trombello contacted Hobson to confirm the FFD. She asked for the first available appointment and was scheduled with Dr. Laura Stewart of CPE on December 14, 2022.

593. Upon arriving at the evaluation, Hobson was given a number of additional

forms to sign from CPE. There was an authorization to release the FFD report to John Trombello and a consent form for her participation that warned here there was no doctor-patient privilege. The consent included information about what the FFD typically entailed, which was interviews and examinations, tests, questionnaires, review of additional information provided from sources including medical and employment, information from third parties, interviews with other parties, and "other background/historical materials."

594. There was a section for "Risks and Benefits." It listed that known risks to being evaluated included "emotional and sometimes physical discomfort."

595. Hobson was given additional Authorizations for Use and Disclosure of Protected Healthcare/Other Private Information. Hobson was told to list all her current providers. The authorization requested each provider release "All records, 2018 to present", and the purpose of the release and disclosure was marked "For legal." Hobson did one for her regular doctor, Dr. Stephenie Brinson at Avance Care, her therapist, Sharon McGee, and her psychiatrist, Dr. John Millet, also with Avance Care but at a different location.

596. Hobson met with Dr. Laura Stewart. Dr. John Warren joined briefly by remote to introduce himself and state he appreciated receiving clients from the Department of Justice. Stewart began the evaluation. Hobson felt it was nothing like what she had read about in preparation, and had little to do about her job responsibilities at all.

597. Hobson was asked questions about possible domestic violence and sexual

147

abuse, family dynamics and her estranged brother, the death of both her father and her son, eating disorders, and much more. Stewart took a lunch break and Hobson contacted her therapist to ask if that was routine for a FFD, which McGee said she did not believe the questions were consistent with her understanding of a fitness for duty evaluation.

598. The authorizations that Hobson signed were sent out to her providers the following day, December 15, 2022. On the same day without having received any records back Dr. Stewart documented her findings from the FFD. She stated Hobson was "Fit to return to duty with specific recommendations." The specific recommendations were "Continue with mental health counseling and medications." Dr. Stewart stated Hobson was able to return to duty the following day, December 16, 2022.

599. Hobson was informed by Trombello the afternoon of December 15th that Dr. Stewart had cleared her return to work on December 16th, but that she would have to wait for HR to contact her and tell her what date to return. He also sent the FFD report to Beckman on December 16, 2022, at 9:42 am. Trombello's email to Beckman stated, "With a new release, I can case manage, and keep you updated on her participation and compliance with treatment."

600. Beckman called Trombello for further understanding of what she needed to do to return to work. He explained the process after the FFD determination. Trombello documented that he explained the process to Beckman and after HR met and discussed the findings of the FFD they could notify Hobson to contact

148

Trombello, who would have a signed release of his that would monitor her compliance.

601. On January 4, 2023, Beckman emailed Hobson and attached a notification of determination following the FFD evaluation. The notification was dated December 30, 2022, and was notated in the corner "Via email / Via certified mail." Hobson had not received a certified letter. Beckman stated that the notification explained the next steps in the FFD process.

602. The notification stated that Hobson had a FFD evaluation on December 14, 2022, and that the evaluation summary stated Hobson was:

- Fit to Return to Duty with specific recommendations (see below)

- The provider has determined that the employee does not pose a hazard or risk to self or others, or to the employer's property and is fit for duty.

- However, the evaluative findings recommend that the employee should undergo treatment as a condition of continued employment.

603. The notification also contained a quote from the Employee Assistance Program Policy in the State Human Resources Manual stating the following:

> If treatment has been recommended following the fitness for duty evaluation, the EAP will provide the following services:
>
> - the employee to a treatment provider
> - monitor the employee's compliance with treatment recommendations
> - Maintain ongoing communication with the agency until closure of services

604. The notification continued:

> If, at any time, the employee refuses to sign the necessary consent for release

149

of information or later revokes the consent for release of information or does not comply with treatment recommendations, the agency may rely solely on the disciplinary process to resolve the job performance or personal conduct, or behavioral issue that originally prompted the referral.

605. Finally, the notification stated:

As a condition of your return to work, you will need to comply with the evaluator's recommendations and the above-referenced provisions of the Employee Assistance Program Policy. ...John Trombello will handle your referral to a provider, monitor your compliance with treatment recommendations, and maintain ongoing communication with the NCDOJ until closure of services. Mr. Trombello will not be privy to your detailed medical information, and neither will NCDOJ.

You will need to sign a new release that will allow John Trombello to monitor your compliance.

606. The notification closed, "You may return to work upon your agreement to comply with the evaluator's recommendation for treatment and your return of the completed Medical Release form. Feel free to share this information with your attorney." Hobson did not have an attorney retained.

607. Beckman's accompanying email stated that her response was required by the end of business that Friday, January 6, 2022, but out of consideration for the short holiday week Hobson could request an extension of the deadline by reaching out to Beckman before it expired.

608. Despite having reached out to Trombello on December 16th for instructions on what to do, Beckman sent a release she had prepared and did not tell Hobson she needed to contact Trombello as the next step. There was no discussion of a potential date to return to work.

609. On January 5, 2023, Hobson contacted Trombello and expressed she felt uncomfortable with Beckman's release. Trombello asked her to send the one Beckman had prepared so he could look at it, along with the names of her therapist, psychiatrist, and primary care provider.

610. Trombello told Hobson he understood her hesitation and would do new authorization forms himself. He documented that he let Beckman know he had been in conversation with Hobson and she was cooperating fully. Trombello said they would need an extension of more time and that Hobson would be contacting Beckman and sending them a request.

611. On January 5, 2023, Hobson asked Beckman to forward her recorded time information. The next day Beckman sent Hobson a time sheet showing only Hobson's current accrued time balances for each category – vacation, sick, holiday comp, holiday leave, community service, Special Bonus FY 19-20, and Personal Observance.

612. Hobson responded that same day, January 6, 2023, "Please forward me my time statements from November and December as well. Thank you." Beckman ignored the request but Rodriquez responded, "As requested, please see attached." Rodriguez also attached the leave balances.

613. On January 6, 2023, also Hobson emailed Beckman, copying Bierline and Admassu, and requested the approval letter for the extension of investigatory leave that Beckman had told her in December would be arriving by certified mail.

614. Beckman replied all, "Your request has been forwarded and will be responded to when the document is available."

615. As Hobson had not been returned to work by the DOJ and she could not get the letter authorizing the investigatory leave extension, she suspected they were using her leave balances to account for the hours she was away from the office instead of charging it to investigatory leave since Hobson was out of work involuntarily. Hobson could not access her time records and had been, repeatedly, instructed not to contact any employee of the DOJ, so she hesitated to contact payroll.

616. Hobson called Nancy Astrike in the State office for assistance getting the documentation, who told her she would need to call her back. After about ten minutes Astrike called Hobson and said she did not have any information and that Hobson would need to reach out to Bierline. She received Bierline's voicemail.

617. On January 6, 2023, Hobson also emailed Beckman, Bierline and Admassu and stated she would accept Beckman's offer of an extension for returning the release and was working with Mr. Trombello on reviewing the releases related to her return to work. She asked for five days to comply.

618. On Monday, January 9, 2023, Beckman responded that the agency had agreed to grant the request and to refer to a letter she had attached. Hobson's new deadline for responding to the FFD determination was due by January 13, 2023.

619. The attached letter had been dated January 6, 2023, and also indicated it had been sent by certified mail, as well as Hobson personal email. She had received neither. The mailing address on the letter for Hobson was also incorrect. Her street number was 6544, and Beckman had written 544.

620. The letter stated it was to inform her of the expiration of the ILWP she had been placed on November 2, 2022. It reminded her ILWP was not disciplinary and therefore could not be appealed by filing a grievance. Beckman's letter stated the ILWP period began November 2, 2022, and was for thirty days, but had been extended with the approval of the State Human Resources Director for 60 days.

621. In the letter Beckman wrote,

> The period of extension ends on January 6, 2023. On January 4, 2023, you were notified that as a condition of your return to work, you will need to comply with the evaluator's recommendations.
> *-The evaluative findings recommend that the employee should undergo treatment as a condition of continued employment* You were informed that as a condition of employment, you are required to comply with the evaluator's recommendations which includes signing a new Medical Release form. To comply with the recommendations, you are to return the **signed** medical release form to this office by close of business January 6th, 2023. You may return to work upon your agreement to comply with the evaluator's recommendation for treatment and your return of the completed Medical Release form. As stated, the period of investigatory leave with pay has ended. The period of IP will not be extended past January 6, 2023. You will be returned to active work status in the pay system effective January 6, 2023, but **cannot** resume your normal duties and responsibilities until your decision regarding the compliance requirements of the Fitness for Duty Evaluation.

622. Hobson reached out to Trombello who emailed Beckman that same morning,

January 9, 2023, at 11:52 am, "S.H. has completed releases allowing me to monitor her treatment. She is complying fully with the EAP."

623. Trombello contacted Hobson's three providers by email and confirmed she was in compliance. He also provided Hobson a blank release form at her request so that her therapist could get a copy of the full report written by Dr. Laura Stewart, who performed the FFD evaluation.

624. Beckman then emailed Trombello that afternoon at 4:21 pm and informed him, "The Agency requires a copy of the completed form as well as a notification from the employee on what date she intends to return to work." Almost simultaneously she sent Trombello an additional email that stated Hobson had until the 16th at close of business to return the appropriate forms.

625. At 5:31 pm Beckman emailed Hobson and told her to ensure she faxed in her medical release forms and that she would not be returned to work until she did. She now declared, "Email confirmation from the MYGROUP without the required docuentaion does not allow the Agency to return you to work. You will continue in a leave status until the documents are received."

626. The next morning Hobson sent Trombello an anxious email asking why she had to sign a release giving them the information when the EAP was responsible for validating her participation, and also expressing concern that Beckman's emails were being copied to her personnel file. She stated, "I thought anything to do with the investigatory leave and FFD was to be housed separately?"

154

627. The next morning, January 10, 2023, Trombello called Beckman and left a voicemail. He documented that he had asked Beckman to please call him and would like to "make sure we are all on the same page regarding the release forms."

628. Trombello spoke to Beckman and then communicated to Hobson that HR was not satisfied and wanted Hobson to sign a release form to send directly to Beckman. He sent Hobson a new release.

629. Hobson was shocked by the new release. It authorized the EAP to release to Frances Beckman service dates and other information needed for "compliance with mental health counseling and medications." Boxes were checked indicating the purpose of the disclosure was Supervisor Referral and "as a condition of continued employment following FFD."

630. On the same day, January 10, 2023, Hobson responded to Trombello and told him her concerns about the release. At 3:29 pm he emailed her, "I can go with that. Here is a blank release for you to complete."

631. The next day, January 11, 2023, Sharon McGee received the full report by Dr. Stewart and reviewed it with Hobson. Trombello had also given permission for Hobson to have a copy as long as she signed a release with McGee.

632. Hobson learned none of records that Stewart had requested from her providers had been involved in her full report. They had not even had enough time to respond before the report was finalized and submitted to the EAP.

633. Hobson contacted Stewart and asked what records had been returned and if

155

she could have a copy of her file. After getting on the phone initially Stewart then declined to discuss it further and stated all records belonged to the employer. Trombello also confirmed he never received those records from Stewart or her practice, CPE.

634. From the 9th until the 14th of January, 2023, Beckman sent multiple emails and messages to Trombello and Hobson insisting time was running out and the DOJ needed signed authorizations from Hobson's medical providers releasing her records.

635. In turn, Hobson reiterated her earlier requests for records showing her leave balances. Each time Beckman replied that he had already provided them or sent the leave balance sheet she had run on January 5, 2023. Hobson also requested, again, the approval letter for the extension of the investigatory leave.

636. On January 11, 2023, Beckman sent Hobson an email with another "official letter" attached hat stated it was the Agency's response to Hobson's request for her time statement - and also attached the same leave balance sheet clearly marked at the top that it was run on January 5, 2023, that she had sent twice before. Bateman wrote, "Included with this notification is a copy of your Time statement, run date 11 January 2023, which shows the remaining leave quotas."

637. Beckman's accompanying email stated she would be sending a "separate notification regarding your request for the Extension Approval for IP (sp)

156

leave."

638. Beckman sent another separate, unsolicited email to Hobson at 4:42 pm informing her that she did not have access to certain documents, such as employees time and attendance. She also did not have access to Bierline's communications and stated, "I have requested a copy of the written approval of extension of the period of investigatory leave. The requested documentation will be provided to you when I receive it...."

639. Hobson did not receive an email from Beckman with the separate notification, but she did receive a certified letter, correctly addresses, dated the same date Beckman stated she was sending it, January 11, 2023. The letter was postmarked the 18th and delivered to Hobson on the 23rd. It notified Hobson that her Investigatory Leave had ended on January 2, 2023, and she had been returned to active work status in the pay system effective January 3, 2023. In the corner the letter contained the typed Certified Mail tracking number and stated it was also sent via email – to a gmail.com address similar to the aol.com address Hobson used to communicate, but which was not Hobson's email address.

640. On Friday, January 14, 2023, a resigned Hobson sent HR the releases for Beckman to receive her medical record information from all three of her providers. She used the blank form Trombello had provided her and authorized only the EAP could release to Beckman "Other - May only disclose periodic writen confirmation of my compliance with the specific recommendations

157

contained in the FFD evaluation dated 12/15/23." Beneath her signature she put, "Under protest."

641. On January 17, 2023, Beckman emailed Hobson and told her that in order "[t]o be supportive of your medical needs the Human Resource Office, in conjunction with your medical team, has implemented a temporary change to your daily work plan schedule." Beckman stated Hobson was now going to telework all five days a week.

642. In shock, Hobson responded, "I do not think I understand. What medical needs?" She stated she was just found perfectly fit in December, as well as being found fit by her doctors to return to work in October, and during her meetings that month with Zellinger no one, including Hobson, had stated that Hobson needed a medical accommodation. Hobson asked Beckman to tell her what medical need she was addressing that she thought would be helped by Hobson staying at home - especially when Beckman was not supposed to know anyone's medical condition.

643. Beckman replied that the change had been made to give Hobson time to "consider if an application for Reasonable Accommodation under the American (sp) with Disbilities Act" applied to her. It would also give the Agency time to restablish her email access and for her team to plan for her transition back to work  as well as for Hobson to communicate with her team. Beckman stated the plan would not affect Hobson's accrued leave. In the same email Beckman now stated she could not access leave balances and that an "appropriate HR

158

team mamber" had sent her the time information Hobson had requested.

644. Hobson requested the applicable policies and asked how she was supposed to work without her computer or access to any programs. She requested a copy of her personnel file and was ignored.

645. By Friday, January 20, 2023, the teleworking idea was abandoned by HR as quickly as it had appeared. Now Hobson was instructed to communicate with Zellinger regarding her return date. On that date Bierline finally told Hobson she would be sending her the copy of the approval for the extension of investigatory leave.

646. On January 23, 2023, Beckman began to include Dismukes in the multiple email streams she was sending, which included Admassu, Bierline, Zellinger, Elder, in different combinations.

647. During one period Hobson was able to log in she saw multiple emails from IT confirming completion of work orders to either cut off or reinstate her account. Her email was briefly reinstated, then deactivated, reinstated, then deactivated.

648. One completed work order included an email chain between IT and Admassu, with Admassu instructing IT that before Hobson returned to work he wanted her emails, J-Drive, and other user programs downloaded/copied and sent to Zellinger. Boone-Pittman attempted to call Hobson via a Teams message and within moments Hobson received a message that her audio was deactivated.

649. Ultimately Hobson was told she would have to have a meeting, alone, with

159

Zellinger and Elder, before she could resume her position. She asked if Admassu or another attorney in the AGs office could be present and was unsurprisingly told no.

650. Hobson could not ascertain how many leave hours she still had and never received her time statements. She refused to meet alone with Elder and Zellinger because of the psychological torture and false accusations to which she had been subjected at previous meetings with no witnesses, Hobson determined that rather than meet with them as a condition of continued employment, she would resign effective February 10, 2023.

651. On February 2, 2023, Hobson spoke with Trombello about receiving any documentation from her file with the Employee Assistance Program. Trombello stated he could provide her with the communications log of her file.

652. The communications log provided Hobson the history of how Beckman had neglected the submission of her FFD referral, her early knowledge that Hobson had been returned to work following the FFD, and her repeated attempts to have Hobson authorize her medical records to released on an ongoing basis to Beckman.

653. Hobson learned that on January 27, 2023, Nancy Astrike, James Harris (from the office of the Governor), Kristen Bierline, Frances Beckman, and Elias Admassu had all scheduled a conference call with Trombello in an attempt to solicit information regarding Hobson's FFD evaluation. Trombello told them they could attempt to reach Dr. John Warren and Dr. Laura Stewart with

questions, but Trombello would only share that Hobson was compliant with the FFD recommendations.

654. On the evening of February 8, 2023, Hobson received a call from Dismukes. Hobson was with friends at their home near Parkton because she had been dog-sitting while her friend's husband was in the hospital in Charlotte. He had just been released earlier that day. Hobson gestured to her friend to walk outside with her and bring her phone so she could record Dismukes.

655. She put Dismukes on speaker. Dismukes and Hobson spoke for some time and Dismukes stated she was calling because Hobson had emailed her work emails to her personal email, and Dismukes was worried there was victim information in there.

656. Hobson stated that she had only been downloading emails that contained documentation she needed with regard to the two EEOC complaints she had taken out against the DOJ. She and Dismukes discussed things that had happened and Hobson said she knew HR had been siphoning off her personal leave time to cover how they mangled the handling of the ILWP. Hobson also expressed that she knew all this happened because Zellinger was racist and selectively prosecuting cases.

657. Hobson cried briefly and told Dismukes, "You know I respected you. I revered you." She brought up some personal things Dismukes and she had shared and said she knew Dismukes had watched it happen to her.

658. Dismukes seemed remorseful and told Hobson there were things she could still

161

do for Hobson to make it right. She stated she would get Hobson's performance evaluation opened back up and that it was possible for things to be changed.

659. Then Dismukes stated that she was concerned that Hobson would get in trouble for having sent State emails to herself. She stated, "I don't want you to get in trouble." Dismukes said that she was going to have to ask the SBI to open an investigation into Hobson, but that she could keep anything from happening to Hobson.

660. Dismukes told Hobson she wanted Hobson to meet Dismukes and "someone from IT" to look at Hobson's cell phone. She stated that all they needed to do was look at Hobson's email and confirm that the emails had only gone to Hobson's account and she had not shared or disseminated them to anyone. At first Hobson was genuinely shaken up.

661. Dismukes, as the Criminal Bureau Chief, could authorize arrests. Hobson insisted that IT could see what she had downloaded on their end. Dismukes said they had and knew there was one email that contained information in a sex offense case.

662. Hobson stated her name and said she could get her on the phone now and Dismukes could tell the young woman Hobson had her personal information and that Hobson was confident the young woman would state she trusted Hobson explicitly. Dismukes's tone changed and she said, "Don't do that. Don't call her."

663. Dismukes then imposed a deadline of Friday by 5 pm for Hobson to meet her

162

and let her go through her phone. Dismukes stated at one point Hobson was going to be meeting her and an agent instead of someone from IT. Hobson stated that she knew she was no tech genius but after all the phone dumps she had seen she was pretty sure that looking through a person's phone wasn't proof of much. Dismukes stated it was just so that she would not have to open the SBI investigation into Hobson, not that she ever thought Hobson had done anything intentionally wrong or unethical.

664. Hobson then asked why they didn't just go into her email through her laptop as it was surely signed in. She stated the phone things didn't make any sense. Dismukes then said "Come on Steph. Don't make me do this to you." Hobson stated "Uh-oh. No. You want come and get it." Dismukes snorted and said, "I'm not driving all the way to Hoke County. I'll meet you halfway."

665. Hobson's friend froze and gestured for Hobson to take the phone off speaker. She told Hobson she had not heard Hobson say she was in Hoke County.

666. Hobson began to end the call and told Dismukes she would think about it but nothing was going to happen tonight. Dismukes told her she needed an answer by the next day and Hobson said yeah, sure. Dismukes told her it was serious and to please let her know before noon the next day. She repeated, "Please don't make me do this Steph."

667. After the call Hobson's friend asked if Hobson had talked to Byrd or put anything on Facebook. Hobson said no, nobody knows I'm here. It was especially telling that Dismukes had said Hoke County, as Hobson resided in

163

Johnston County and was from Cumberland, where her mother still resides in Fayetteville.

668. Hobson contacted her attorney and gave her the sign-in to her personal email. Her attorney then removed all the DOJ emails she could locate off in Hobson's email account and emailed Dismukes and Admassu to indicate that all of the emails the referenced NCDOJ had been removed from Hobson's email and would be held in confidence in a secure location by the attorney, to address the stated concern that Hobson had confidential information on her phone. The attorney also indicated that they had done enough to Hobson and it was time to leave Hobson alone.

669. Hobson confirmed with the State Controller later that year that HR had been using Hobson's personal time to account for at least three weeks when she was on ILWP and remains unsure to this day about whether she was properly paid for all of her accrued leave at her termination.

670. Later in 2023, Hobson also learned that Frances Beckman had used the Authorization form that Magaly Rodriguez had created and required Hobson to sign on August 5, 2022, to convince a temporary front staff employee at Hobson's primary care provider's office that NCDOJ still needed records for Hobson's FMLA.

671. The records were sent and a communication log created by the provider's office on September 1, 2022 – seven weeks after Hobson had turned in her completed FMLA application. Beckman also attempted to do the same thing at Hobson's

164

psychiatrist, as both were under the same group but in different offices, but the psychiatrist's office did not comply with the request or respond.

672. Defendants knowingly created and permitted working conditions that were so intolerable that a reasonable person in Hobson's position would feel compelled to resign.

673. Hobson's resignation was not voluntary but constituted a constructive discharge caused by Defendants' retaliation.

674. The actions taken by the individual defendants against Hobson would be sufficient to deter a reasonable person from engaging in protected speech.

675. The First Amendment of the United States Constitution guarantees individuals, including State employees, the right to free speech.

676. 42 U.S.C. 1983 shields persons against discrimination by state actors based on the rights guaranteed by the United States Constitution.

677. The First and Fourteenth Amendments of the United States Constitution, via 42 U.S.C. Section 1983, prohibit State actors like the individual Defendants from terminating an employee for constitutionally-protected speech.

678. Plaintiff engaged in protected speech when she confronted Dismukes, Zellinger, and Beckman about the selection prosecution of cases in the SP section involving non-White victims and defendants and in Beckman's cases about the retaliation to which Plaintiff had been subjected after expressing her concern as a citizen about the selective prosecution of cases involving non-White victims and defendants..

165

679. Dismukes, Zellinger, and Beckman enlisted the assistance of Elder, Admassu, Bierline, and Rodriguez in further retaliating against Plaintiff for her complaints about the retaliation.

680. Plaintiff's speech was about a matter of public concern: the bias she perceived to exist in the SP section's prosecution of cases involving non-White defendants and victims.

681. The speech was not made as a part of Plaintiff's official job duties and in fact was inconsistent with her official job duties. Plaintiff's speech was made as a concerned citizen to her supervisors who were in a position to take action to ensure that cases which had been neglected began to receive the same attention as cases not involving non-White victims and defendants.

682. Because Plaintiff's speech was protected, a balance of the employee's interest in the selective prosecution of such cases greatly outweighed the government's interest in avoiding disruption to operations.

683. The defendants' actions in subjecting Plaintiff to a hostile work environment which ultimately resulted in her constructive discharge on February 10, 2023, abridged her rights to freedom of speech in violation of the First and Fourteenth Amendments of the U.S. Constitution.

684. The Defendants, acting in their individual capacity, retaliated against Plaintiff for her exercise of free speech.

685. The actions of the Defendants and their agents, representatives, and employees were intentional and in disregard of the rights and sensibilities of

166

the Plaintiff.

686. The Plaintiff's interest as a citizen in commenting on matters of public concern including the selective prosecution of cases involving racial minorities outweighs the Defendants' interest in promoting an efficient work environment.

687. Plaintiffs consistently high-achieving performance history throughout her career and while employed by the NCDOJ demonstrated her ability to effectively perform and execute her duties both prior to and after her protected speech.

## COUNT ONE
## FIRST AMENDMENT RETALIATION IN VIOLATION OF 42 U.S.C. § 1983

688. Hobson realleges and incorporates all preceding paragraphs.

689. Hobson engaged in constitutionally protected speech on matters of public concern.

690. Defendants took adverse employment actions against Hobson, including effectuating her constructive discharge.

691. Hobson's protected speech was a substantial or motivating factor in Defendants' retaliatory actions.

692. Defendants' conduct violated Hobson's rights under the First Amendment to the United States Constitution.

693. As a direct and proximate result of the Plaintiff's constructive discharge, Plaintiff has sustained injuries and damages in an amount in excess of $25,000.00 including, but not limited to: the loss of earnings, mental and

167

emotional distress, humiliation, and embarrassment.

## SECOND CAUSE OF ACTION
### FMLA RETALIATION ((29 U.S.C. § 2615(a)(2))

694. Hobson realleges and incorporates all preceding paragraphs.

695. Hobson engaged in protected activity under the FMLA.

696. Defendants took willful adverse employment actions against Hobson, including constructive discharge.

697. There is a causal connection between Hobson's FMLA activity and Defendants' adverse actions, including temporal proximity and escalating hostility.

698. Defendants' actions violated 29 U.S.C. § 2615(a)(2).

699. As a direct and proximate result of the Plaintiff's constructive discharge, Plaintiff has sustained injuries and damages in an amount in excess of $25,000.00 including, but not limited to: the loss of earnings, mental and emotional distress, humiliation, and embarrassment.

## THIRD CAUSE OF ACTION:
### PUNITIVE DAMAGES

700. The allegations contained in the preceding paragraphs are incorporated by reference and realleged as if fully set forth herein.

701. The Defendants' conduct and described in this pleading outline conduct that is outrageous and aggravated.

702. Alternatively, the conduct described in this pleading outline conduct that is malicious, willful or wanton.

168

703. The Defendants' conduct is conduct that should be punished for their egregiously wrongful acts and to deter the Defendants from committing similar wrongful acts in the future.

704. The Plaintiff is entitled to punitive damages as a result of the Defendants' conduct.

## DEMAND FOR JURY TRIAL

705. The Plaintiff demands a trial by jury for all issues so triable.

WHEREFORE, the Plaintiff respectfully for the following relief:

a. That the Plaintiff be granted a declaratory judgment declaring the Defendants' actions unlawful and in violation of the Plaintiffs First and Fourteenth Amendment rights to free speech 42 U.S.C. § 1983;

b. That the Plaintiff be granted a preliminary and permanent injunction reinstating the Plaintiff, and enjoining any further retaliation against the Plaintiff because of, or on the basis of, his constitutionally-protected political speech;

c. That the Plaintiff be granted actual damages in the amount equal to the wages, fringe benefits, and other benefits the Plaintiff lost due to the retaliatory conduct of the Defendants;

d. That the Plaintiff be granted an award of compensatory damages sufficient to compensate her for her mental anguish, embarrassment, humiliation, and damage to her personal and professional reputation as a result of the Defendants' actions;

e. That the Plaintiff be granted an award of punitive damages, as a result of the reckless indifference with which the Defendants violated Plaintiffs right to free speech;

f. That the costs of this action, including the Plaintiffs reasonable attorney's fees, be taxed against the Defendants herein;

g. That the Plaintiff have and recover all other remedies permitted by law, including remedies in equity and in law; and

h. That the Plaintiff be granted such other and further relief as this Court deems just and proper.

Respectfully submitted, this 10th day of February 2026.

/s/ VALERIE L. BATEMAN
Valerie L. Bateman
NC State Bar No. 13417
New South Law Firm
209 Lloyd Street, Ste 350
Carrboro, North Carolina 27510
valerie@newsouthlawfirm.com
Tel: 919-810-3139
Fax: 919-823-6383

S/ JAMIE L. PAULEN
Jamie L. Paulen
NC Bar No. 41509
New South Law Firm
209 Lloyd St., Ste 350
Carrboro, NC 27510
jamie@newsouthlawfirm.com
Tel:919-408-7916
Fax: 919-823-6383

*Counsel for Hobson*